# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

GENERAL PROTECHT GROUP, INC.,
f/k/a ZHEJIANG DONGZHENG
ELECTRICAL, CO.; G-TECHT
GLOBAL CORPORATION;
SECURELECTRIC CORPORATION;
WAREHOUSE-LIGHTING.COM LLC;
CENTRAL PURCHASING, LLC; and
HARBOR FREIGHT TOOLS USA, INC.,

        Plaintiffs,

vs.                                    No. CIV 10-1020 JB/LFG

LEVITON MANUFACTURING CO.,

        Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, filed November 2, 2010 (Doc. 5)("Motion"). The Court held a hearing November 16, 2010. The primary issues are: (i) whether the Plaintiffs can show a reasonable likelihood of success on the merits, which depends on whether the Confidential Settlement Agreement ("CSA") granted the Plaintiffs an implied license to Defendant Leviton Manufacturing Co.'s U.S. Patent Nos. 7,463,124 (the '124 patent) and 7,764,151 (the '151 patent), and whether the forum selection clause in the CSA requires that the parties litigate this dispute in the United States District Court for the District of New Mexico; (ii) whether the Plaintiffs will suffer irreparable harm unless the Court grants the requested injunctive relief, because they will be deprived of their bargained-for forum and suffer hardship as the result of litigating on two fronts; (iii) whether the balance of hardships favors the Plaintiffs, taking into account the harm that the Plaintiffs would suffer absent injunctive relief, and the material hardship that the Court's issuance

of injunctive relief would cause for Leviton; and (iv) whether the public interest favors granting the requested injunctive relief, taking into account the forum selection clause in the CSA and the effect of injunctive relief on the proceeding in the United States International Trade Commission ("ITC"). The Court will enter a preliminary injunction ordering Leviton to dismiss its patent-infringement claims against the Plaintiffs in the pending ITC action and in the pending action in the United States District Court for the Northern District of California.  It appears that the best construction of the CSA is that it granted the Plaintiffs an implied license to the '124 and '151 patents, and that the forum selection clause in the CSA requires that the parties litigate the dispute in the District Court for the District of New Mexico.  The Court finds that the Plaintiffs will likely suffer irreparable harm absent injunctive relief, because they will be deprived of their bargained-for forum and will suffer the inconvenience of litigating on two fronts, causing financial hardship and disruption of their businesses.  The Court finds that the balance of hardships favors the Plaintiffs, because, absent injunctive relief, the Plaintiffs will likely suffer the irreparable harms, yet injunctive relief will not likely materially harm Leviton, as the District of New Mexico can, for the most part, grant Leviton the same relief it could obtain in the ITC action.  The  Court finds that the public interest favors granting the injunction, because public policy supports enforcing the forum selection clause and because an injunction will not have a deleterious effect on the ITC's investigation.  Because the Court will grant a preliminary injunction, ordering Leviton to dismiss its patent infringement claims in the ITC action and in the action in the District Court for the Northern District of California, the Court need not grant the Plaintiffs' request that it enter a temporary restraining order ("TRO") requiring Leviton to consent to the Plaintiffs' request for a stay of the ITC action.[1]

---

[1] Rule 65 of the Federal Rules of Civil Procedure states: "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the

## FACTUAL BACKGROUND

General Protecht Group, Inc. ("GPG")[2] and Leviton manufacture and sell competing ground fault circuit interrupter ("GFCI") products.  See Leviton Mfg. Co. v. Nicor, Inc., 557 F. Supp. 2d 1231, 1235 (D.N.M. 2007); Leviton Mfg. Co. v. Nicor, Inc., No. CIV 04-0424, 2006 WL 4079129, at *1 (D.N.M. May 23, 2006); Memorandum of Law in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction at 7, filed November 2, 2010 (Doc. 6)("Memorandum").  GFCIs are safety devices that reduce the risk of electrocution.  Leviton Mfg. Co. v. Nicor, Inc., 2006 WL 4079129, at *1.  GPG markets and sells GFCI products to United States distributors, including Plaintiffs Harbor Freight Tools USA, Inc., Central Purchasing, LLC, G-Techt Global Corp., SecurElectric Corp., and Warehouse Lighting.com LLC.  See Leviton Mfg. Co. v. Zhejiang Dongzheng Elec. Co., 506 F. Supp. 2d 646, 648-49 (D.N.M. 2007); Leviton Mfg. Co. v. Nicor, Inc., 557 F. Supp. 2d at 1235; Memorandum at 7. GPG manufactures its GFCI products in China.  See Leviton Mfg. Co. v. Zhejiang Dongzheng Elec. Co., 506 F. Supp. 2d at 648-49; Memorandum at 7.

### 1.     The Prior Actions.

In 2004 and 2005, Leviton asserted claims of patent infringement of U.S. Patent Nos. 6,246,558 ("the '558 Patent") and 6,864,766 ("the '766 patent") in the District Court for the District of New Mexico.  See Memorandum at 8; Defendant Leviton Manufacturing Co.'s Memorandum of

court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).  Leviton did not request a security.  The Court will therefore not order the Plaintiffs to post a security at this time and on this record, but Leviton may request that the Plaintiffs post a security at a latter time.

[2] General Protecht Group, Inc. was formerly known as Zhejiang Dongzheng Electrical Co., but has changed its name.  See Memorandum at 9 n.3.  To avoid confusion, the Court will refer to the company as General Protecht Group, Inc. -- or GPG.

Law in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary

Injunction at 3, filed November 12, 2010 (Doc. 18)("Response").  In these actions, Leviton alleged

that GPG, Harbor Freight, Central Purchasing, and Nicor Inc. infringed Leviton's '558 patent and

'766 patent through their sale of GFCIs that GPG manufactured.  See Leviton Mfg. Co. v. Nicor,

Inc., Nos. CIV 04-0424 JB/RHS, CIV 04-1295 JB/ACT (D.N.M.); Leviton Mfg. Co. v. Zhejiang

Dongzheng Elec., Co., No. CIV 05-0301 JB/DJS (D.N.M.).  On March 5, 2007, the Court made a

Markman[3] ruling, which adopted GPG, Harbor Freight, Nicor, and Central Purchasing's construction

of the terms "movable bridge[,]" "predetermined condition[,]" and "reset portion."  Leviton Mfg.

Co. v. Zhejiang Dongzheng Elec. Co., 506 F. Supp. 2d at 648.  On July 10, 2007, the Court granted

summary judgment of non-infringement to GPG, Harbor Freight, and Nicor with respect to Claim

3 of the '558 patent.  See Leviton Mfg. Co. v. Nicor, Inc., 557 F. Supp. 2d at 1235, 1250-51.

**2.     The CSA.**

In October 2007, Leviton, GPG, Harbor Freight, Nicor, and Central Purchasing entered into

a CSA to resolve the patent infringement actions pending in the Court.  See Memorandum at 9;

Response at 3.  The CSA included a covenant not to sue.  The covenant stated:

> 2.1     Leviton . . . hereby covenants not to sue (1) Defendants, their officers,
> directors, shareholders, members, employees, subsidiaries, or affiliates for
> alleged infringement of the '558 and/or '766 patents based on the Dongzheng
> products currently accused of infringement in the '558 and/or '766 actions;
> and (2) Defendants, their officers, directors, shareholders, members,
> employees, subsidiaries, or affiliates for alleged infringement of the '558
> patent and/or the '766 patent with respect to an anticipated future new GFCI
> product that Defendant Dongzheng has indicated its intent to market in the
> U.S. in the future, . . . .
>
> 2.2     The dismissals and covenant not to sue by Leviton in Article 2.1 shall also
> apply to Defendants' customers of the Dongzheng Products including, but

---

[3] Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996).

> not limited to, Interline Brands, Inc., provided such customers do not seek to invalidate any claim of the '558 or '766 patents or seek to have those patents declared invalid or unenforceable through any presently existing or future court action or administrative filing.

CSA §§ 2.1, 2.2, at 4-5, filed November 2, 2010 (Doc. 8-1).

The CSA also contained a section regarding the District of New Mexico's '766 <u>Markman</u> order.

> The parties will jointly request that the Court vacate its '766 Order in . . . the Court's Memorandum Opinion and Order dated March 5, 2007, by submitting a joint motion and proposed form of Order to the Court . . . .  However, Leviton agrees not to challenge any proposed claim construction of a '766 patent claim that is reflected in the '766 Markman Order, which any of the Defendants, their officers, directors, shareholders, members, employees, subsidiaries, affiliates (or their customers) may propose in connection with any claim of infringement of a '766 patent claim. Defendants and their officers, directors, shareholders, members, employees, subsidiaries, affiliates (or their customers) are not precluded from proposing said claim construction in any action or proceeding asserting infringement of any patent related to the '766 patent, although Leviton may challenge such proposed claim construction.  Leviton and defendants agree that neither the fact of the Court's decision to vacate or not vacate its '766 Markman Order, nor the fact that the parties requested that the Court vacate its '766 Markman Order, can be used by a party to this Agreement to support or challenge a proposed construction of a claim related to the '766 patent.

CSA § 4.1.

The CSA also contained a section entitled "Governing Law/Venue."  CSA § 11.2, at 11. This section states:  "Any dispute between the Parties relating to or arising out of this [CSA] shall be prosecuted exclusively in the United States District Court for the District of New Mexico.  The Parties consent to the venue and jurisdiction of such court for this purpose."  CSA § 11.2, at 11.

## 3.    <u>Leviton's '124 and '151 Patents.</u>

After the CSA, Leviton secured two new patents -- U.S. Patent Nos. 7,463, 124 ("the '124 patent") and 7,764,151 ("the '151 patent").  On December 9, 2008, the '124 patent issued from application no. 10/977,929 ("the '929 application"), which was filed on October 28, 2004.  <u>See</u>

Response at 6; Memorandum at 10.  The '151 patent issued on July 27, 2010 from application no. 12/176,735 ("the '735 application"), which was filed on July 21, 2008.  <u>See</u> Response at 7; Memorandum at 10.  The '929 application was filed as a continuation[4] of the '766 patent. <u>See</u> Response at 6.  The '735 application was filed as a continuation of the '929 application.  <u>See</u> Response at 7.

### 4.    <u>Actions Asserting Infringement of Leviton's '124 and '151 Patents</u>.

In September 2010, Leviton filed patent infringement complaints with the ITC and in the District Court for the Northern District of California, alleging that GPG, Techt, SecureElectric, Warehouse Lighting.com, Central Purchasing, Harbor Freight, and other entities, infringed Leviton's '124 and '151 patents.  <u>See</u> Response at 7; Memorandum at 14.[5]  In its ITC Complaint, Leviton

---

[4] A continuation is:

a second application for the same invention claimed in a prior nonprovisional application and filed before the original prior application becomes abandoned.  A continuation application may be filed under 37 C.F.R. § 1.53(b) or under 37 C.F.R. § 1.53(d) as a CPA, Continued Prosecution Application.  A continuation carries forward the disclosure from a previous application but adds nothing new, merely providing a second opportunity to have the same disclosure reviewed for patentability.  Thus, to enjoy the status of a continuation, the later application must have a disclosure common with the previous application, be copending with it, and clearly refer back to it.  Except as provided in 37 C.F.R. § 1.45, the applicant in the continuation must be the same as in the prior application. The disclosure presented in the continuation must be the same as that of the original application, that is, the continuation should not include anything which would constitute new matter if inserted in the original application.  At any time during the prosecution of the earlier nonprovisional application, the applicant may file a continuation in order to introduce a new set of claims and to establish a right to further examination by the Patent and Trademark Office.

J. Mills, D. Reiley & R. Highley, 3 <u>Patent Law Fundamentals</u> § 15:8 (2d ed. 2004).

[5] Both the ITC proceeding and the proceeding in the Northern District of California contain allegations regarding another patent, U.S. Patent No. 7,737,809, which have not been asserted against the Plaintiffs in this action.  <u>See</u> Response at 8 n.4.

asserts that six of GPG's GFCI products infringe the '124 and '151 patents.  See Declaration of

Huaiyin Song ¶¶ 8-11, at 4-5 (dated October 29, 2010), filed November 2, 2010 (Doc. 8); Amended

Complaint Under Section 337 of the Tariff Act of 1930, as Amended at i-ii, 1-9, 26-46, filed

November 3, 2010 (Doc. 10-1).  Leviton's Complaint in the District Court for the Northern District

of California alleges identical claims of patent infringement as Leviton's ITC Complaint.  See Song

Decl. ¶ 7, at 4; Leviton Manufacturing Co.'s First Amended Complaint for Patent Infringement and

Trade Secret Misappropriation, filed November 3, 2010 (Doc. 10-2).  The Plaintiffs assert that the

CSA licensed the six GFCI products that Leviton asserts infringe the '124 and '151 patents.  See

Song Decl. ¶¶ 8-11, at 4-5.  Song states that, of the GPG GFCI products that Leviton currently

accuses the Plaintiffs of infringing, one products is a product that Leviton accused of infringement

in the previous litigation in the District of New Mexico, and the other five products are the

"anticipated future new" product identified in § 2.1 of the CSA.  Song Decl. ¶¶ 8-11, at 4-5.  Leviton

asserts that the ITC Investigation, is not limited to the six identified GPG products, because Leviton

has a right, through discovery in the ITC Investigation to assert that additional products infringe its

patents.  See Response at 8.

## PROCEDURAL BACKGROUND

The Plaintiffs move the Court for a TRO and a preliminary injunction to enjoin Leviton from

taking any further action to prosecute or litigate any claims of patent infringement in the ITC or in

the District Court for the Northern District of California.  See Motion at 1.  The Plaintiffs request

a TRO compelling Leviton to consent to their motion to stay the ITC action and, if Leviton's

objection to their motion to stay has already been lodged, to withdraw such objection.  See Motion

at 2.  The Plaintiffs request the Court to preliminarily enjoin Leviton to take all actions necessary

to secure dismissal of all claims of patent infringement asserted in the ITC action and in the action

in the District Court for the Northern District of California.  <u>See</u> Motion at 2.  The Plaintiffs

provided notice to Leviton under rule 65.  <u>See</u> Certificate of Notion to Leviton Under Rule 65, filed

November 2, 2010 (Doc. 9).

The Plaintiffs have set forth the grounds for their motion in a Memorandum, and in the

Declarations of Huaiyin Song and Joshua D. Curry, which the Plaintiffs filed concurrently with their

motion.  In their Memorandum, the Plaintiffs assert that they can make the showing necessary for

a TRO and for a preliminary injunction.  <u>See</u> Memorandum at 17.  The Plaintiffs contend that they

have made a strong showing that they are likely to prevail on the merits of their claims, because the

CSA granted them an implied license to Leviton's '124 and '151 patents, and because the forum

selection clause in the CSA requires that the parties litigate the dispute in the District of New

Mexico.  <u>See</u> Memorandum at 18, 21.  The Plaintiffs allege that they will suffer irreparable harm

unless the Court grants the requested injunctive relief, because they will experience the deprivation

of their bargained-for forum and the hardship of litigating on two fronts.  <u>See</u> Memorandum at 26.

The Plaintiffs allege that the balance of hardships strongly favors them, because while they will

suffer irreparable harm absent injunctive relief, the requested injunctive relief will not prejudice

Leviton, as the Court can grant Leviton essentially the same relief it could obtain in the ITC.  <u>See</u>

Memorandum at 27.  The Plaintiffs also allege that public policy favors enforcing the forum

selection clause.  <u>See</u> Memorandum at 28.

Leviton filed a Response, contending that the Plaintiffs could not carry their heavy burden

of demonstrating that a TRO or a preliminary injunction is appropriate.  <u>See</u> Response at 1.  Leviton

contends that the Plaintiffs cannot demonstrate a likelihood of success on the merits, because they

do not have an implied license to the '124 and '151 patents, and because the forum selection clause

does not preclude the ITC investigation, as Leviton's claims in the ITC action do not relate to or

arise out of the CSA.  <u>See</u> Response at 11, 23.  Leviton also contends that, even if the Plaintiffs have

an implied license to some claims of the '124 and '151 patents, the implied license extends only to

the claims that dominate the claims of the '558 and '766 patents.  <u>See</u> Response at 21.  Leviton

asserts that the Plaintiffs do not face irreparable harm, as shown by their delay in seeking a TRO and

a preliminary injunction.  <u>See</u> Response at 25.  Leviton also contends that litigating on two fronts

cannot irreparably harm the Plaintiffs, because, even if the Court finds an implied license, that

license cannot extend to the narrower claims of the '124 and '151 patents; therefore, litigation at the

ITC should continue as to those narrower claims.  <u>See</u> Response at 25.  Leviton contends that the

balance of hardships weighs in its favor, because the ITC affords Leviton a forum for quickly

addressing its claims and obtaining the relief it seeks.  <u>See</u> Response at 25.  Leviton alleges that the

Plaintiffs' only hardship is litigating at the ITC.  <u>See id.</u> at 26.  Leviton contends that the Plaintiffs'

assertion that public policy favors supporting the forum section clause is inapplicable, because the

forum selection clause does not govern this dispute.  <u>See</u> Response at 26.  Leviton also contends it

is not in the public interest to hinder the ITC's investigation.  <u>See id.</u> at 26-27.

At the hearing, Larry L. Shatzer, Leviton's counsel, stated that the decision whether an

implied license exists is made on a case-by-case basis, and that there is no per se rule that, if a

company covenanted not to sue on patents A and B, it could not later sue on the same products on

patents  C  and  D.    <u>See</u>  Transcript  of  Hearing  at  18:12-18  (taken  November  16,

2010)(Shatzer)("Tr.").[6]  Mr. Shatzer agreed that Leviton's covenant not to sue on the '558 and '766

patents for the two defined product categories was a license.  <u>See</u> Tr. at 22:2-10 (Court, Shatzer).

Mr. Shatzer contended, however, that the CSA gave the Plaintiffs no more than a covenant not to

_____

[6] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

-9-

sue on the '558 and '766 patents for the two defined classes of products.  <u>See</u> Tr. at 20:22-25 (Shatzer).

After the hearing, the Plaintiffs replied to Leviton's Response.  <u>See</u> Plaintiffs' Reply Memorandum of Law in Support of Their Motion for TRO and Preliminary Injunction, filed November 24, 2010 (Doc. 36).  In their Reply, the Plaintiffs contend that an implied license could arise from a covenant not to sue without supplemental licensing language.  <u>See</u> Reply at 2.  The Plaintiffs also argue that their implied license rights are not limited to the dominating claims in the '124 and '151 patents, because the doctrine of legal estoppel bars Leviton from asserting any patent claim that would prevent them from practicing their rights to the products licensed in the CSA.  <u>See</u> Reply at 5-6.  The Plaintiffs also contend that the parties did not contemplate future infringement suits against the products that the CSA licensed.  <u>See</u> Reply at 6.

## <u>LEGAL STANDARD FOR THE ISSUANCE OF A TRO AND A PRELIMINARY INJUNCTION</u>

The grant or denial of injunctive relief is generally a procedural issue not unique to the exclusive jurisdiction of the United States Court of Appeals for the Federal Circuit; therefore, Federal Circuit law generally does not apply.  <u>See</u> <u>Texas Instruments Inc. v. Tessera, Inc.</u>, 231 F.3d 1325, 1328 (Fed. Cir. 2000).  Federal Circuit law governs whether to grant or deny injunctive relief, however, when procedural matters involve substantive issues in areas of law within the Federal Circuit's unique jurisdiction.  <u>See</u>  <u>Texas Instruments Inc. v. Tessera, Inc.</u>, 231 F.3d at 1328.  In <u>Texas Instruments Inc. v. Tessera, Inc.</u>, the plaintiff requested that the district court enjoin the defendant from continued participation in an ITC proceeding.  <u>See</u>  <u>Texas Instruments Inc. v. Tessera, Inc.</u>, 231 F.3d at 1328.  The district court denied the plaintiff's request for a preliminary injunction, and the plaintiff appealed.  <u>See</u> <u>Texas Instruments Inc. v. Tessera, Inc.</u>, 231 F.3d at 1238.

Because the Federal Circuit has exclusive appellate jurisdiction over ITC determinations, it found that the appeal related to a procedural matter arising from substantive issues in an area of law within the unique jurisdiction of the Federal Circuit and therefore applied its procedural law.  See Texas Instruments Inc. v. Tessera, Inc., 231 F.3d at 1328. The Federal Circuit also found, however, that the district court's order denying the plaintiff's motion for a preliminary injunction presented an issue concerning interpretation of a license agreement and stated that "[g]eneral contract interpretation is not within the exclusive jurisdiction of the Federal Circuit." Texas Instruments Inc. v. Tessera, Inc., 231 F.3d at 1325.

In Ciena Corp. v. Nortel Networks Inc., No. 2:05 CV 14, 2005 WL 1189881 (E.D. Tex. May 19, 2005), the United States District Court for the Eastern District of Texas addressed which law to apply in determining whether it should enjoin a party from participating in and further pursuing its action in the ITC under the forum selection clause in a settlement agreement, and whether it should order the party to withdraw its ITC complaint.  See 2005 WL 1189881, at *2.  The district court stated that, although contract interpretation is a question of state law, Federal Circuit law governs the issue whether to grant the preliminary injunction, because it "involves a procedural matter arising from substantive issues that are unique to the Federal Circuit's jurisdiction." Ciena Corp. v. Nortel Networks Inc., 2005 WL 1189881, at *3 (citing Texas Instruments Inc. v. Tessera, Inc., 231 F.3d at 1329).

In this matter, both parties agree that Federal Circuit law governs whether to grant the Plaintiffs' request for a TRO and a preliminary injunction.  See Memorandum at 17 ("Federal Circuit law governs whether to grant Movants' request for a temporary injunction enjoining Leviton from continuing to prosecute its ITC complaint against Movants."); Response at 8 ("Federal Circuit law governs whether to grant Plaintiffs' Motion because the motion relates to a procedural matter

within the unique jurisdiction of the Federal Circuit.").  The Court will apply Federal Circuit law in deciding whether to grant the Plaintiffs' request for a TRO and preliminary injunction.  See Texas Instruments Inc. v. Tessera, Inc., 231 F.3d at 1328.  When interpreting the CSA and the forum selection clause in the CSA, however, the Court will apply state law.  See Texas Instruments Inc. v. Tessera, Inc., 231 F.3d at 1325 (finding that the district court's order denying the plaintiff's motion for a preliminary injunction also presented an issue concerning interpretation of the license agreement and stating that "[g]eneral contract interpretation is not within the exclusive jurisdiction of the Federal Circuit."); Broadcom Corp. v. Qualcomm Inc., No. SACV 05-468-JVS(MLGx), 2005 WL 5925584, at *2 (C.D. Cal. Oct. 19, 2005)("The interpretation of the forum selection clause in the Bluetooth RF Agreement, a private contract, is not within the exclusive jurisdiction of the Federal Circuit, but rather is a question of state law.").  The CSA does not expressly state what law a court should apply in interpreting it.  It contains a clause, however, which states: "Governing Law/Venue."  This clause provides that disputes relating to or arising out of the CSA shall be litigated in the District of New Mexico.  In this clause, the parties consent to the venue and the jurisdiction of the District of New Mexico.  Both parties' citation to New Mexico cases in the sections of their briefing that discuss the forum selection clause leads the Court to believe that the parties intended that New Mexico law apply to the interpretation of the contract.  See Restatement (First) of Contracts § 235 (1932)("If the conduct of the parties subsequent to a manifestation of intention indicates that all the parties placed a particular interpretation upon it, that meaning is adopted if a reasonable person could attach it to the manifestation.").[7]

---

[7] As New Mexico is the forum state for the District Court in the District of New Mexico, the Court looks to New Mexico choice of law to determine which state's substantive law to apply.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941).  In New Mexico, choice-of-law analysis is a two-step process.  See Terrazas v. Garland & Loman, Inc., 140 N.M. 293, 296, 142 P.3d

In federal courts, "the bases for injunctive relief are irreparable injury and inadequacy of legal remedies." Amoco Production Co. v. Village of Gambell, AK, 480 U.S. 531, 542 (1987). Under Federal Circuit law, "to establish any entitlement to a [TRO] or preliminary injunction, [a] plaintiff must demonstrate four factors:" (i) a reasonable likelihood of success on the merits; (ii) irreparable harm if the injunction is not granted; (iii) the balance of the hardships favoring the plaintiff -- specifically, the balance between the irreparable harm absent injunctive relief and the harm that granting the injunction will cause to the other party; and (iv) the public interest favors granting the injunction. Caddell Const. Co. v. United States, 7 Cl. Ct. 236 (1985). See Purdue Pharma L.P. v. Boehringer Ingelheim GMBH, 237 F.3d 1359, 1363 (Fed. Cir. 2001); Nutrition 21 v. United States, 930 F.2d 867, 869 (Fed. Cir. 1991). In considering these factors, the district court should "measure each of the four factors against the other factors and against the magnitude of the relief requested." Chrysler Motor Corp. v. Auto Body Panels of Ohio, Inc., 908 F.2d 951, 952 (Fed. Cir. 1990).

## LAW REGARDING IMPLIED LICENSES BASED ON LEGAL ESTOPPEL

"In patent law, an implied license merely signifies a patentee's waiver of the statutory right to exclude others from making, using, or selling the patented invention." Wang Laboratories, Inc.

_____

374, 377 (Ct. App. 2006). First, the Court must characterize the "area of substantive law -- e.g., torts, contracts, domestic relations -- to which the law of the forum assigns a particular claim or issue." Terrazas v. Garland & Loman, Inc., 140 N.M. at 296, 142 P.3d at 377. The next step is to apply New Mexico's choice-of-law rule. See Terrazas v. Garland & Loman, Inc., 140 N.M. at 296, 142 P.3d at 377. "When a claim sounds in contract, New Mexico will generally apply the choice-of-law rule of lex loci contractus -- the law of the place of contracting." Guidance Endontics, LLC v. Dentsply Intern., Inc., No. CIV 08-1101 JB/RLP, 2010 WL 4340806, at *16 (D.N.M. Oct. 14, 2010)(Browning, J.). The Court does not know the place of contracting. As previously discussed, however, the Court will apply New Mexico law. Even if it turns out that New Mexico law does not apply, the principles regarding contract interpretation that the Court applies in this opinion are so basic that they likely do not vary so materially from state to state that a different state's contract law will change the result of this matter.

v. Mitsubishi Elecs. Am., Inc., 103 F.3d 1571, 1580 (Fed. Cir. 1997)(citation omitted).   The

Supreme Court of the United States has stated:

> No formal granting of a license is necessary in order to give it effect.  Any language
> used by the owner of the patent or any conduct on his part exhibited to another, from
> which that other may properly infer that the owner consents to his use of the patent
> in making or using it, or selling it, upon which the other acts, constitutes a license,
> and a defense to an action for a tort.

De Forest Radio Telephone & Telegraph Co. v. United States, 273 U.S. 236, 241 (1927).  "[C]ourts

and commentators relate that implied licenses arise by acquiescence, by conduct, by equitable

estoppel (estoppel in paid), or by legal estoppel."  Wang Laboratories, Inc. v. Mitsubishi Elecs. Am.,

Inc., 103 F.3d at 1580.  "Legal estoppel refers to a narrow[ ] category of conduct encompassing

scenarios where a patentee has licensed or assigned a right, received consideration, and then sought

to derogate from the right granted."  Wang Laboratories, Inc. v. Mitsubishi Elecs. Am., Inc., 103

F.3d at 1580.

"The essence of legal estoppel that can be found in the estoppel of the implied license

doctrine involves the fact that the licensor (or assignor) has licensed (or assigned) a definable

property right for valuable consideration, and then has attempted to derogate or detract from that

right."  AMP Inc. v. United States, 389 F.2d 448, 452 (Ct. Cl. 1968).  "The grantor is estopped from

taking back in any extent that for which he has already received consideration."  AMP Inc. v. United

States, 389 F.2d at 452.  A legal estoppel case turns "on the manifest intention of the parties'

agreement."  AMP Inc. v. United States, 389 F.2d at 452.  See Transcore, LP v. Elec. Transaction

Consultants Corp., 563 F.3d 1271, 1275 (Fed. Cir. 2009)("The court in Jacobs [v. Nintendo of

America, Inc., 370 F.3d 1097 (Fed. Cir. 2004),] was differentiating between settlement terms for the

express purpose of determining the contracting parties' intent in the context of an implied license

analysis.").

In Jacobs v. Nintendo of America, Inc., the Federal Circuit found that a settlement agreement granted an implied license.  See 370 F.3d at 1101.  A patent owner, Jordan Spencer Jacobs, terminated a patent infringement suit against Analog Devices, Inc. by entering into a settlement and licensing agreement with Analog.  See 370 F.3d at 1098.  Jacobs later sued Nintendo of America, Inc. for infringing the same patent.  See 370 F.3d at 1098.  Nintendo moved for summary judgment of non-infringement, alleging "that it was entitled to practice the '958 patent by virtue of the settlement agreement between Jacobs and Analog," who supplied an accelerometer for one of Nintendo's products.  370 F.3d at 1099.  Two paragraphs in the settlement agreement were important to determination of the case.  These paragraphs stated:

> 3. License.  Jacobs grants Analog an irrevocable, perpetual, fully paid up license to take any actions set forth in 35 U.S.C. § 271 which would, but for this license, constitute an infringement or violation of Jacobs' patent rights under the '958 patent. Without limiting the foregoing, the license granted hereunder includes the right to make, use, sell, import and export components, including micromachined accelerometers, for use in tilt-sensitive control boxes.

> 5. Covenant-not-to-sue.  Jacobs covenants not to sue Analog for any alleged infringement or violation of the '958 patent.  This covenant-not- to-sue extends to any cause of action having as an element the infringement of the '958 patent by Analog or any other party, whether occurring in the past, present, or in the future.

370 F.3d at 1098-99.  The Federal Circuit recognized that the settlement agreement granted two important rights: (i) a peace -- the right to not be sued for infringement of the '958 patent; and (ii) a prosperity -- the right to sell accelerometers for use in products.  See 370 F.3d at 1099.  The Federal Circuit agreed with the district court that "the right given to Analog to sell its accelerometers for use in infringing tilt-sensitive control boxes would be meaningless if Jacobs could effectively prevent Analog from making any such sales by suing Analog's customers for putting the accelerometers into infringing control boxes and selling the resulting products."  370 F.3d at 1101. Jacobs urged the Federal Circuit to interpret paragraph 3 as a bare license -- a right to not be sued

for making, using, or selling accelerometers for use in tilt-sensitive control boxes.  See  370 F.3d

at 1101.  The Federal Circuit stated:

> To interpret paragraph 3 as a bare license, however, would ignore the language of the second sentence of paragraph 3 that goes beyond the creation of a license (conveying the right to make and sell accelerometers "for use in tilt-sensitive control boxes"). In addition, it would make paragraph 3 entirely redundant, because paragraph 5 already ensures Analog freedom from suit "for any alleged infringement or violation of the '958 patent."  If all that Jacobs intended to do through the settlement agreement was to free Analog of its liability for infringement, paragraph 5 of the agreement (the covenant not to sue) would have been fully sufficient to serve that purpose. Paragraph 3, however, goes much further by granting Analog an affirmative right to engage in the manufacture and sale of accelerometers to be used in tilt-sensitive control boxes.  That grant comes without restriction of any kind.

370 F.3d at 1101.  The Federal Court found that the settlement agreement granted an implied

license, stating:

> Furthermore, as the district court noted, it is unlikely that Analog would have contracted for the right to manufacture and sell a product knowing that its customers would be unable to use the product that it sold them for the bargained-for purpose. Thus, we agree with the district court that the Jacobs-Analog settlement agreement grants to Analog's customers an implied sublicense to use Analog's accelerometers to make, use, and sell tilt-sensitive control boxes that infringe the '958 patent without interference by Jacobs.

370 F.3d at 1101-02.

In Transcore LP v. Electronic Transaction Consultants Corp., the Federal Circuit found that:

(i) a non-exclusive patent license is equivalent to a covenant not to sue; and (ii) a settlement

agreement grants an implied license to a later-issued patent that is necessary to practice a patent

licensed in the settlement agreement.  See 563 F.3d at 1278-80.  In that case, TransCore sued Mark

IV for infringement of several TransCore patents.  See Transcore LP v. Elec. Transaction

Consultants Corp., 563 F.3d at 1272.  The parties resolved the action through "a settlement

agreement, in which Mark IV paid $4.5 million in exchange for an unconditional covenant not to

sue and a release of all existing claims."  Transcore LP v. Elec. Transaction Consultants Corp., 563

F.3d at 1278-80.  The covenant not to sue stated:

> 3. In exchange for the payment set forth in paragraph 1, TCI hereby agrees and covenants not to bring any demand, claim, lawsuit, or action against Mark IV for future infringement of any of United States Patent Nos. 5,805,082; 5,289,183; 5,406,275; 5,144,553; 5,086,389; 5,751,973; 5,347,274; 5,351,187; 5,253,162; and 4,303,904, or any foreign counterparts of the aforesaid United States Patents, for the entire remainder of the terms of the respective United States Patents and their foreign counterparts.  This Covenant Not To Sue shall not apply to any other patents issued as of the effective date of this Agreement or to be issued in the future.
>
> . . . .
>
> 8. TCI, TII and GRAVELLE, for themselves and their respective predecessors, successors, heirs and assigns, fully and forever release, discharge and dismiss all claims, demands, actions, causes of action, liens and rights, in law or in equity (known, unknown, contingent, accrued, inchoate or otherwise), existing as of June 26, 2001, that they have against MARK IV, and its officers, directors, employees, representatives and attorneys of MARK IV, but excluding any claims for breach of this Agreement.  No express or implied license or future release whatsoever is granted to MARK IV or to any third party by this Release.

Transcore LP v. Elec. Transaction Consultants Corp., 563 F.3d at 1273.  Several years after the parties entered into the agreement, Electronic Transaction Consultants Corp. ("ETC") agreed, as part of a contract, to set up products obtained from Mark IV.  See Transcore LP v. Elec. Transaction Consultants Corp., 563 F.3d at 1273.  TransCore sued ETC for infringement of three patents that were at issue in the lawsuit against Mark IV, as well as of a patent that was pending before the "Patent and Trademark Officer but had not yet issued at the time of the . . . settlement."  Transcore LP v. Elec. Transaction Consultants Corp., 563 F.3d at 1273-74.  The Federal Circuit addressed whether the settlement agreement authorized Mark IV's sale of the systems that ETC installed, such that TransCore's patent rights were exhausted as to those systems.  See Transcore LP v. Elec. Transaction Consultants Corp., 563 F.3d at 1274.  TransCore relied on Jacobs v. Nintendo of America, Inc. to assert that sales under a covenant not to sue are not authorized.  See Transcore LP v. Elec. Transaction Consultants Corp., 563 F.3d at 1274.

-17-

In <u>Jacobs</u>, a panel of this court addressed the respective roles of a license term and a covenant not to sue in a settlement agreement. . . . .  The court in <u>Jacobs</u> was differentiating between settlement terms for the express purpose of determining the contracting parties' intent in the context of an implied license analysis.  As the Supreme Court explained in <u>Quanta</u>, however, the parties' intent with respect to downstream customers is of no moment in a patent exhaustion analysis.  The analysis in <u>Jacobs</u>, therefore, does not apply here.

Rather, our analysis begins with the premise that one cannot convey what one does not own. This principle is particularly important in patent licensing, as the grant of a patent does not provide the patentee with an affirmative right to practice the patent but merely the right to exclude.  It follows, therefore, that a patentee, by license or otherwise, cannot convey an affirmative right to practice a patented invention by way of making, using, selling, etc.; the patentee can only convey a freedom from suit.

For this reason, the Supreme Court in <u>De Forest Radio Telephone & Telegraph Co. v. United States</u>, reiterated: "As a license passes no interest in the monopoly, it has been described as a mere waiver of the right to sue by the patentee." 273 U.S. 236, 242 . . . (1927) (treating a covenant not to enjoin infringing acts as a license).  To like effect, this court and its predecessors have on numerous occasions explained that a non-exclusive patent license is equivalent to a covenant not to sue . . . .  The real question, then, is not whether an agreement is framed in terms of a "covenant not to sue" or a "license."  That difference is only one of form, not substance -- both are properly viewed as "authorizations."

<u>Transcore LP v. Elec. Transaction Consultants Corp.</u>, 563 F.3d at 1275-76 (internal citations omitted).  The Federal Circuit thus found that the question is not whether the agreement is framed in the terms of a covenant not to sue or a license, but what the agreement authorizes.  <u>See</u> <u>Transcore LP v. Elec. Transaction Consultants Corp.</u>, 563 F.3d at 1276.  The Federal Circuit found that the settlement agreement authorized sales.  <u>See</u> <u>Transcore LP v. Elec. Transaction Consultants Corp.</u>, 563 F.3d at 1276.  The Federal Circuit then addressed whether TransCore's rights to the '946 patent -- which had not yet issued at the time of the settlement agreement, and was thus not identified in the settlement agreement -- "were exhausted by Mark IV's authorized sales under an implied license to practice that patent by virtue of legal estoppel."  <u>Transcore LP v. Elec. Transaction Consultants Corp.</u>, 563 F.3d at 1278.  The Federal Circuit stated that when

-18-

> a person sells a patent which employs an invention which infringes a prior patent, the person selling is estopped from bringing an action against his grantee for that infringement, even though the earlier patent is acquired after the sale of the later patent.  The same principle applies to the grant of a patent right by license as well as assignment.

Transcore LP v. Elec. Transaction Consultants Corp., 563 F.3d at 1278 (citation omitted). The Federal Circuit stated: "Although TransCore argues that this form of legal estoppel only applies to 'prior' or 'earlier' patents, we see no reason for so fine a distinction -- the timing of patent issuance is no more relevant to this inquiry than the timing of acquisition." Transcore LP v. Elec. Transaction Consultants Corp., 563 F.3d at 1279.  The Federal Circuit stated:

> On summary judgment, ETC asserted, and TransCore did not dispute, that TransCore's later-issued '946 patent was broader than, and necessary to practice, at least the '082 patent that was included in the TransCore-Mark IV settlement agreement.  Indeed, during discovery TransCore adopted its '082 patent infringement contentions as its contentions related to the '946 patent.  Absent argument to the contrary, the district court properly concluded that in order for Mark IV to obtain the benefit of its bargain with TransCore, it must be permitted to practice the '946 patent to the same extent it may practice the '183, '275 and '082 patents.  TransCore is, therefore, legally estopped from asserting the '946 patent against Mark IV in derogation of the authorizations granted to Mark IV under the '183, '275 and '082 patents.  And Mark IV is, in turn, an implied licensee of the '946 patent.  The language of the TransCore-Mark IV settlement agreement, which states that "[t]his Covenant Not To Sue shall not apply to any other patents . . . to be issued in the future," is not to the contrary.  This language may protect TransCore against broad claims that future patents generally are impliedly licensed, but it does not permit TransCore to derogate from the rights it has expressly granted and thus does not preclude a finding of estoppel.

Transcore LP v. Elec. Transaction Consultants Corp., 563 F.3d at 1279 (internal footnotes omitted). The Federal Circuit thus found that a settlement agreement can grant an implied license to a later-issued patent, if the later-issued patent is necessary to practice another patent which was licensed in the settlement agreement.  See Transcore LP v. Elec. Transaction Consultants Corp., 563 F.3d at 1279.

## RELEVANT NEW MEXICO LAW REGARDING CONTRACT INTERPRETATION

In contract cases, "the role of the court is to give effect to the intention of the contracting parties." Bogle Farms, Inc. v. Baca, 122 N.M. 422, 428, 925 P.2d 1184, 1190 (1996). "The primary objective in construing a contract is not to label it with specific definitions or to look at form above substance, but to ascertain and enforce the intent of the parties as shown by the contents of the instrument." Bogle Farms, Inc. v. Baca, 122 N.M. at 428, 925 P.2d at 1190 (citing Shaeffer v. Kelton, 95 N.M. 182, 185, 619 P.2d 1226, 1229 (1980)). "The parol evidence rule 'bars admission of evidence extrinsic to the contract to contradict and perhaps even supplement the writing.'" Memorial Med. Ctr., Inc. v. Tatsch Const., Inc., 129 N.M. 677, 683, 12 P.3d 431, 437 (2000)(citation omitted). If a contract is ambiguous, however, "evidence will be admitted to aid in interpreting the parties' expressions." C.R. Anthony Co. v. Loretto Mall Partners, 112 N.M. 504, 508, 817 P.2d 238, 242 (1991)(citation omitted). "On the other hand, if the court determines that the contract is clear and unambiguous on its face, evidence of the circumstances surrounding the transaction is inadmissible *to vary or modify its terms*." C.R. Anthony Co. v. Loretto Mall Partners, 112 N.M. at 508, 817 P.2d at 242 (citation omitted)(italics in original).

## RELEVANT LAW REGARDING FORUM SELECTION CLAUSES

"A contractual forum selection clause is prima facie valid and should be enforced unless unreasonable under the circumstances." M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 10 (1972). New Mexico state courts have not had much opportunity to address forum selection clauses. The Court of Appeals of New Mexico has recognized that the general rule on enforcement of forum selection clauses is that, "when venue is specified in a forum selection clause with mandatory or obligatory language, the clause will be enforced." Mueller v. Sample, 135 N.M. 748, 752, 93 P.3d 769, 773 (Ct. App. 2004)(citing K & V Scientific Co. v. Bayerische Motoren Werke

Aktiengesellschaft (K & V Scientific Co. v. BMW), 314 F.3d 494, 499 (2002)).

Although no New Mexico state court has more thoroughly discussed the enforcement of a forum selection clause, the District of New Mexico and United States Court of Appeals for the Tenth Circuit have more fully discussed the general rules regarding enforcement of forum selection clauses. "The difference between a mandatory and permissive forum selection clause is that '[m]andatory forum selection clauses contain clear language showing that jurisdiction is appropriate only in the designated forum.'" American Soda, LLP v. U.S. Filter Wastewater Group, Inc., 428 F.3d 921, 926 (10th Cir. 2005)(citing Excell, Inc. v. Sterling Boiler & Mech., Inc., 106 F.3d 318, 321 (10th Cir. 1997)). See Knight Oil Tools, Inc. v. Unit Petroleum Co., No. CIV 05-0669 JB/ACT, 2005 WL 2313715, at *5 (D.N.M. Aug. 31, 2005)(Browning, J.). "In contrast, permissive forum selection clauses authorize jurisdiction in a designated forum, but do not prohibit litigation elsewhere." American Soda, LLP v. U.S. Filter Wastewater Group, Inc., 428 F.3d at 926-27 (citation omitted). See Knight Oil Tools, Inc. v. Unit Petroleum Co., 2005 WL 2313715, at *5. In K & V Scientific Co. v. BMW, the Tenth Circuit adopted the majority rule for enforcing forum selection clauses. See 314 F.3d at 500. When venue is specified, such as when the parties designate a particular county or tribunal, and the designation is accompanied by mandatory or obligatory language, a forum selection clause will be enforced as mandatory. See K & V Scientific Co. v. BMW, 314 F.3d at 499.

No New Mexico court or Tenth Circuit court has addressed whether a forum selection clause applies to actions where the contract containing the forum selection clause is raised only as a defense. Other courts, however, have addressed this issue.

Several courts have stated that, when the forum selection clause governs only a dispute arising out of the contract containing the forum selection clause and the contract is relevant only as

a defense, the form selection clause is inapplicable.  In Phillips v. Audio Active Ltd., 494 F.3d 378 (2d Cir. 2007), the forum selection clause provided that "any legal proceedings that may arise out of [the agreement] are to be brought in England."  494 F.3d at 386.  The plaintiff denied "that the contract ha[d] any role or relevance whatever with respect to his copyright claims."  Phillips v. Audio Active Ltd., 494 F.3d at 391 (citation omitted).  The United States Court of Appeals for the Second Circuit found that ,"[b]ecause the recording contract is only relevant as a defense in this suit, we cannot say that [the plaintiff's] copyright claims originate from, and therefore 'arise out of,' the contract."  Phillips v. Audio Active Ltd., 494 F.3d at 391.  The Second Circuit therefore held that the contract did not evince an intent that the plaintiff's federal copyright claims had to be heard in England.  See Phillips v. Audio Active Ltd., 494 F.3d at 391.  In Corcovado Music Corp. v. Hollis Music, Inc., 981 F.2d 679 (2d Cir. 1993), Corcovado brought suit against the defendants for copyright infringement, and the defendants moved to dismiss the complaint based on a number of contracts with a third party, alleging that the contracts required interpretation by a Brazilian court and that the contracts conveyed renewal rights.  See Corcovado Music Corp. v. Hollis Music, Inc., 981 F.2d at 681.  In addition, the defendants argued that Corcovado was bound by the forum selection clause in the contracts.  See  Corcovado Music Corp. v. Hollis Music, Inc., 981 F.2d at 681.  The Second Circuit stated that the "contracts are relevant only as a defense[;] [t]he Complaint asserts no rights whatsoever arising out of those contracts, and they form no part of plaintiff Corcovado's case."  Corcovado Music Corp. v. Hollis Music, Inc., 981 F.2d at 682.  The Second Circuit therefore found the district court erred when it dismissed Corcovado's actions with instructions to pursue it in Brazil.  See  Corcovado Music Corp. v. Hollis Music, Inc., 981 F.2d at 683.

Other courts have found that a forum selection clause governing any dispute relating to or

arising in relation to the agreement encompasses a dispute in which the agreement is raised as a defense.  See Schering Corp. v. First Databank, Inc., 479 F. Supp. 2d 468, 470-71 (D.N.J. 2007)(discussing a forum selection clause that provided that, "[i]n the event of any dispute concerning this Agreement or the Licensed Products, suit may be brought . . . in the U.S. District Court of the Northern District of California" and finding that the action related to the agreement because the defendant's defenses were based on the agreement).  In John Wyeth & Bro. Ltd. v. CIGNA Intern. Corp., 119 F.3d 1070 (3d Cir. 1997), the United States Court of Appeals for the Third Circuit found that the language of the forum selection clause stating that "the English Courts shall have exclusive jurisdiction in relation to any dispute arising under or out of or in relation to this Agreement" encompassed a dispute in which the agreement containing the clause was raised as a defense.  John Wyeth & Bro. Ltd. v. CIGNA Intern. Corp., 119 F.3d 1073, 1076.  The Third Circuit noted that the phrase arising in relation to is broader than the phrase arising under.  See John Wyeth & Bro. Ltd. v. CIGNA Intern. Corp., 119 F.3d at 1074.

> The answer to the question whether a "defense" based on a contract that contains a forum selection clause implicates that clause depends on the language of the clause. Here, as we have noted, the clause is broadly worded, extending to any dispute "arising . . . in relation to."  This language easily encompasses a dispute in which the 1990 Agreement is raised as a defense. Corcovado is distinguishable because it contains no analysis of a forum selection clause with comparable language.

John Wyeth & Bro. Ltd. v. CIGNA Intern. Corp., 119 F.3d at 1076.

## ANALYSIS

The Court will enter a preliminary injunction ordering Leviton to dismiss its patent-infringement claims  against the Plaintiffs in the ITC action and in the action in the District Court for the Northern District of California.  The Plaintiffs have shown a reasonable likelihood of success on the merits, because the CSA granted the Plaintiffs an implied license to the '124 and '151 patents,

and because the forum selection clause in the CSA requires the parties to litigate the dispute in the District of New Mexico.  The Plaintiffs will suffer irreparable harm absent injunctive relief, because they will be deprived of their bargained-for forum and will suffer inconvenience of litigating on two fronts, causing financial hardship and disruption of their business.  The balance of hardships favors the Plaintiffs, because, absent injunctive relief, the Plaintiffs will suffer irreparable harm, while injunctive relief will not materially harm Leviton, as the District Court can, for the most part, grant Leviton the same relief it could obtain in the ITC action.  The public interest favors granting the injunction, because the public policy supports enforcing the forum selection clause, and because an injunction will not have a deleterious effect on the ITC action.  Because the Court will grant a preliminary injunction, ordering Leviton to dismiss its patent-infringement claims in the ITC action and the action in the Northern District of California, the Court need not grant the Plaintiffs' request for a TRO requiring Leviton to consent to the Plaintiffs' request for a stay of the ITC action.

I.      **THE PLAINTIFFS HAVE SHOWN A REASONABLE LIKELIHOOD OF SUCCESS ON THE MERITS.**

The Plaintiffs have shown a reasonable likelihood of success on the merits.  The CSA appears to grant the Plaintiffs an implied license to the '124 and '151 patents.  Moreover, the forum selection clause appears to require that the parties litigate the dispute in the District Court for the District of New Mexico.

      A.      **THE CSA APPEARS TO GRANT THE PLAINTIFFS AN IMPLIED LICENSE TO LEVITON'S '124 AND '151 PATENTS.**

The Plaintiffs contend that Leviton's covenant not to sue, in section 2.2 of the CSA constitutes a patent license to the '558 and '766 patent, as it authorized the Plaintiffs to make, use, offer for sale, sell, and import the licensed products.  <u>See</u> Memorandum at 18.  The Plaintiffs assert

that the express license[8] includes an implied license to "any new patents necessary to practice" the licensed products, including the '124 and '151 patents, and that Leviton is legally estopped from derogating from that license.  Memorandum at 18.

Leviton contends that the Plaintiffs cannot demonstrate a likelihood of success on the merits, because "it is clear from the CSA that the Plaintiffs were not granted any rights to the '124 and '151 patents."  Response at 9.  Leviton contends that the manifest intent of the parties in entering into the CSA was to grant the Plaintiffs a restricted covenant not to sue on the '558 and '766 patents with respect to a limited set of products, and not to grant "any rights with respect to future related (or unrelated) patents."  Response at 10.  Leviton contends that legal estoppel does not apply in this matter, because it has not derogated any right granted to the Plaintiffs, as the Plaintiffs were never promised freedom from suit for patents related to the '558 and '766 products.  See Response at 18. Leviton contends that the Plaintiffs have not met their burden of establishing the existence of an implied license as an affirmative defense, because they have made only a "bare assertion that the products identified in the ITC complaint fall within the scope of this narrow class of products," and do not provide a factual basis for the assertion or identify whether there are other products that would fall within the scope of the ITC investigation.  Response at 20-21.  Leviton also contends that, even if the Plaintiffs have an implied license to some claims of the '124 and '151 patents, that implied license extends only to the claims that dominate the claims of the '558 and '766 patents, and because not all of the claims of the '124 and '151 patents dominate, Leviton is free to assert the narrower claims against the Plaintiffs at the ITC.  See Response at 21.

"The essence of legal estoppel that can be found in the estoppel of the implied license

---

[8] "[O]ne who possesses [an express license of rights from a patent owner] cannot be made liable for patent infringement."  9 R. Moy, Moy's Walker on Patents § 19:34 (4th ed.).

doctrine involves the fact that the licensor (or assignor) has licensed (or assigned) a definable property right for valuable consideration, and then has attempted to derogate or detract from that right."  AMP Inc. v. United States, 389 F.2d at 452.  "The grantor is estopped from taking back in any extent that for which he has already received consideration."  AMP Inc. v. United States, 389 F.2d at 452.  A legal estoppel case turns "on the manifest intention of the parties' agreement."  AMP Inc. v. United States, 389 F.2d at 452.

It appears that the best construction of Leviton's covenant not to sue in the CSA is that it constitutes a patent license to the '558 and '766 patents.  Section 2.1 of the CSA states:

> Leviton . . . hereby covenants not to sue (1) Defendants, their officers, directors, shareholders, members, employees, subsidiaries, or affiliates for alleged infringement of the '558 and/or '766 actions; and (2) Defendants, their officers, directors, shareholders, members, employees, subsidiaries, or affiliates for alleged infringement of the '558 patent and/or the '766 patent with respect to an anticipated future new GFCI product that Defendant Dongzheng has indicated its intent to market in the U.S. in the future, . . . .

CSA § 2.1.  On "numerous occasions,"  the Federal Circuit has "explained that a non-exclusive patent license is equivalent to a covenant not to sue."  TransCore, LP v. Elect. Transaction Consultants Corp., 563 F.3d at 1275.  In Spindelfabrik Suessen-Schurr, Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft, 829 F.2d 1075 (Fed. Cir. 1987), the Federal Circuit explained:

> As a threshold matter, a patent license agreement is in essence nothing more than a promise by the licensor not to sue the licensee.  Even if couched in terms of "[l]icensee is given the right to make, use, or sell X," the agreement cannot convey that absolute right because not even the patentee of X is given that right.  His right is merely one to exclude others from making, using or selling X, 35 U.S.C. § 154.  Indeed, the patentee of X and his licensee, when making, using, or selling X, can be subject to suit under other patents.  In any event, patent license agreements can be written to convey different scopes of promises not to sue, e.g., a promise not to sue under a specific patent or, more broadly, a promise not to sue under any patent the licensor now has or may acquire in the future.

829 F.2d at 1081 (internal citation omitted).  The Court therefore finds that it is likely that the Plaintiffs will be able to establish that Leviton's covenant not to sue, in section 2.1 of the CSA constitutes a patent license for the '558 and '766 patents.  See U.S. Phillips Corp. v. International Trade Com'n, 424 F.3d 1179. 1189 (Fed. Circ. 2005)("A nonexclusive patent license is simply a promise not to sue for infringement.").

The Court does not believe that Jacobs v. Nintendo of America, Inc. requires it to find that the covenant not to sue in the CSA is insufficient to create an implied license to the '124 and '151 patents.  In Jacobs v. Nintendo of America, Inc., Jacobs entered into a settlement and licensing agreement with Analog, which terminated his patent infringement suit against Analog.  See 370 F.3d at 1098.  Jacobs later sued Nintendo for infringing the same patent.  See 370 F.3d at 1098.  Nintendo moved for summary judgment of non-infringement, alleging "that it was entitled to practice the '958 patent by virtue of the settlement agreement between Jacobs and Analog," who supplied a part for one of Nintendo's products.  See 370 F.3d at 1099.  The settlement agreement granted two important rights: (i) a peace -- the right to not be sued for infringement of the '958 patent; and (ii) a prosperity -- the right to sell micromachined accelerometers for use in certain products.  370 F.3d at 1099. Jacobs urged the Federal Circuit to interpret paragraph 3 -- the prosperity -- as a bare license -- a right to not be sued for making, using, or selling accelerometers for use in certain products.  See 370 F.3d at 1101.  The Federal Circuit, however, found that this interpretation of paragraph 3 would render the paragraph redundant, as paragraph 5 -- the peace -- already ensured freedom from suit. See  370 F.3d at 1101.  The Federal Circuit stated

> If all that Jacobs intended to do through the settlement agreement was to free Analog of its liability for infringement, paragraph 5 of the agreement (the covenant not to sue) would have been fully sufficient to serve that purpose.  Paragraph 3, however, goes much further by granting Analog an affirmative right to engage in the manufacture and sale of accelerometers to be used in tilt-sensitive control boxes.

That grant comes without restriction of any kind.

370 F.3d at 1101.  Jacob sought to explain the license granted in paragraph 3 by characterizing it as

giving Analog the right to make and sell infringing products on its own, or, alternatively, ensuring

Analog would be free to sell accelerometers for use in infringing products, "but not protecting

Analog's customers from suit for making and selling [products]."  370 F.3d at 1101.  The Federal

Court found that these explanations were not plausible, as Jacobs knew Analog was not in the

business of making game controllers, "so there is no reason to believe Analog would have bargained

for that right."  370 F.3d at 1101.

> Furthermore, as the district court noted, it is unlikely that Analog would have
> contracted for the right to manufacture and sell a product knowing that its customers
> would be unable to use the product that it sold them for the bargained-for purpose.
> Thus, we agree with the district court that the Jacobs-Analog settlement agreement
> grants to Analog's customers an implied sublicense to use Analog's accelerometers
> to make, use, and sell tilt-sensitive control boxes that infringe the 958 patent without
> interference by Jacobs.

370 F.3d at 1101-02.  The Court is not convinced that Jacobs v. Nintendo of America, Inc. dictates

that a covenant not to sue, contained in a settlement agreement, cannot grant an implied license.  In

Jacobs v. Nintendo of America, Inc., the Federal Circuit was "differentiating between settlement

terms for the express purpose of determining the contracting parties' intent in the context of an

implied license analysis."  TransCore, LP v. Elec. Transaction Consultants Corp., 563 F.3d at 1275.

As Leviton  stated in the hearing and in its briefing, "with respect to an implied license, the decision

is made on case-by-case basis[,]" Tr. at 18:12-18 (Shatzer), by considering the "manifest intent[ ]

of the parties' agreement[,]" Response at 16.  Because the purpose of an implied license is to stop

the licensor from derogating or detracting from the right that he or she has licensed, see AMP Inc.

v. United States, 389 F.2d at 452, the courts must determine what rights were licensed.  The Federal

Circuit in Jacobs v. Nintendo of Am., Inc. found that it was unlikely that Analog would have

contracted for the right to sell a product knowing its customers would not be able to use the product it sold them and therefore held that an implied license arose from an license provision in the settlement agreement.   The Federal Circuit made this finding in the context of determining the parties' intent as to what rights were licensed as reflected in the settlement agreement.   The Court therefore believes that a covenant not to sue can grant an implied license, assuming it is consistent with the parties' intent as reflected in the settlement agreement.   See TransCore, LP v. Elec. Transaction Consultants Corp., 563 F.3d at 1278-79 (finding that an implied license arose from a covenant not to sue for infringement of certain patents when a implied license to practice the later-issued patent was necessary to practice the patents licensed in the settlement agreement).

Because "[t]he essence of legal estoppel . . . found in . . . the implied license doctrine involves the fact that the licensor (or assignor) has licensed (or assigned) a definable property right for valuable consideration, and then has attempted to derogate or detract from that right[,]" AMP Inc. v. United States, 389 F.2d at 452, the Court must first determine what property right Leviton licensed to the Plaintiffs.  The CSA states

> Leviton . . . hereby covenants not to sue (1) Defendants . . . for alleged infringement of the '558 and/or '766 patents based on the Dongzheng products currently accused of infringement . . . ; and (2) Defendants . . . for alleged infringement of the '558 and/or the '766 patent with respect to an anticipated future new GFCI product that Defendant Dongzheng has indicated its intent to market in the U.S. in the future . . . .

CSA § 2.1.  Through this covenant not to sue, Leviton granted the Plaintiffs licenses to the '558 and '766 patents for the licensed products.

Leviton contends that the language in the CSA makes it clear that Leviton did not grant the Plaintiffs the right to be free from future actions for infringement, including patent infringement actions related to the '766 and '558 patents.  See Response at 13.  Section 4.1 of the CSA states:

> The parties will jointly request that the Court vacate its '766 Order in . . . the Court's

Memorandum Opinion and Order dated March 5, 2007, by submitting a joint motion and proposed form of Order to the Court . . . .   However, Leviton agrees not to challenge any proposed claim construction of a '766 patent claim that is reflected in the '766 Markman Order, which any of the Defendants, their officers, directors, shareholders, members, employees, subsidiaries, affiliates (or their customers) may propose in connection with any claim of infringement of a '766 patent claim. Defendants and their officers, directors, shareholders, members, employees, subsidiaries, affiliates (or their customers) are not precluded from proposing said claim construction in any action or proceeding asserting infringement of any patent related to the '766 patent, although Leviton may challenge such proposed claim construction.   Leviton and defendants agree that neither the fact of the Court's decision to vacate or not vacate its '766 Markman Order, nor the fact that the parties requested that the Court vacate its '766 Markman Order, can be used by a party to this Agreement to support or challenge a proposed construction of a claim related to the '766 patent.

CSA § 4.1.  Section 2.1 of the CSA provides that "[t]hese covenants not to sue . . . still apply to the Dongzheng Products even if Leviton asserts a claim of infringement of the '766 or '558 patents against Defendants, their officers, directors, shareholders, members, employees, subsidiaries, or affiliates for manufacturing, using, importing, selling or offering to sell <u>other products</u>."  CSA § 2.1 (emphasis added).  Section 2.2 states:

Nothing in this Settlement Agreement shall otherwise be construed as limiting the right of any customer to challenge the validity of the '558 or '766 patents if Leviton asserts, whether through court or administrative filings or through authorized correspondence sufficient to give rise to declaratory judgment jurisdiction, that such customer infringes on one or both patents, and the covenant not to sue customers as defined above still applies to Dongzheng Products even if Leviton asserts that a customer infringes the '766 or '558 patents by importing, selling or offering to sell <u>other products</u>.

CSA § 2.2 (emphasis added).  Section 4.1 in the CSA is not discussing anticipated future patent infringement litigation on the licensed products for patents related to the '766 patent. The plain language of section 4.1, taken in the context of the CSA, <u>see</u> <u>H-B-S Partnership v. Aircoa</u> <u>Hospitality Servs., Inc</u>., 137 N.M. 626, 633, 114 P.3d 306, 313 (Ct. App. 2005)("We consider the plain language of the relevant provisions, giving meaning and significance to each word or phrase

within the context of the entire contract . . . . . "), indicates that this section relates to the other products referenced in section 2.1 and 2.2.  Sections 2.1 and 2.2 discuss the possibility that Leviton may assert claims of patent infringement of the '766 or '558 patents with regard to other products, and not with regard to the licensed products.  The language in the CSA indicates that the parties reserved their rights -- such as the Plaintiffs' right to raise arguments regarding the construction of claims in the '766 patent and Leviton's right to challenge the proposed claim construction -- so that they could raise these rights if Leviton sued the Plaintiffs for other products -- such as products produced at a later time that do not constitute the anticipated new product mentioned in the section 2.1 of the CSA, not the licensed products, under the '766 or '558 patents.  The language in the CSA does not indicate that the parties were contemplating more litigation on the licensed products under the '766 patent or patents related to the '766 patent; instead, it indicates that they were contemplating litigation on the '766 patent or related patents for other products.  For example, the parties might have contemplated litigation on products that might infringe the '766 patent but were not yet manufactured and did not constitute the anticipated new product mentioned in section 2.1 of the CSA.  Or, the parties might have contemplated litigation on other existing products, not at issue in the litigation in the District of New Mexico, if, after additional research, Leviton believed that these other existing products infringed the '766 patent.  This language therefore does not indicate that the parties did not intend an implied license to the '124 and '151 patents for the licensed products.

Although the language of the covenant not to sue in the CSA is limited to the licensed products, this limitation does not mean that the CSA cannot grant an implied license.  In TransCore, LP v. Electronic Transaction Consultants Corp., the covenant not to sue, in the settlement agreement stated:

> In exchange for the payment set forth in paragraph 1, TCI hereby agrees and covenants not to bring any demand, claim, lawsuit, or action against Mark IV for future infringement of any of United States Patent Nos. 5,805,082; 5,289,183; 5,406,275; 5,144,553; 5,086,389; 5,751,973; 5,347,274; 5,351,187; 5,253,162; and 4,303,904, or any foreign counterparts of the aforesaid United States Patents, for the entire remainder of the terms of the respective United States Patents and their foreign counterparts.  This Covenant Not To Sue shall not apply to any other patents issued as of the effective date of this Agreement or to be issued in the future.

389 F.2d at 450.  The Federal Circuit found that the settlement agreement granted an implied license to a later-issued patent.  See TransCore, LP v. Elec. Transaction Consultants Corp., 563 F.3d at 1279.  The Federal Circuit stated:

> The language of the TransCore-Mark IV settlement agreement, which states that "[t]his Covenant Not To Sue shall not apply to any other patents . . . to be issued in the future," is not to the contrary.  This language may protect TransCore against broad claims that future patents generally are impliedly licensed, but it does not permit TransCore to derogate from the rights it has expressly granted and thus does not preclude a finding of estoppel.

TransCore, LP v. Elec. Transaction Consultants Corp., 563 F.3d at 1279.  Similarly, the best construction of the language limiting the covenant not to sue to the licensed products appears to allow Leviton to bring patent infringement suits for the '558 and '766 patents based on other products, but this limitation does not allow Leviton to derogate from the rights it granted to the Plaintiffs, and therefore "does not preclude a finding of [legal] estoppel."  TransCore, LP v. Elec. Transaction Consultants Corp., 563 F.3d at 1279.

Under TransCore, LP v. Electronic Transaction Consultants Corp., the CSA granted an implied license to the '124 and '151 patents, if the plaintiffs must practice the '124 and '151 patents to obtain the benefit of their bargain to practice the '766 and '558 patents.  In TransCore, LP v. Electronic Transaction Consultants Corp., the Federal Circuit addressed whether TransCore's rights to the '946 patent -- which had not yet issued at the time of the settlement agreement and was thus not identified in the settlement agreement -- "were exhausted by Mark IV's authorized sales under

an implied license to practice that patent by virtue of legal estoppel." TransCore, LP v. Elec.

Transaction Consultants Corp., 563 F.3d at 1278.  The Federal Circuit stated that when

> a person sells a patent which employs an invention which infringes a prior patent, the
> person selling is estopped from bringing an action against his grantee for that
> infringement, even though the earlier patent is acquired after the sale of the later
> patent.  The same principle applies to the grant of a patent right by license as well
> as assignment.

TransCore, LP v. Elec. Transaction Consultants Corp., 563 F.3d at 1278.  The Federal Circuit saw

no reason to limit this form of legal estoppel to only prior or earlier patents.  See TransCore, LP v.

Elec. Transaction Consultants Corp., 563 F.3d at 1279.  The Federal Circuit stated:

> TransCore's later issued '946 patent was broader than, and necessary to practice, at
> least the '082 patent that was included in the TransCore-Mark IV settlement
> agreement.  Indeed, during discovery TransCore adopted its '082 patent infringement
> contentions as its contentions related to the '946 patent.  Absent argument to the
> contrary, the district court properly concluded that in order for Mark IV to obtain the
> benefit of its bargain with TransCore, it must be permitted to practice the '946 patent
> to the same extent it may practice the '183, '275 and '082 patents.  TransCore is,
> therefore, legally estopped from asserting the '946 patent against Mark IV in
> derogation of the authorizations granted to Mark IV under the '183, '275 and '082
> patents.  And Mark IV is, in turn, an implied licensee of the '946 patent.

TransCore, LP v. Elec. Transaction Consultants Corp., 563 F.3d at 1279.  Leviton's suits for

infringement of the '124 and '151 patents involve the products licensed under the CSA.  It is

unlikely that the Plaintiffs would enter into the CSA, and obtain the right to practice the licensed

products under the '558 and '766 patents, knowing that Leviton would then sue them for patent

infringement on the '124 and '151 patents based on the same licensed products.  Cf. Jacobs v.

Nintendo of Am., Inc., 370 F.3d at 1101 ("[I]t is unlikely that Analog would have contracted for the

right to manufacture and sell a product knowing that its customers would be unable to use the

product that it sold them for the bargained for purpose.").  As in TransCore, LP v. Electronic

Transaction Consultants Corp., where the later-issued patent was broader than, and necessary to

practice, the earlier issued patents that were licensed in the settlement agreement, in this case, the best construction appears to be that an implied license to the '124 and '151 patents for the licensed products is necessary to practice the license to the '558 and '766 for the licensed products. For the Plaintiffs to obtain the benefit of their bargain to practice the '766 and '558 patents for the licensed products, the best construction suggests that the Plaintiffs must be allowed to practice the '124 and '151 patents for the licensed products. The Court thus finds that the Plaintiffs will likely be able to prove that they have an implied license to the '124 and '151 patents. See TransCore, LP v. Elec. Transaction Consultants Corp., 563 F.3d at 1279 ("[F]or Mark IV to obtain the benefit of its bargain with TransCore, it must be permitted to practice the '946 patent . . . . Mark IV is [thus] . . . an implied licensee of the '946 patent."). Cf. Amp Inc. v. United States, 389 F.2d at 453 ("There is ample authority for the rule that where [a patent] owner . . . grants to a licensee the right to use a patented machine, the grant carries with it, by necessary implication, a license under any other patent of the licensor which would be infringed by operation under the grant." (citing Frederick B. Stevens, Inc. v. Steel & Tubes, Inc., 114 F.2d 815 (6th Cir. 1940)).

Leviton contends that the Plaintiffs have failed to carry their burden to show that the products that they are currently selling are within the scope of the CSA, because they have made only a conclusory allegation that the products are the licensed products referenced in the CSA, and because Leviton is entitled to -- and is currently seeking -- discovery whether other products should fall within the scope of the ITC investigation. See Response at 21. The Court believes that the case on which Leviton relies, Carborundum Co. v. Molten Metal Equipment Innovations, Inc., 72 F.3d 872 (Fed. Cir. 1995), does not compel the finding that the Plaintiffs have failed to carry their burden. In Carborundum Co. v. Molten Metal Equipment Innovations, Inc., the Federal Circuit addressed a district court's decision to grant judgment as a matter of law on an implied license defense. See 72

-34-

F.3d at 877.  The Federal Circuit stated that the party asserting an implied license as an affirmative

defense has the burden of establishing the existence of the implied license.  See 72 F.3d at 878.  The

Plaintiffs contend that the products that Leviton alleges infringe the '124 and '151 patents are the

licensed products referenced in the CSA.  In support of this assertion, the Plaintiffs submitted Song's

Declaration.  In support of the Plaintiffs' assertion that they have an implied license to the '124 and

'151 patents for these products, the Plaintiffs submitted the CSA.  Leviton does not contest the

Plaintiffs' characterization of their claims.  The Court believes that the Plaintiffs have sufficiently

carried their burden of proof, through their submission of Song's Declaration and the CSA, for a

preliminary injunction.  The Court notes that if Leviton wishes to conduct discovery whether other

products allegedly infringe its patents, it may conduct such discovery in this forum.

Leviton further contends that, even if the Plaintiffs have an implied license to some of the

claims in the '124 and '151 patents, the implied license extends only to those claims that dominate

the claims of the '558 and '766 patents, and Leviton is free to assert the narrower claims against the

Plaintiffs at the ITC.  See Response at 21.  In TransCore, LP v. Electronic Transaction Consultants

Corp., the Federal Circuit stated:

> On summary judgment, ETC asserted, and TransCore did not dispute, that
> TransCore's later-issued '946 patent was broader than, and necessary to practice, at
> least the '082 patent that was included in the TransCore-Mark IV settlement
> agreement.  Indeed, during discovery TransCore adopted its '082 patent infringement
> contentions as its contentions related to the '946 patent.  Absent argument to the
> contrary, the district court properly concluded that in order for Mark IV to obtain the
> benefit of its bargain with TransCore, it must be permitted to practice the '946 patent
> to the same extent it may practice the '183, '275 and '082 patents.

TransCore, LP v. Elec. Transaction Consultants Corp., 563 F.3d at 1279 (emphasis added).  Leviton

does not address whether the '124 and '151 patents are broader than, and necessary to practice, the

'558 and '766 patents.  Instead, Leviton contends that several claims in the '124 and '151 patents

are narrower than the claims of the '558 and '766 patents. The Court does not believe that this fact means that the '124 and '151 patents are not necessary to practice the '558 and '766 patents. If the Court found that the Plaintiffs' implied license was limited to the claims of the '124 and '151 patents that dominate the '558 and '766 patents, the Plaintiffs' implied license would inadequately reflect the benefit of the bargain that they obtained in the CSA. Leviton's construction would allow Leviton to derogate from its grant of a license to the '558 patent and the '766 patent by making several claims in the '124 and '151 patents narrower.

### B.   THE FORUM SELECTION CLAUSE IN THE CSA REQUIRES THAT THE PARTIES LITIGATE THE DISPUTE IN THIS COURT.

The Plaintiffs contend that the forum section clause in the CSA is mandatory, because it states that any disputes between the parties "relating to or arising out of" the CSA "shall be prosecuted exclusively" in the District of New Mexico. CSA § 11.2 (emphasis added). The Plaintiffs further contend that Leviton's patent infringement claims regarding the licensed products are within the scope of the forum selection clause, because Leviton's asserted claims regarding the '124 and '151 patents are related to the '558 and '766 patents identified in the CSA. See Memorandum at 23. The Plaintiffs also contend that they raise many of the same defenses that they raised in the prior litigation in the District of New Mexico, and that they rely on the CSA -- specifically, the implied licenses contained in the CSA -- as a defense to Leviton's new claims. See Memorandum at 22. Furthermore, the Plaintiffs allege that the phrase "relating to" is broad; therefore, without regard to whether Leviton's claims are directly arising out of the CSA, they relate to the CSA. See Memorandum at 24. The Plaintiffs conclude that Leviton should litigate its new claims of patent infringement exclusively in the District Court for the District of New Mexico and that injunctive relief is the appropriate remedy to prevent Leviton from breaching the forum

selection clause.  See Memorandum at 25.

Leviton contends that the ITC claims do not relate to or arise out of the CSA, because the claims involve patents that were not licensed under the CSA.  See Response at 23.  Leviton thus contends that section 11.2 of the CSA does not apply.  See Response at 23.  Leviton also contends that it should not be deprived of an opportunity to litigate its causes of action at the ITC, merely because the Plaintiffs might be able to "conjure an affirmative defense implicating the [Settlement] Agreement." Response at 24-25.

### 1.    The Forum Selection Clause in the CSA is Mandatory.

The difference between a mandatory and permissive forum selection clause is that '[m]andatory forum selection clauses contain clear language showing that jurisdiction is appropriate only in the designated forum.'"  Am. Soda, LLP v. U.S. Filter Wastewater Group, Inc., 428 F.3d at 926 (citing Excell, Inc. v. Sterling Boiler & Mech., Inc., 106 F.3d at 321).  "In contrast, permissive forum selection clauses authorize jurisdiction in a designated forum, but do not prohibit litigation elsewhere."  Am. Soda, LLP v. U.S. Filter Wastewater Group, Inc., 428 F.3d at 926-27 (citation omitted).  The general rule on enforcement of forum selection clauses is that, "when venue is specified in a forum selection clause with mandatory or obligatory language, the clause will be enforced."  Mueller v. Sample, 135 N.M. at 752, 93 P.3d at 773 (citing K & V Scientific Co. v. BMW, 314 F.3d at 499.

The CSA states that "[a]ny disputes between the Parties relating to or arising out of this [CSA] shall be prosecuted exclusively in the United States District Court for the District of New Mexico.  The Parties consent to the venue and jurisdiction of such court for this purpose."  CSA § 11.2.  This forum selection clause is mandatory. The specified venue -- the District Court for the District of New Mexico -- is accompanied by mandatory language -- specifically "shall" and

"exclusively."  CSA § 11.2.

> ### 2.   The Forum Selection Clause Covers Leviton's Infringement Claims Against the Plaintiffs.

Leviton's patent infringement claims in the ITC proceeding and the proceeding in the District Court for the Northern District of California are related to the CSA, because the claims involve patents that were impliedly licensed in the CSA and products that were licensed in the CSA. Even if Leviton's patent infringement claims in the ITC proceeding and in the proceeding in the District Court for the Northern District of California do not relate to the CSA, the exclusive venue provision covers Leviton's patent infringement claims.

Several courts have stated that, when the forum selection clause governs only disputes arising out of the contract containing the forum selection clause and the contract is relevant only as a defense, the forum selection clause is inapplicable.  See Corcovado Music Corp. v. Hollis Music, Inc., 981 F.2d at 682 (finding that the forum selection clause requiring the parties to resolve any disputes in Brazil has no effect when the contract containing the clause is "relevant only as a defense[;] [t]he Complaint asserts no rights whatsoever arising out of those contracts, and they form no part of plaintiff Corcovado's case").  In Phillips v. Audio Active Ltd., the forum selection clause provided that "any legal proceedings that may arise out of [the agreement] are to be brought in England."  494 F.3d at 386. The Second Circuit stated the plaintiff denied "that the contract ha[d] any role or relevant whatever with respect to his copyright claims."  494 F.3d at 391 (citation omitted).  The Second Circuit found that, "[b]ecause the recording contract is only relevant as a defense in this suit, we cannot say that [the plaintiff's copyright claims originate from, and therefore 'arise out of,' the contract."  494 F.3d at 391.

Other courts have found that a forum selection clause governing any dispute relating to or

arising in relation to the agreement encompasses a dispute in which the agreement is raised as a defense.  See Schering Corp. v. First Databank, Inc., 479 F. Supp. 2d at 470-71 (discussing a forum selection clause which provided that, "[i]n the event of any dispute concerning this Agreement or the Licensed Products, suit may be brought . . . in the U.S. District Court of the Northern District of California," and finding that the action related to the agreement because the defendant's defenses were based on the agreement).  In John Wyeth & Bro. Ltd. v. CIGNA Intern. Corp. the Third Circuit found that the language of the forum selection clause stating that "the English Courts shall have exclusive jurisdiction in relation to any dispute arising under or out of or in relation to this Agreement" encompassed a dispute in which the agreement containing the clause was raised as a defense.  119 F.3d 1073, 1076.  The Third Circuit noted that the phrase arising in relation to is broader than arising under.  See 119 F.3d at 1074.  The Third Circuit stated:

> The answer to the question whether a "defense" based on a contract that contains a forum selection clause implicates that clause depends on the language of the clause. Here, as we have noted, the clause is broadly worded, extending to any dispute "arising . . . in relation to." This language easily encompasses a dispute in which the 1990 Agreement is raised as a defense.  Corcovado is distinguishable because it contains no analysis of a forum selection clause with comparable language.

John Wyeth & Bro. Ltd. v. CIGNA Intern. Corp., 119 F.3d at 1076

The forum selection clause in this CSA states that the disputes "relating to" or "arising out of" the CSA shall be litigated in the District Court for the District of New Mexico.  CSA § 11.2. This case is analogous to John Wyeth & Bro. Ltd. v. CIGNA Intern. Corp., where the Third Circuit addressed an agreement containing a forum selection clause governing disputes "in relation to th[e] Agreement" and found that the language "easily encompass[ed] a dispute in which the . . . Agreement [was] raised as a defense." John Wyeth & Bro. Ltd. v. CIGNA Intern. Corp., 119 F.3d at 1073, 1076.  An implied license is a defense to patent infringement.  See Carborundum Co.

v. Molten Metal Equipment Innovations, Inc., 72 F.3d at 878. The Plaintiffs argue that the CSA granted them an implied license to the '124 and '151 patents. Because the language relating to is broad, the Court finds that the best construction is that the forum selection clause encompasses a dispute in which the CSA is raised as a defense. The Court therefore is likely to find that the forum selection clause in the CSA encompasses this dispute.

### 3.   Injunctive Relief is the Appropriate Remedy for Leviton's Breach of the Forum Selection Clause in the CSA.

The Court finds that the entry of a preliminary injunction enjoining Leviton to dismiss the suits it brought in the ITC and in the District Court for the Northern District of California is the appropriate remedy to prevent Leviton from breaching the forum selection clause in the CSA. See Texas Instruments Inc. v. Tessera, Inc., 231 F.3d at 1332 (stating that "[a]ny potential injunction would simply implement the governing law clause," and it would not and could not enjoin the ITC action."). Indeed, Leviton did not dispute that, if injunctive relief was warranted, the requested injunctive relief was appropriate. See Ciena Corp. v. Nortel Networks Inc., 2005 WL 1189881, at *12 (concluding that "the preliminary injunction factors favor preliminarily enjoining Ciena's participation in the ITC action . . . ."). The Court need not enjoin the ITC proceeding or another court.

## II.   THE PLAINTIFFS WILL LIKELY BE IRREPARABLY HARMED UNLESS THE COURT GRANTS THE REQUESTED INJUNCTIVE RELIEF.

The Plaintiffs allege that, absent the requested injunctive relief, they will suffer the irreparable harm of being deprived of their bargained-for forum. See Memorandum at 25. The Plaintiffs also contend that they will be forced to litigate on two fronts, causing them to suffer the irreparable harms of inconvenience, disruption of business, and financial hardship. See id. at 26.

Leviton contends that the Plaintiffs' claim of irreparable harm is belied by their delay of

nearly two months before seeking a TRO and a preliminary injunction.  See Response at 25.  Leviton also contends that the Plaintiffs cannot successfully assert that they will be irreparably harmed by litigating on two fronts, because, even if the Court finds there is an implied license, the license cannot extend to the narrower claims of the '124 and '151 patents; therefore, litigation at the ITC should continue as to the narrower claims even if the preliminary injunction is granted.  See Response at 25.  Leviton also contends that the Plaintiffs brought the litigation on two fronts on themselves by filing this action.  See Response at 26.

The Court believes that the amount of time that the Plaintiffs waited before seeking a TRO and preliminary injunction does not -- without more -- belie their allegations of irreparable harm.  Leviton initiated its ITC proceeding on September 3, 2010, and contemporaneously filed its action in the Norther District of California.  Leviton contends that the Plaintiffs retained counsel by October 13, 2010, yet did not inform Leviton of their intention to raise an implied license as a defense until October 26, 2010 and did not file their motion for a TRO and preliminary injunction until November 2, 2010.  See Response at 25.  The Court is unwilling to find that this delay -- without more -- belies the Plaintiffs' claims of irreparable harm.

If the Court does not issue injunctive relief, and the Plaintiffs' construction of the forum selection clause prevails, as the Court believes it will, the Plaintiffs will suffer irreparable harm.  In the CSA, the parties agreed that "[a]ny disputes between the Parties relating to or arising out of this [CSA] shall be prosecuted exclusively in the United States District Court for the District of New Mexico."  CSA § 11.2.  The Court has determined that the best construction of the forum selection clause is that this dispute relates to the CSA.  The Plaintiffs therefore will likely suffer the irreparable harm of the deprivation of their bargained-for forum if the Court does not issue injunctive relief.  See Ciena Corp. v. Nortel Networks Inc., 2005 WL 1189881, at *7 (finding that

the party seeking injunctive relief would be irreparably harmed if the ITC action proceeded, because it would "be deprived of its bargained-for forum -- an Article III judge's court and jury in the United States District Court for the Eastern District of Texas").

The Plaintiffs will also likely suffer irreparable harm, because, without injunctive relief, they might also be forced to litigate on several fronts. Leviton filed a patent infringement action with the ITC and in the District Court for the Northern District of California. The Plaintiffs then filed this motion in the Court, requesting injunctive relief. Although the action in the District Court for the Northern District of California has been stayed pending the outcome of the 2010 ITC action, and thus "does not present an immediate danger of causing irreparable harm to Movants while it remains stayed," Memorandum at 15, the ITC action is still pending. The Court does not believe that it is material that the Plaintiffs brought litigating on two fronts on themselves. The Plaintiffs instituted this litigation, in part, because they believe the ITC is not the proper forum. Had Leviton filed a patent infringement case in the District Court for the District of New Mexico, the Plaintiffs would not currently be litigating on two fronts. Litigation on two fronts causes "inconvenience, disruption of . . . business, loss of good will, and financial . . . hardship[, which result from the] duplicative actions." Ciena Corp. v. Nortel Networks Inc., 2005 WL 1189881, at *7. The Court therefore finds that the litigation on two fronts will cause irreparable harm to the Plaintiffs. See Texas Instruments, Inc. v. Tessera, Inc., 231 F.3d at 1332 ("Tessera breached . . . the license agreement by bringing an action against TI at the ITC . . . . Thus, TI may have been prejudiced by Tessera's breach, for TI . . . [was] obliged to defend a second action . . . Tessera is [effectively] attempting to compel TI to fight infringement battles on two fronts."); Texas Instruments, Inc. v. Tessera, Inc., No. C-00-2114 CW, slip. op. at 6 (N.D. Cal. Mar. 6, 2001)("[L]itigating simultaneously in California and the ITC will cause financial and business hardship to TI. Even if its attorneys' fees and costs are

eventually recoverable in damages, the inconvenience and disruption to its business is irreparable."). The Court finds that, absent injunctive relief, the Plaintiffs will likely suffer the irreparable harms of deprivation of their bargained-for forum, and the inconvenience and hardship of litigating on two fronts.

III.   **THE BALANCE OF HARDSHIPS FAVORS THE PLAINTIFFS, BECAUSE THEY WILL LIKELY SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF, WHILE INJUNCTIVE RELIEF IS UNLIKELY TO MATERIALLY HARM LEVITON.**

The Plaintiffs contend that the balance of hardships strongly favors them, because the Court's failure to enter the requested injunctive relief would cause them irreparable harm, while the requested injunctive relief would not prejudice or work material hardship to Leviton, because, for all practical purposes, the Court can grant Leviton any relief it would have obtained in the ITC or in California. See Memorandum at 27. The Plaintiffs further contend that, even if Leviton believes it would be entitled to relief not available before the Court, Leviton is a "sophisticated litigant that knowingly bargained that relief away when it agreed that th[e] Court would serve as the exclusive forum for future disputes arising out of or relating to the CSA." Memorandum at 27.

Leviton responds that the balance of hardships weighs in Leviton's favor, because the ITC action affords Leviton a forum for quickly addressing its claims and obtaining the relief it seeks -- "barring the importation of infringing goods admittedly manufactured in China." Response at 26. Leviton contends that the Plaintiffs' only hardship is litigating at the ITC, which is not a substantial hardship, because the discovery obtained at the ITC can be used in a later district court proceeding. See Response at 26.

The balance of the hardships favors the Plaintiffs. The hardship to the Plaintiffs absent injunctive relief is not limited to litigation at the ITC. As the Court previously found, the Plaintiffs

will likely suffer irreparable harm absent injunctive relief, because they will be deprived of their bargained-for forum, and they will suffer the hardships of litigating on two fronts.  Entry of injunctive relief will not work a material hardship on Leviton, however.  For all practical purposes, a party can obtain the same relief in a district court as it could obtain in the ITC, see Ciena Corp. v. Nortel Networks Inc., 2005 WL 1189881, at * 8 ("This injunction will not work a material hardship to Ciena, as for all practical purposes, this Court can grant Ciena any relief it could have obtained in the ITC."), with the exception of the automatic Customs Service enforcement of an exclusion order that the ITC issues, see Texas Instruments Inc. v. Tessera, Inc., 231 F.3d at 1230 ("[A] patentee must . . . request[ ] the U.S. Customs Service to enforce [a] district court judgment [respecting infringing imports] by seizing the . . . goods.  In the ITC, the patentee may not seek money damages, but the ITC automatically enforces its judgment by directing the U.S. Customs Service to seize any infringing imports." (internal citation omitted)).  See Freres v. Yucheng Lujian Biological Co., Ltd., No. 06-cv-04928, 2009 WL 3135175, at *1-2 (D.N.J. 2009)("[I]f a plaintiff seeks relief in a district court, he must additionally [ask] the U.S. Customs Service . . . to enforce the . . . judgment by seizing the offending goods. . . .  In contrast, if a patentee files an action directly with the ITC . . . the ITC automatically enforces its judgment." (internal quotation marks and citations omitted)).  The Court can grant, for all practical purposes the same relief the ITC could grant, and the best construction of the CSA suggests that Leviton agreed that disputes arising from or relating to the CSA would be brought in the District Court for the District of New Mexico.  See CSA § 11.2.  The Court therefore finds that entry of injunctive relief is unlikely to materially harm Leviton.  The Court finds that the balance of hardships weighs in the Plaintiffs' favor, because they likely will suffer irreparable harm absent injunctive relief, while injunctive relief is unlikely to materially harm Leviton.

-44-

## IV.    PUBLIC POLICY AND THE PUBLIC INTEREST FAVOR ENTRY OF INJUNCTIVE RELIEF.

The Plaintiffs contend that public policy favors enforcing the forum selection clause. <u>See</u>
Memorandum at 28. Leviton contends that the forum selection clause does not govern the dispute,
and that "[i]t is not in the public interest to hinder an investigation that, while instigated by Leviton,
was launched and is being conducted by a federal agency." Response at 26-27.

Contractual forum selection clauses "are prima facie valid and should be enforced unless
enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." <u>M/S
Bremen v. Zapata Off-Shore Co.</u>, 407 U.S. 1, 10 (1972). Public policy therefore favors the
enforcement of forum selection clauses. The Court does not believe that it is in the public interest
to contravene the public policy favoring enforcement of forum selection clauses when its issuance
of an injunction will not have a negative effect on the ITC action. In the ITC action, Leviton alleged
that the Plaintiffs and other entities infringed its '124 and '151 patents. It also alleged that other
entities infringed its '809 patent. The ITC action, that alleges other entities infringed Leviton's
'124, '151, and '809 patents will continue. The Plaintiffs do not ask the Court to enjoin the ITC
action. In <u>Texas Instruments Inc. v. Tessera, Inc.</u>, the Federal Circuit discussed the district court's
decision to deny Texas Instrument's request for a preliminary injunction, in part, because to do so
would interfere with the ITC's statutory mandate to investigate complaints and would adversely
impact the ITC's ability to perform its statutory duties. <u>See</u> 231 F.3d at 1332. The Federal Circuit
stated: "[Texas Instrument]'s preliminary injunction motion will not and cannot enjoin[9] the ITC

_____

[9] Section 1337 of Title 19 of the United States Code states: "The Commission <u>shall
investigate any alleged violation of this section</u> on complaint under oath or upon its initiative. Upon
commencing any such investigation, the Commission shall publish notice thereof in the Federal
Register. <u>The Commission shall conclude any such investigation</u> and make its determination under
this section at the earliest practicable time after the date of publication of notice of such

action. . . .   Any potential injunction would simply implement the governing law clause and any litigation between Tessera and [Texas Instruments] will occur in a California district court." 231 F.3d at 1332.  Injunctive relief would solely enjoin Leviton to dismiss its patent infringement claims against the Plaintiffs.  The remainder of Leviton's action in the ITC action would continue, and the ITC could continue its investigation of these allegations.  The Court therefore does not believe that its issuance of injunctive relief would hinder the ITC action.  Because the Court's issuance of injunctive relief will not hinder the ITC action, and because public policy favors enforcement of forum selection clauses, the Court finds that the public interest weighs in favor of granting injunctive relief.

**IT IS ORDERED** that the Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, filed November 2, 2010 (Doc. 5), is granted in part.  The Court will grant the Plaintiffs' request for a preliminary injunction enjoining Leviton to take all actions necessary to secure dismissal of all claims of patent infringement asserted against the Plaintiffs in the International Trade Commission action and the action in the United States District Court for the Northern District of California.  Because the Court's grant of this injunction renders the Plaintiffs' other requested relief unnecessary, the Court will deny the Plaintiffs' request for a temporary restraining order compelling Leviton to consent to the Plaintiffs' motion to stay the ITC action or, if Leviton's objection to the motion to stay has already been lodged, to withdraw that objection.

---

investigation."  19 U.S.C. § 1337(b)(1)(emphasis added).

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Roger Michener
Michener Law Firm, LLC
Placitas, New Mexico

     *Attorneys for the Plaintiffs*

William F. Long
Ann G. Fort
Joshua D. Curry
Lei Fang
Sutherland Asbill & Brennan, LLP
Atlanta, Georgia

     *Attorneys for Plaintiffs General Protecht Group, Inc.,*
       *SecurElectric Corporation, G-Techt Global Corporation,*
       *and Warehouse-Lighting.com LLC*

Mark J. Rosenberg
Sills Cummis & Gross, P.C.
New York, New York

     *Attorneys for Plaintiffs Harbor Freight Tools USA, Inc.*
       *and Central Purchasing, LLC*

Robin L. Brewer
Stefani E. Shanberg
Wilson, Sonsini, Goodrich & Rosati, P.C.
Palo Alto, California

-- and --

Emil Kiehne
Modrall Sperling Roehl Harris & Sisk, P.A.
Albuquerque, New Mexico

--and--

Larry L. Shatzer
Shaun R. Snader
Wilson, Sonsini, Goodrich & Rosati, P.C.
Washington, D.C.

    *Attorneys for Defendant Leviton Manufacturing Co.*