# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

GENERAL PROTECHT GROUP, INC.,
f/k/a ZHEJIANG DONGZHENG
ELECTRICAL, CO.; G-TECHT GLOBAL
CORPORATION; SECURELECTRIC
CORPORATION; WAREHOUSE-
LIGHTING.COM LLC; CENTRAL
PURCHASING, LLC; and HARBOR
FREIGHT TOOLS USA, INC.,

       Plaintiffs,

vs.                                                    No. CIV 10-1020 JB/LFG

LEVITON MANUFACTURING CO.,

       Defendant.

## <u>MEMORANDUM OPINION</u>[1]

    **THIS MATTER** comes before the Court on the Plaintiff's Motion for Finding

Exceptional Case Under 35 U.S.C. § 285 and Award of Attorneys' Fees, filed June 22, 2012

(Doc. 202)("Motion").  The Court held a hearing on March 6, 2013.  The primary issue is

whether Defendant Leviton Manufacturing Co. should pay some or all of the Plaintiffs' attorneys

fees, which would require the Court to find that Leviton Manufacturing litigated so unreasonably

or from such a weak position that the case is "exceptional" under 35 U.S.C. § 285.  The Court

concludes that (i) Leviton Manufacturing's position was incorrect but not exceptionally so; and

(ii)  Leviton Manufacturing did not litigate in an excessively unreasonable manner by asserting

---

[1]On March 29, 2013, the Court issued an Order denying the Plaintiffs' Motion for
Finding of Exceptional Case Under 35 U.S.C. § 285 and Award Attorneys' Fees, but said it
would issue a full Memorandum Opinion detailing its rationale at a later date.  <u>See</u> Memorandum
Opinion and Order (Doc. 227).  This Memorandum Opinion is the promised the opinion.

its faulty position.  Consequently, the Court concludes the case is not exceptional, and, thus, no attorneys' fees are warranted.  Nonetheless, the Court will consider the reasonableness of the Plaintiffs' requested attorneys' fees and find that, even if the Court had found the case exceptional, it would not have awarded fees for: (i) clerical or secretarial tasks that paralegals performed; (ii) work performed relating to a separate trade dispute; (iii) three attorneys to attend single depositions; or (iv) travel expenses to send an attorney to China.

**FACTUAL BACKGROUND**

General Protecht Group, Inc.[2] and Leviton Manufacturing build and sell competing ground fault circuit interrupter ("GFCI") products.  See Leviton Mfg. Co. v. Nicor, Inc., 557 F. Supp. 2d 1231, 1235 (D.N.M. 2007); Leviton Mfg. Co. v. Nicor, Inc., No. CIV 04-0424, 2006 WL 4079129, at *1 (D.N.M. May 23, 2006); Memorandum at 7.  GFCIs are safety devices that reduce the risk of electrocution.  See Leviton Mfg. Co. v. Nicor, Inc., 2006 WL 4079129, at *1.  General Protecht markets and sells GFCI products to United States distributors, including Plaintiffs Harbor Freight Tools USA, Inc., Central Purchasing, LLC, G-Techt Global Corp., SecurElectric Corp., and Warehouse-Lighting.com LLC.  See Leviton Mfg. Co. v. Zhejiang Dongzheng Elec. Co., 506 F. Supp. 2d 646, 648-49 (D.N.M. 2007); Leviton Mfg. Co. v. Nicor, Inc., 557 F. Supp. 2d at 1235; Memorandum at 7.  General Protecht manufactures its GFCI products in China.  See Leviton Mfg. Co. v. Zhejiang Dongzheng Elec. Co., 506 F. Supp. 2d at 648-49; Memorandum at 7.

---

[2]General Protecht Group, Inc. was formerly known as Zhejiang Dongzheng Electrical Co., but has changed its name.  See Memorandum of Law in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction at 9 n.3, filed November 2, 2010 (Doc. 6)("Memorandum").  To avoid confusion, the Court will refer to the company as General Protecht.

1.      **The Prior Actions.**

In 2004 and 2005, Leviton Manufacturing asserted claims of patent infringement of U.S.

Patent Nos. 6,246,558 ("the '558 Patent") and 6,864,766 ("the '766 patent") in the United States

District Court for the District of New Mexico.  See Memorandum at 8; Defendant Leviton

Manufacturing Co.'s Memorandum of Law in Opposition to Plaintiffs' Motion for Temporary

Restraining Order and Preliminary Injunction at 3, filed November 12, 2010 (Doc. 18)

("Response").  In these actions, Leviton Manufacturing alleged that General Protecht, Harbor

Freight, Central Purchasing, and Nicor, Inc. infringed Leviton's '558 patent and '766 patent

through their sale of GFCIs that General Protecht manufactured.  See Leviton Mfg. Co. v. Nicor,

Inc., Nos. CIV 04-0424 JB/RHS, CIV 04-1295 JB/ACT (D.N.M.); Leviton Mfg. Co. v. Zhejiang

Dongzheng Elec., Co., No. CIV 05-0301 JB/DJS (D.N.M.).  On March 5, 2007, the Court made

a Markman[3] ruling, which adopted General Protecht, Harbor Freight, Nicor, Inc., and Central

Purchasing's construction of the terms "movable bridge," "predetermined condition," and "reset

portion."  Leviton Mfg. Co. v. Zhejiang Dongzheng Elec. Co.,  506 F. Supp. 2d at 648.  On July

10, 2007, the Court granted summary judgment of non-infringement to General Protecht, Harbor

Freight, and Nicor, Inc. with respect to the '558 patent.  See Leviton Mfg. Co. v. Nicor, Inc., 557

F. Supp. 2d at 1235, 1250-51.

---

[3]Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996)("Markman").  In patent-infringement cases, the court determines the patent's meaning and scope as a matter of law, and the jury then determines whether the defendant's conduct infringed the patent, as the judge construes it.  Markman hearings are pre-trial hearings that the court conducts to determine the patent's meaning and scope, and Markman rulings are the legal determinations that result from them.

2.      **The CSA.**

In October 2007, Leviton Manufacturing, General Protecht, Harbor Freight, Nicor, Inc., and Central Purchasing entered into a confidential settlement agreement ("CSA") to resolve the patent infringement actions pending in the Court.  See Memorandum at 9; Response at 3.  The CSA included a covenant not to sue.  The covenant stated:

> 2.1     Leviton . . . hereby covenants not to sue (1) Defendants, their officers, directors, shareholders, members, employees, subsidiaries, or affiliates for alleged infringement of the '558 and/or '766 patents based on the Dongzheng products currently accused of infringement in the '558 and/or '766 actions; and (2) Defendants, their officers, directors, shareholders, members, employees, subsidiaries, or affiliates for alleged infringement of the '558 patent and/or the '766 patent with respect to an anticipated future new GFCI product that Defendant Dongzheng has indicated its intent to market in the U.S. in the future, . . . .

> 2.2     The dismissals and covenant not to sue by Leviton in Article 2.1 shall also apply to Defendants' customers of the Dongzheng Products including, but not limited to, Interline Brands, Inc., provided such customers do not seek to invalidate any claim of the '558 or '766 patents or seek to have those patents declared invalid or unenforceable through any presently existing or future court action or administrative filing.

CSA §§ 2.1, 2.2, at 4-5.  The CSA also contained a section regarding the District of New Mexico's '766 <u>Markman</u> order.

> The parties will jointly request that the Court vacate its '766 Order in . . . the Court's Memorandum Opinion and Order dated March 5, 2007, by submitting a joint motion and proposed form of Order to the Court . . . .  However, Leviton agrees not to challenge any proposed claim construction of a '766 patent claim that is reflected in the '766 <u>Markman</u> Order, which any of the Defendants, their officers, directors, shareholders, members, employees, subsidiaries, affiliates (or their customers) may propose in connection with any claim of infringement of a '766 patent claim.   Defendants and their officers, directors, shareholders, members, employees, subsidiaries, affiliates (or their customers) are not precluded from proposing said claim construction in any action or proceeding asserting infringement of any patent related to the '766 patent, although Leviton may challenge such proposed claim construction.  Leviton and defendants agree that neither the fact of the Court's decision to vacate or not vacate its '766 <u>Markman</u> Order, nor the fact that the parties requested that the Court vacate its '766

- 4 -

<u>Markman</u> Order, can be used by a party to this Agreement to support or challenge a proposed construction of a claim related to the '766 patent.

CSA § 4.1.

The CSA also contained a section entitled "Governing Law/Venue."  CSA § 11.2, at 11. This section states:  "Any dispute between the Parties relating to or arising out of this [CSA] shall be prosecuted exclusively in the United States District Court for the District of New Mexico.  The Parties consent to the venue and jurisdiction of such court for this purpose."  CSA § 11.2, at 11.

   **3.    <u>Leviton's '124 and '151 Patents</u>.**

After executing the CSA, Leviton Manufacturing secured two new patents -- U.S. Patent Nos. 7,463,124 ("the '124 patent") and 7,764,151 ("the '151 patent").  On December 9, 2008, the '124 patent issued from application no. 10/977,929 ("the '929 application"), which Leviton filed on October 28, 2004.  <u>See</u> Response at 6; Memorandum at 10.  The '151 patent issued on July 27, 2010 from application no. 12/176,735 ("the '735 application"), which Leviton Manufacturing filed on July 21, 2008.  <u>See</u> Response at 7; Memorandum at 10.  The '929 application was filed as a continuation[4] of the '766 application.  <u>See</u> Response at 6.  The '735 application was filed as a continuation of the '929 application.  <u>See</u> Response at 7.

_____

   [4]A continuation is

a second application for the same invention claimed in a prior nonprovisional application and filed before the original prior application becomes abandoned.  A continuation application may be filed under 37 C.F.R. § 1.53(b) or under 37 C.F.R. § 1.53(d) as a CPA, Continued Prosecution Application.  A continuation carries forward the disclosure from a previous application but adds nothing new, merely providing a second opportunity to have the same disclosure reviewed for patentability.  Thus, to enjoy the status of a continuation, the later application must have a disclosure common with the previous application, be

**4.      Actions Asserting Infringement of Leviton's '124 and '151 Patents.**

In September 2010, Leviton Manufacturing filed patent infringement complaints with the International Trade Commission ("ITC") and in the District Court for the Northern District of California, alleging that General Protecht, Techt, SecureElectric, Warehouse-Lighting.com, Central Purchasing, Harbor Freight, and other entities, infringed Leviton Manufacturing's '124 and '151 patents.   Response at 7; Memorandum at 14.[5]   In its ITC Complaint, Leviton Manufacturing asserts that six of General Protecht's GFCI products infringe the '124 and '151 patents.  See Declaration of Huaiyin Song ¶ 8, at 4-5 (executed Oct. 29, 2010), filed November 2, 2010 (Doc. 8)("Song Decl."); Amended Complaint Under Section 337 of the Tariff Act of 1930, as Amended at i-ii, 1-9, 26-46, filed November 3, 2010 (Doc. 10-1).   Leviton Manufacturing's complaints in the District Court for the Northern District of California and in the ITC allege identical claims of patent infringement.   See Song Decl. ¶ 7, at 3-4; Leviton Manufacturing Co.'s First Amended Complaint for Patent Infringement and Trade Secret Misappropriation, filed November 3, 2010 (Doc. 10-2).   The Plaintiffs assert that the CSA

---

copending with it, and clearly refer back to it.  Except as provided in 37 C.F.R. § 1.45, the applicant in the continuation must be the same as in the prior application. The disclosure presented in the continuation must be the same as that of the original application, that is, the continuation should not include anything which would constitute new matter if inserted in the original application. At any time during the prosecution of the earlier nonprovisional application, the applicant may file a continuation in order to introduce a new set of claims and to establish a right to further examination by the Patent and Trademark Office.

J. Mills, D. Reiley & R. Highley, 3 Patent Law Fundamentals § 15:8 (2d ed. 2004).

[5]Both the ITC proceeding and the proceeding in the Northern District of California contain allegations regarding another patent, U.S. Patent No. 7,737,809; that patent, and those allegations, are not implicated in the case before the Court.  See Response at 8 n.4.

licensed the six GFCI products that Leviton Manufacturing asserts infringe the '124 and '151 patents.  See Song Decl. ¶¶ 8-10, at 4-5.  Huaiyin Song, a manager in General Protecht's Department of Technology Development and Product Manufacturing, states that, of the General Protecht GFCI products that Leviton Manufacturing currently accuses the Plaintiffs of infringing, one of them is one of the same products that Leviton Manufacturing accused the Plaintiffs of infringing in the previous litigation in the District of New Mexico.  Song Decl. ¶ 10, at 4.  He states that the other five products are, together, the "anticipated future new" product identified in § 2.1(2) of the CSA.  Song Decl. ¶ 9, at 4.  Leviton Manufacturing asserts that the ITC action is not limited to the six identified General Protecht products, because Leviton Manufacturing has a right, through discovery in the ITC action, to assert that additional products infringe its patents. See Response at 8.

## PROCEDURAL BACKGROUND

On October 28, 2010, the Plaintiffs filed their Complaint for Declaratory and Injunctive Relief.  See Doc. 1 ("Complaint").  They assert ten Counts against Leviton Manufacturing: (i) Count I is a claim for declaratory judgment and injunctive relief, requesting a ruling from the Court that Leviton Manufacturing violated the CSA's exclusive forum-selection provision; (ii) Count II is a claim for declaratory judgment of non-infringement based on license or estoppel; (iii) Count III is a claim for declaratory judgment of non-infringement of the '124 patent; (iv) Count IV is a claim for declaratory judgment of non-infringement of the '151 patent; (v) Count V is a claim for declaratory judgment of invalidity of the '124 patent; (vi) Count VI is a claim for declaratory judgment of invalidity of the '151 patent; (vii) Count VII is a claim for declaratory judgment of invalidity of the '124 and '151 patents because of prosecution laches; (viii) Count VIII is a claim for declaratory judgment of inequitable conduct with respect to the

'124 and '151 patents; (ix) Count IX is a claim for attorneys' fees on the ground that this case is an "exceptional case" under 28 U.S.C. § 285; and (x) Count X is a claim for breach of contract. Complaint ¶¶ 40-116, at 9-23.  Leviton Manufacturing asserts three counterclaims against the Plaintiffs: (i) Counterclaim I is for infringement of  the '124 patent; (ii) Counterclaim II is for infringement of  the '151 patent; and (iii) Counterclaim III is a claim for trade-secret misappropriation  under Georgia Code §§ 10-1-763 through 64.   See Defendant Leviton Manufacturing Co. Inc.'s Answer, Defenses, and Counterclaims to Complaint for Declaratory and Injunctive Relief at 19-25, filed December 15, 2010 (Doc. 59)("Answer").   Leviton Manufacturing asserts Counterclaim III against GPG only.  See Answer ¶¶ 162-73, at 22-24.

The Court issued a Memorandum Opinion and Order (Doc. 41)("Nov. 30, 2010 MOO") on the Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, filed November 2, 2010 (Doc. 5), granting the Plaintiffs' request for a preliminary injunction.  The Court enjoined Leviton Manufacturing to take all actions necessary to secure dismissal of all claims of patent infringement asserted against the Plaintiffs in the ITC action and the action in the Northern District of California.  See Nov. 30, 2010 MOO at 46.  The Plaintiffs also requested a temporary restraining order compelling Leviton Manufacturing to stay the ITC action, but the Court denied that requested ruling, finding it unnecessary in light of the Court's granting of the preliminary injunction.  See Nov. 30, 2010 MOO at 46.  On December 8, 2010, Leviton Manufacturing filed a Notice of Appeal, appealing the Court's grant of the preliminary injunction to the United States Court of Appeals for the Federal Circuit.  See Notice of Appeal at 1, filed December 8, 2010 (Doc. 53).  On July 8, 2011, the Federal Circuit issued a Judgment affirming the Court's grant of the preliminary injunction.  See Judgment at 1, filed October 5, 2011 (Doc. 146).

In early 2011, General Protecht moved to dismiss Leviton Manufacturing's trade-secret claim for lack of subject-matter jurisdiction.  See GPG's Motion to Dismiss Leviton's Trade Secret Misappropriation Counterclaim for Lack of Jurisdiction at 1, filed January 10, 2011 (Doc. 73)("GPG's MTD").  General Protecht asserts that there is no common nucleus of fact between the federal causes of action relating to patent infringement, over which the Court has original subject-matter jurisdiction under 28 U.S.C. § 1331, and the trade-secret counterclaim Leviton Manufacturing asserts against General Protecht.  See Memorandum in Support of GPG's Motion to Dismiss Leviton's Trade Secret Misappropriation Counterclaim for Lack of Subject Matter Jurisdiction at 1-3, filed January 10, 2011 (Doc. 74)("GPG's MTD Memo.").  It notes that the Court has only supplemental jurisdiction over the trade-secret claim.  See GPG's MTD Memo. at 3.  General Protecht asserts that diversity jurisdiction does not exist in this case, because some Plaintiffs and the Defendant share citizenship, thus destroying complete diversity.  See GPG's MTD Memo. at 3.  General Protecht asserts that the dispute underlying the trade-secret claim is not so related as to be part of the same case or controversy as the dispute underlying the patent claims.  See GPG's MTD Memo. at 3-4.  General Protecht argues that, even if supplemental jurisdiction exists over the trade-secret claim, the Court should decline to exercise supplemental jurisdiction over that claim.  See GPG's MTD Memo. at 4-6.

On November 3, 2011, Leviton Manufacturing filed its response to General Protecht's motion to dismiss.  See Leviton's Memorandum of Law in Opposition to GPG's Motion to Dismiss Leviton's Trade Secret Counterclaim for Lack of Subject Matter Jurisdiction (Doc. 150) ("Response to GPG's MTD").  It asserts that its trade-secret counterclaim arises out of the same common nucleus of operative fact as the patent dispute.  See Response to GPG's MTD at 1.  It contends that "[t]he trade secret counterclaim involves GPG's efforts to misappropriate

Leviton's trade secrets, including those related to ground fault circuit interrupters ('GFCIs'), the same type of products at issue in the patent claims and counterclaims."  Response to GPG's MTD at 1.  Leviton Manufacturing notes that "[t]he trade secret misappropriation occurred in 2008, before the ink was dry on the October 2007 Settlement Agreement that forms the basis of the of [sic] GPG's breach of contract claim."  Response to GPG's MTD at 1-2.  Leviton Manufacturing argues that there will be "substantial factual overlap" between the trade-secret claim and the patent claims.  Response to GPG's MTD at 1.  Leviton Manufacturing contends that exercising supplemental jurisdiction over the trade-secret claim is appropriate.  See Response to GPG's MTD at 5-8.  Leviton does not, however, raise any argument that diversity jurisdiction is present over its trade-secret claim.  See Response to GPG's MTD at 1-8; Answer ¶¶ 132-33, at 15.  General Protecht filed its reply brief on November 21, 2011.  See Reply Brief in Support of GPG's Motion to Dismiss Leviton's Trade Secret Misappropriation Counterclaim for Lack of Subject Matter Jurisdiction (Doc. 151).

In October of 2011, Leviton Manufacturing filed a motion to dismiss.  See Defendant Leviton Manufacturing Co., Inc.'s Motion to Dismiss Patent Claims and Counterclaims at 1, filed October 11, 2011 (Doc. 144)("Leviton's MTD").  Leviton Manufacturing asks the Court to enter "an order dismissing its First and Second Counterclaims" for patent infringement with prejudice.  Leviton Manufacturing Co., Inc.'s Memorandum of Law in Support of Its Motion to Dismiss Patent Claims and Counterclaims at 1, filed October 11, 2011 (Doc. 145)("Leviton's MTD Memo.").  It argues that "[t]he dismissal of its Patent Counterclaims with prejudice by Leviton coupled with the this [sic] Court's decision, as affirmed by the" Federal Circuit's decision, that the "Plaintiffs have an implied license to the '124 and '151 patents for the products currently at issue, render moot both the Patent Counterclaims and Patent Claims."  Leviton's

MTD Memo. at 1-2 (footnote omitted).  It contends that the Court should dismiss Counts II through VIII as moot.  See Leviton's MTD Memo. at 2-5.  Leviton Manufacturing asserts that, once it dismisses its patent counterclaims, there will "no longer [be] a 'substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'"  Leviton's MTD Memo. at 3-4 (quoting MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 126 (2007)).  It contends that the Federal Circuit has recognized that "a covenant not to sue already exists" in the parties' earlier settlement agreement and that, thus, the case is now moot.  Leviton's MTD Memo. at 4.

On November 3, 2011, the Plaintiffs responded to Leviton's MTD.  See Plaintiffs' Response to Leviton's Motion to Dismiss Patent Claims and Counterclaims (Doc. 149) ("Response to Leviton's MTD").  The "Plaintiffs agree that Leviton's infringement counterclaims should be dismissed with prejudice," and they also consent to dismissal of Counts III and IV without prejudice.  Response to Leviton's MTD at 1.  They oppose dismissal of the remaining Counts that they have asserted against Leviton Manufacturing.  See Response to Leviton's MTD at 1.  They assert that, rather than dismiss Count II as moot, the Court should enter judgment in favor of the Plaintiffs on Count II based on the Federal Circuit's finding that the Plaintiffs have an implied license to the '124 and '151 patents for the products described in the parties' settlement agreement.  See Response to Leviton's MTD at 3.  The Plaintiffs recognize, however, that "the Federal Circuit's opinion was technically only affirming this Court's grant of a preliminary injunction."  Response to Leviton's MTD at 3.  They also assert that, even if Leviton Manufacturing dismisses its patent-infringement claims with prejudice, their claims asserting that Leviton Manufacturing's patents are unenforceable and/or invalid are not moot.  See Response to Leviton's MTD at 4-5, 9-13.  The Plaintiffs contend that Leviton's

argument that a covenant not to sue makes this dispute moot is not persuasive given that "Leviton did not offer a covenant not to sue during the litigation." Response to Leviton's MTD at 6. They argue that, "[i]nstead[,] there has been an adjudication of non-infringement based on implied license, and it is only the adjudicated finding of non-infringement -- not any voluntary change of position prior to adjudication -- that prevents Leviton from pursuing its infringement claims against Plaintiffs." Response to Leviton's MTD at 6 (emphasis in original). The Plaintiffs also argue that, "[e]ven if the Court were to agree with Leviton that Plaintiffs' invalidity and unenforceability claims are moot, the Court retains subject matter jurisdiction to decide Plaintiffs' unenforceability claims based on Plaintiffs' claim for attorneys' fees under § 285." Response to Leviton's MTD at 13.

On November 21, 2011, Leviton Manufacturing filed its reply brief to the Response to Leviton's MTD. See Leviton's Reply to Plaintiffs' Opposition to Leviton's Motion to Dismiss Patent Claims and Counterclaims (Doc. 154)("Reply to Response to Leviton's MTD"). It asserts that, even if the Court can exercise jurisdiction over the remaining patent claims in the Plaintiffs' declaratory judgment action, it should decline to do so. See Reply to Response to Leviton's MTD at 7-10. On November 30, 2011, the Plaintiffs filed a surreply brief. See Plaintiffs' Surreply Brief in Opposition to Leviton's Motion to Dismiss Patent Claims and Counterclaims (Doc. 158-1)("Surreply"). The Plaintiffs argue that the Federal Circuit's "finding of implied license renders the infringement issue fully litigated." Surreply at 2.

On January 18, 2012, Harbor Freight and Central Purchasing informed the Court that, in contradiction to their earlier position, they now consent "to the dismissal of Counts III-VIII as they apply to" them, "so long as the dismissal is" without prejudice. Letter to the Court from Mark J. Rosenberg at 1 (dated Jan. 18, 2012), filed January 17, 2012 (Doc. 165). On February

14, 2012, the remaining Plaintiffs, besides Harbor Freight and Central Purchasing, informed the Court that they are "willing to consent to dismissal of Counts III through VIII" if dismissal is without prejudice.  Letter to the Court from William F. Long at 1 (dated February 14, 2012), filed February 14, 2012 (Doc. 168).

At the hearing on February 16, 2012, the Court inquired whether considerations of fairness and efficiency have any bearing on its determination whether it has supplemental jurisdiction over the trade-secret claim.  See Transcript of Hearing at 13:11-15 (taken Feb. 16, 2012)(Court)("Feb. 16, 2012 Tr.").[6]  Leviton Manufacturing acknowledged that the Court must first decide whether it has supplemental jurisdiction over the claim and then it can decide whether it will choose to exercise supplemental jurisdiction over that claim.  See Feb. 16, 2012 Tr. at 13:16-19 (Shatzer).  Leviton Manufacturing asserted that its trade-secret claim shares the most facts in common with the patent-infringement claims it has asserted against the Plaintiffs and with the Plaintiffs' claims of non-infringement.  See Feb. 16, 2012 Tr. at 14:19-15:2 (Court, Shatzer).  The Plaintiffs acknowledged that the Court is competent to handle the trade-secret claim, but emphasized that the Court has no jurisdiction to hear that claim.  See Feb. 16, 2012 Tr. at 15:25-16:7 (Long).  The Plaintiffs asserted that the alleged misappropriation of the trade secrets took place at least in part in Georgia and that the alleged injury occurred in New York. See Feb. 16, 2012 Tr. at 16:9-18 (Court, Long).  Leviton Manufacturing noted that it would have the same expert testify regarding damages for each of its counterclaims.  See Feb. 16, 2012 Tr. at 21:9-22:16 (Shatzer).

_____

[6]The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

During a discussion of Leviton's MTD Memo., Leviton asserted that the Court should not state whether the dismissal of the claims to which the parties have agreed to dismissal is with or without prejudice, but should state instead that it will dismiss the claims for lack of subject-matter jurisdiction based on the lack of a case or controversy.  See Feb. 16, 2012 Tr. at 26:10-22 (Shatzer).  The Plaintiffs argued that, rather than agreeing with Leviton that the claims they have asserted in Counts III through VIII are moot, they have chosen not to oppose Leviton's MTD Memo. seeking dismissal of those claims as long as dismissal is without prejudice.  See Feb. 16, 2012 Tr. at 28:8-10 (Long).  The Plaintiffs argued that, because a dismissal for lack of subject-matter jurisdiction is, under rule 41(b) of the Federal Rules of Civil Procedure, without prejudice, the Court does not need to specify whether the dismissal is with or without prejudice. See Feb. 16, 2012 Tr. at 28:16-20 (Long).  The Court inquired whether the parties would find it acceptable for the Court to dismiss the claims asserted in Counts III through VIII for lack of subject-matter jurisdiction without mentioning whether the dismissal is with or without prejudice.  See Feb. 16, 2012 Tr. at 30:3-5 (Court).  Leviton Manufacturing asserted that it was amenable to this proposal.  See Feb. 16, 2012 Tr. at 30:6-7 (Shatzer).  The Plaintiffs stated that this proposal was acceptable given that the dismissal would ultimately be without prejudice, but noted that they are having trouble understanding why Leviton Manufacturing would not agree to the order stating the dismissal is without prejudice.  See Feb. 16, 2012 Tr. at 30:8-12 (Long); id. at 31:20-32:3 (Long).

Leviton Manufacturing asserted that entering judgment in favor of the Plaintiffs on Count II is not appropriate given that the Federal Circuit's decision was a ruling on an appeal of a preliminary junction as opposed to a dispositive motion.  See Feb. 16, 2012 Tr. at 32:13-33:18 (Shatzer).  Leviton Manufacturing argued that, instead, dismissal of Count II as moot is

appropriate in light of its agreement to dismiss its patent counterclaims with prejudice.  See Feb. 16, 2012 Tr. at 32:13-33:18 (Shatzer).   The Plaintiffs explained that they had previously believed, based on Leviton Manufacturing's briefing, that it had conceded that entry of judgment in the Plaintiffs' favor was appropriate for Count II.  See Feb. 16, 2012 Tr. at 35:9-20 (Long). The Plaintiffs related that, in light of Leviton Manufacturing's clarification of its position at the hearing, they planned to file a motion for summary judgment if the Court denies Leviton's MTD Memo.  See Feb. 16, 2012 Tr. at 35:9-20 (Long).  The Plaintiffs asserted that they read certain statements in Leviton Manufacturing's briefing as admissions that the Plaintiffs have an implied license regarding the '124 and '151 patents, but noted that those statements may not have been intended as admissions.  See Feb. 16, 2012 Tr. at 36:6-25 (Long).

Leviton Manufacturing argued that Count II, a claim seeking a declaration of non-infringement, is now moot, given that Leviton Manufacturing has agreed to dismiss with prejudice its infringement claims based on those same patents.  See Feb. 16, 2012 Tr. at 37:9-38:7 (Shatzer).   Leviton Manufacturing contended that, to the extent that the question whether the Plaintiffs have an implied license regarding the '124 and '151 patents is a question of law, it does not intend to contest that the Plaintiffs have an implied license in light of the Federal Circuit's opinion ruling on the preliminary injunction.   See Feb. 16, 2012 Tr. at 41:20-42:4 (Shatzer).  It argued that any dispute regarding the scope of that license is now moot in light of its agreement to dismiss its patent-infringement claims with prejudice.  See Feb. 16, 2012 Tr. at 42:1-4 (Shatzer).  Leviton Manufacturing reiterated that entering judgment based on holdings in the Federal Circuit's decision affirming the grant of a preliminary injunction would not be appropriate.  See Feb. 16, 2012 Tr. at 42:9-12 (Shatzer).  The Plaintiffs responded that Leviton Manufacturing is trying to avoid an adverse judgment against it and that there is still an

ongoing dispute.  See Feb. 16, 2012 Tr. at 43:11-16 (Long).  Leviton Manufacturing argued that

the Plaintiffs are seeking to litigate the implied license's scope in case they intend to bring other

products to the market in the future and that any decision the Court renders would be an advisory

opinion.  See Feb. 16, 2012 Tr. at 43:17-44:3 (Shatzer).  The Plaintiffs asserted that they want as

much clarity as possible on the resolution of the current dispute before the Court to avoid future

litigation and to avoid Leviton Manufacturing in the future saying that the Plaintiffs do not have

an implied license because that issue has not been decided.  See Feb. 16, 2012 Tr. at 44:4-45:5

(Long).

　　　Following the February 16, 2012 hearing, the Plaintiffs filed a separate motion for

summary judgment in which they sought summary judgment in their favor on Counts I and II.

See Plaintiffs' Motion for Summary Judgment that Leviton Breached its Implied License at 1,

filed March 8, 2012 (Doc. 171)("Plaintiffs' MSJ").  Later that month, Leviton Manufacturing

filed a cross-motion for summary judgment on Counts I and II.  See Leviton's Memorandum of

Law in Opposition to Plaintiffs' Motion for Summary Judgment that Leviton Breached its

Implied License, filed March 26, 2012 (Doc. 182)("Leviton's MSJ").

　　　On May 12, 2012, the Court issued a Memorandum Opinion and Order (Doc. 193)("May

12, 2012 MOO") on several motions: (i) GPG's MTD; (ii) Leviton's MTD; (iii) the Plaintiffs'

MSJ; and (iv) Leviton's MSJ.  The Court granted GPG's MTD, dismissing Leviton's

Counterclaim III.  See May 12, 2012 MOO at 2.  The Court also partially granted Leviton's

MTD, dismissing Counterclaims I and II with prejudice.  See May 12, 2012 MOO at 2.  With

Counterclaims I and II dismissed, the Court dismissed Count II as moot.  See May 12, 2012

MOO at 2.  The Court declined to exercise supplemental jurisdiction over the remaining state-

law claims -- Counts I and X.  See May 12, 2012 MOO at 2.  With Count II moot and the Court

declining supplemental jurisdiction over Count I, the Court denied both parties' MSJs as moot. See May 12, 2012 MOO at 2.  The Court retained jurisdiction, however, over the question of attorneys' fees under 35 U.S.C. § 285.  See May 12, 2012 MOO at 2.  The Court entered a final judgment on May 14, 2012.  See Final Judgment at 2, filed May 14, 2012 (Doc. 194).

On June 22, 2012, the Plaintiffs filed a Brief in Support of Motion for Finding of Exceptional Case Under 35 U.S.C. § 285 and Award of Attorneys' Fees, filed June 22, 2012 (Doc. 203)("Plaintiffs' Exceptional Case Brief").  It asserts that this case is exceptional under § 285, because Leviton Manufacturing "failed to abide by the express and implied terms of the Settlement Agreement and . . . filed baseless infringement claims in improper forums and asserted baseless counter claims before this Court."  Plaintiffs' Exceptional Case Brief at 2.

The Plaintiffs argue this case is an exceptional one, because Leviton Manufacturing acted in "[b]ad [f]aith" by: (i) filing suits against the Plaintiffs in forums other than the District of New Mexico, in breach of the CSA; and (ii) asserting patent infringement counterclaim for licensed patents.  Plaintiffs' Exceptional Case Brief at 8-9.  The Plaintiffs contend that "Leviton's bad faith disregard of the terms of the [CSA] effectively forced the Plaintiffs to commence this action for declaratory judgment and move for preliminary injunction."  Plaintiffs' Exceptional Case Brief at 9.

The Plaintiffs argue that courts can infer bad faith "[w]hen the patentee is manifestly unreasonable in assessing the infringement, while continuing to assert infringement in court, whether grounded in or denominated wrongful intent, recklessness, or gross negligence." Plaintiffs' Exceptional Case Brief at 10 (quoting Phonometrics, Inc. v. Westin Hotel Co., 350 F.3d 1242, 1246 (Fed. Cir. 2003))(internal quotations omitted).  Similarly, according to the Plaintiffs, Leviton Manufacturing "was grossly negligent in asserting its infringement claims and

counterclaims," because, "[g]iven the well-established law regarding implied licenses, had Leviton conducted any research on the issue before commencing its litigation strategy, it would have known that the Settlement Agreement granted GPG and Habor Freight an implied license." Plaintiffs' Exceptional Case Brief at 11.   The Plaintiffs contend that "the question of infringement was not close because, as this court and the Federal Circuit affirmed, the patents-in-suit were covered by an implied license that Leviton granted to the Plaintiffs through the Settlement Agreement."  Plaintiffs' Exceptional Case Brief at 10.

The Plaintiffs assert they are the "prevailing party" under 35 U.S.C. § 285 because: (i) the Court granted their requested injunction against Leviton; and (ii) Leviton ultimately dismissed its patent infringement counterclaims against the Plaintiffs "with prejudice and without any agreement that the parties would bear their respective attorneys' fees."  Plaintiffs' Exceptional Case Brief at 7.

The Plaintiffs argue that they are entitled to the attorneys' fees they accrued defending Leviton Manufacturing's appeal of the Court's preliminary injunction.   See Plaintiffs' Exceptional Case Brief at 12.  The Plaintiffs argue that Leviton Manufacturing "conducted a 'scorched earth' strategy for [its] appeal, when it should have simply complied with the injunction."  Plaintiffs' Exceptional Case Brief at 12.   They contend that, instead, Leviton Manufacturing appealed to the Federal Circuit "despite the clear contract provisions and the clear law establishing the implied license," moved both the Court and the Federal Circuit to stay the injunction pending appeal, sought amicus support, and requested en banc rehearing after the Federal Circuit affirmed the injunction.  Plaintiffs' Exceptional Case Brief at 12.  They further argue that "[e]ach of Leviton's actions required a response from the Plaintiffs; indeed the Federal

Circuit ordered the Plaintiffs to respond to Leviton's petition for rehearing en banc." Plaintiffs' Exceptional Case Brief at 12.

General Protecht seeks $1,047,155.95 in attorneys' fees and related expenses. See Plaintiffs' Exceptional Case Brief at 12. Harbor Freight seeks $131,568.82. See Plaintiffs' Exceptional Case Brief at 13. Both General Protecht and Harbor Freight submitted invoices detailing attorneys' fees, billing rates, time expended, and descriptions of work performed. See Plaintiffs' Exceptional Case Brief at 13. GPG and Harbor Freight also submitted "documentation supporting the reasonableness" of each attorney's hourly rate. Plaintiffs' Exceptional Case Brief at 13. The requested amounts include fees that the attorneys have incurred but the clients have not yet paid, costs non-lawyer personnel accrued, and out-of-pocket disbursements, all of which the Plaintiffs contend are recoverable under 35 U.S.C. § 285. See Plaintiffs' Exceptional Case Brief at 14-15. The Plaintiffs assert that "these rates and times should be used by the Court as the lodestar amount to calculate reasonable attorney's fees." Plaintiffs' Exceptional Case Brief at 15.

Less than a month later, Leviton Manufacturing filed its Memorandum of Law in Opposition to Plaintiffs' Motion for Finding of Exceptional Case Under 35 U.S.C. § 285 and Award of Attorneys' Fees and Motion to Tax Costs, filed July 16, 2012 (Doc. 213)("ECB Response"). It contends that "[n]othing about this case was exceptional . . . [,] [and] every objective factor indicates that this case involved a non-frivolous dispute and that Leviton acted reasonably and with the aim of resolving the dispute as efficiently as possible." ECB Response at 1. Should the Court choose to award attorneys' fees, Leviton Manufacturing contends that the Plaintiffs have requested payment of fees "to which they are not entitled . . . [,] includ[ing] fees

and costs for time spent on paralegals performing tasks secretarial in nature and for claims not within the scope of 35 U.S.C. § 285." ECB Response at 1.

Leviton Manufacturing asserts that it did not act in bad faith to avoid the Court's jurisdiction. See ECB Response at 3. Leviton Manufacturing represents that it chose the ITC "for the unique relief available from that venue" and filed in the Northern District of California because "it provided the only venue where there was [personal] jurisdiction over all twenty-nine named parties." ECB Response at 3. Moreover, "[i]t was also Leviton's belief at the time that since the patents in issue were excluded from the Settlement Agreement the forum selection clause was not an issue." ECB Response at 3.

Leviton Manufacturing contends that it did not engage in any misconduct or vexatious litigation; rather, it "advanced [only] non-frivolous arguments and acted professionally and ethically at every step." ECB Response at 9. Leviton Manufacturing notes that "[s]imply losing . . . does not mean that engaging in the litigation was unreasonable." ECB Response at 10. Contrary to the Plaintiffs' assertion that the law regarding implied licenses is so well-established that Leviton should have anticipated the case's outcome, Leviton Manufacturing contends that "judicially implied licenses are rare under any doctrine." ECB Response at 10 (quoting Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc., 103 F.3d 1571,1581 (Fed. Cir. 1997)). Furthermore, Leviton Manufacturing asserts that "[i]nfringement is often difficult to determine, and a patentee's ultimately incorrect view of how a court will find does not of itself establish bad faith." ECB Response at 10 (quoting Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc., 393 F.3d 1378, 1381 (Fed. Cir. 2005))(internal quotation marks omitted). Leviton Manufacturing contends that "the question of infringement was close because there was substantial and reasonable disagreement as to whether an implied license existed." ECB Response at 12.

Leviton Manufacturing argues that "this Court's lengthy opinion and the precedential Federal Circuit Opinion that came as a result of Leviton 's appeal" demonstrate that "this case was subject to reasonable dispute."  ECB Response at 10.  Additionally, Leviton Manufacturing disputes the Plaintiffs' argument that Transcore LP v. Elec. Transaction Consultants, Corp., 563 F.3d 1271 (Fed. Cir. 2009)("Transcore"), set clear precedent, describing it as "a recently decided case that has not been explained or clarified in subsequent precedent."  ECB Response at 12.

Leviton Manufacturing also contends that it "acted carefully and with a goal of resolving this dispute as efficiently as possible," promptly complying with the preliminary injunction and dismissing its patent counterclaims once the Federal Circuit's decision was final.  ECB Response at 11.  Leviton Manufacturing contends it also cooperated with the Plaintiffs to create a Joint Status Report and Provisional Discovery Plan, and "[t]he only discovery dispute that needed to be brought to the Court's attention . . . was resolved in Leviton's favor."  ECB Response at 11.  Leviton Manufacturing asserts that "[n]othing suggests [it] tried to impose unnecessary cost or burdens on Plaintiffs [or] engage in fraud or material misrepresentations."  ECB Response at 11.

Leviton Manufacturing notes that not all Plaintiffs could assert a defense based on an implied license.  See ECB Response at 11.  Leviton Manufacturing argues that "the fact that the crux of Plaintiffs' arguments, the existence of an implied license, did not extend to all [of Leviton's] infringement allegations before this Court further undermines any suggestion that Leviton's position was objectively baseless."  ECB Response at 12.

Leviton argues that the Court has already indicated it does not consider the litigation baseless.  See  ECB Response at 14.  For instance, Leviton Manufacturing notes that the Court wrote that "[n]o New Mexico Court or Tenth Circuit court has addressed whether a forum selection clause applies to actions where the contract containing the forum selection clause is

raised only as a defense."  ECB Response at 14 (quoting Nov. 30, 2010 MOO at 34)(internal quotation marks omitted).  Additionally, Leviton Manufacturing argues that, when the Court found that "the best construction" of the Settlement Agreement is that it establishes an implied license to the '124 and '151 patents, the Court implicitly acknowledged that the Settlement Agreement may allow for other constructions.  ECB Response at 14 (quoting Nov. 30, 2010 MOO)(internal quotation marks omitted).  Finally, Leviton Manufacturing argues that the "Court's lengthy opinion[,] followed by oral argument and a precedential opinion at the Federal Circuit[,] suggest that this case is far from frivolous, i.e., objectively baseless."  ECB Response at 14.

Leviton Manufacturing argues that it did not act with subjective bad faith, because "Leviton understood [the] [Settlement Agreement's] language to apply only to the '558 and '766 patents [and not] to any other patents existing at the time or that might issue in the future."  ECB Response at 15 (quoting Declaration of Meir Y. Blonder in Support of Defendant Leviton Manufacturing Co., Inc.'s Opposition to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (executed Nov. 5, 2010), filed on Nov. 12, 2012 (Doc. 20)("Blonder Decl.")).

Leviton Manufacturing contends that, even if the Court rules that this case is exceptional, an award of attorneys' fees is not warranted, because "none of the relevant factors, such as 'the closeness of the case, the tactics of counsel, the flagrant or good faith character of the parties' conduct, and any other factors contributing to imposition of punitive sanctions or to fair allocation of the burdens of litigation,' warrants a fees award."  ECB Response at 15 (quoting Delta-X Corp. v. Baker Hughes Prod. Tools, Inc., 984 F.2d 410, 414 (Fed. Cir. 1993)).  Leviton Manufacturing contends that, in any case, the prevailing party has an obligation to "make a good

faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary," ECB Response at 16 (quoting Hensley v. Eckerhart, 461 U.S. 424, 434 (1983) ("Hensley")), and that the "Plaintiffs have made little, if any, effort to comply with these obligations," ECB Response at 16.  Leviton Manufacturing identifies several fees and costs[7] that it contends are not within the scope of recovery under 35 U.S.C. § 285.  See ECB Response at 16.  These excessive fees and costs include: (i) fees relating to the trade secret claim, which "this Court expressly found . . . w[ere] not related to the patent claim," ECB Response at 16; (ii) fees related to the ITC action, "which is outside the jurisdiction of this Court," ECB Response at 16; (iii) fees accrued during the appeal to the Federal Circuit, because the Plaintiffs have not established that the appeal itself was exceptional, see ECB Response at 18-19; (iv) paralegal fees, because those are recoverable only to the extent that the paralegal is performing work that an attorney would traditionally do, and, according to Leviton Manufacturing, the Plaintiffs' invoices fail to demonstrate that the work satisfies this standard, see ECB Response at 20-21; and (v) other excessive expenses, including fees for three attorneys at single depositions, excessive discussions about hiring an interpreter, and travel expenses "for their lead counsel to travel to China and participate in a press conference," ECB Response at 21. Leviton Manufacturing also notes that its litigation fees were less than half of the Plaintiffs' fees. See ECB Response at 21.  Leviton Manufacturing argues that, because the Plaintiffs have "failed to comply with [their] obligation to eliminate unrecoverable and unreasonable fees and

---

[7]In this brief, Leviton Manufacturing also responds to Plaintiffs' claims in General Protecht Group Plaintiffs' Motion to Tax Cost, filed June 13, 2012 (Doc. 198).  Leviton argues that the Plaintiffs are not entitled to costs relating to a particular deposition and travel expenses for an interpreter.  ECB Response at 22-23.  On September 7, 2012, the Clerk filed its Order Settling Costs (Doc. 222), resolving those issues.

expenses," the Court should deny the Plaintiffs' fee requests entirely.   ECB Response at 17.

Should the Court award attorneys' fees anyway, however, Leviton Manufacturing argues that the

Court should exclude the improperly requested fees and expenses, which Leviton Manufacturing

calculates to a total of $243,975.73.   See ECB Response at 17-18.

The Plaintiffs replied to the ECB Response two weeks later.   See Reply in Support of

Motion for Finding of Exceptional Case Under 35 U.S.C. § 285 and Award of Attorneys' Fees

and Motion to Tax Costs, filed August 2, 2012 (Doc. 220)("Plaintiffs' Reply ECB").   The

Plaintiffs argue that "[t]his case is exceptional for two reasons: (1) Leviton's frivolous assertion

that this Court did not have jurisdiction over its patent infringement claims, and (2) Leviton's

insistence on continuing the litigation once it had lost at both the District Court and Federal

Circuit."   Plaintiffs' Reply ECB at 1.   The Plaintiffs argue that, "[e]ven if Leviton had a good

faith belief that the Settlement Agreement did not cover the '124 and '151 patents, it knew, or

should have known, that Plaintiffs would assert the Settlement Agreement as a defense, thereby

necessitating that Leviton's action be filed in this Court."   Plaintiffs' Reply ECB at 2.

Furthermore, the Plaintiffs argue that Leviton Manufacturing's stated reasons for filing in the

ITC and Northern District of California are unpersuasive, because: (i) "[a]ny remedy available

from the ITC is available from this Court;" and (ii) "Leviton's desire to sue additional parties

does not justify ignoring the exclusive venue provision to which it had already agreed."

Plaintiffs' Reply EBG at 2-3.   The Plaintiffs argue that the Court "should take into account

Leviton's improper forum shopping when determining whether this case is exceptional, as

Leviton's efforts to avoid this Court's jurisdiction is 'an important predicate to understanding

and evaluating [Leviton Manufacturing's] litigation misconduct.'"   Plaintiffs' Reply ECB at 3

(quoting Qualcomm Inc. v. Broadcomm Corp., 548 F.3d 1004, 1027 (Fed. Cir. 2008)).

Additionally, the Plaintiffs argue that "Leviton prolonged these proceedings unnecessarily at every stage, thereby increasing Plaintiff's [sic] fees and expenses" by seeking a stay in the injunction, appealing to the Federal Circuit, seeking another stay, and attempting to recruit several amici.  Plaintiffs' Reply ECB at 3.  The Plaintiffs assert that "[e]very effort by Leviton to prolong these proceedings necessitated a response from Plaintiffs, thereby increasing Plaintiffs' fees and costs."  Plaintiffs' Reply ECB at 3.

The Plaintiffs contend that, "although Leviton's counterclaims may not have been frivolous when originally asserted, [they] became frivolous, at the very least, after the Federal Circuit affirmed this Court's decision. . . .  Leviton should have dropped its appeal and its counterclaims at that point rather than seeking an en banc review."  Plaintiffs' Reply ECB at 3.  The Plaintiffs contend that, "[w]hen viewed in isolation, it might appear that Leviton was merely exercising the options available to it under the governing rules[,] . . . [b]ut this court should . . . evaluate the overall pattern of Leviton's conduct in which it failed to heed the numerous road signs warning it to 'STOP.'"  Plaintiffs' Reply ECB at 4.

The Plaintiffs argue that an award of attorneys' fees is necessary to avoid gross injustice, because Leviton Manufacturing acted in bad faith.  See Plaintiffs' Reply ECB at 5.  The Plaintiffs contend that "[t]here can be no real dispute about the fact [that Leviton Manufacturing] was in possession of objective evidence -- the Settlement Agreement -- at the outset of the case establishing that its infringement claims . . . had to be brought in this District."  Plaintiffs' Reply ECB at 6.  Additionally, the Plaintiffs contend that Leviton Manufacturing was "aware of the legal basis for the Plaintiffs' implied license argument," not only because of Transcore, but because "Plaintiffs' counsel certainly notified Leviton of their implied license position."

Plaintiffs' Reply ECB at 6.  The Plaintiffs conclude: "That is proof enough of both objective baselessness, *and* subjective bad faith."  Plaintiffs' Reply ECB at 6 (emphasis in original).

The Plaintiffs contend that their fee requests are appropriate and reasonable.  See Plaintiffs Reply ECB at 7.  They explain that they requested expenses relating to the ITC proceedings, because "such legal time was incurred in order to obtain information necessary to proceed with their motion for a preliminary injunction, to ensure Leviton's compliance with the Court's order granting that injunction and to obtain information requested by the Court . . . ." Plaintiffs' Reply ECB at 7.  The Plaintiffs also assert that their requested legal fees are reasonable, because the "Plaintiffs achieved an excellent result from the litigation, defeating Leviton at every stage, despite Leviton's scorched earth tactics."  Plaintiffs' Reply ECB at 7.

The Plaintiffs argue that, if the Court finds that Leviton Manufacturing's preliminary injunction appeal was not initially frivolous, "the evidence establishes that Leviton conducted its appeal in a vexatious manner, including an excessively aggressive strategy of seeking amici and culminating in seeking en banc review of the Federal Circuit's opinion."  Plaintiffs' Reply ECB at 8.  Alternatively, the Plaintiffs contend that, "at the very least, Leviton's appeal became frivolous after . . . the Federal Circuit affirmed the preliminary injunction."  Plaintiffs' Reply ECB at 8.

The Plaintiffs contend that the Federal Circuit allows parties to collect paralegal fees, even for work that attorneys do not traditionally do.  See Plaintiffs' Reply ECB at 9.  The Plaintiffs contend that Leviton Manufacturing's arguments to the contrary rely on "uncontrolling and inapposite case law from the Fifth and Eleventh Circuits."  Plaintiffs' Reply ECB at 9.  The Plaintiffs further argue that they seek to recover costs for work that is "not merely clerical in

nature[, such as] charges relating to the creation and maintenance of sophisticated computer databases by highly skilled information technology specialists."  Plaintiffs' Reply ECB at 10.

At the hearing on March 6, 2013, Leviton Manufacturing argued that the Federal Circuit, in publishing an opinion and requesting the Plaintiffs respond to Leviton Manufacturing's motion for en banc rehearing, demonstrated that Leviton Manufacturing's case had precedential value. See Transcript of Hearing at 25:1-7 (taken March 6, 2013)(Shatzer)("March 6, 2013 Tr"). Leviton Manufacturing also noted that a law professor included the Federal Circuit's opinion in an intellectual property class syllabus.[8]  March. 6, 2013 Tr. at 21:19-22:2 (Shatzer).  Leviton Manufacturing also stated that, following the Federal Circuit's decision, Leviton Manufacturing promptly moved to dismiss their claims, but the Plaintiffs "wanted this case to go forward because they wanted to get a judgment."  March 6, 2013 Tr. at 24:4-15 (Shatzer).  Ann G. Fort, one of the Plaintiffs' attorneys, argued that the Federal Circuit could have chosen to publish its opinion for any number of reasons besides that it found the ruling precedential.  See March 6, 2013 Tr. at 28:17-19 (Fort).  For instance:

> It could be because the clerk who worked on it is particularly proud of the reasoning, or because it presented an opportunity to apply existing precedent in a way that might be useful to judges . . . and to parties[,] . . . but that doesn't preclude a finding that the party who brought the appeal and lost . . . did so recklessly and with subjective bad faith.

March 6, 2013 Tr. at 28:19-25 (Fort).  Ms. Fort also stated that "the only place where I think it might be fair to say that . . . Leviton's conduct was not exceptional was in opposing the

---

[8]The Court believes Leviton Manufacturing is referring to Professor Michael V. O'Shaughnessy's Patent & Know-How Licensing class, held in the Fall of 2014 at the George Mason University School of Law.  The class syllabus lists "General Protecht Group, Inc. v. Leviton Mfg. Co., 2011 WL 2666222 (Fed. Cir. July 8, 2011)" among cases relating to implied licenses.      http://www.law.gmu.edu/assets/files/academics/schedule/2014/fall/OShaughnessy _PatentLicensing-S.pdf

preliminary injunction."   Mar. 6, 2013 Tr. at 36:15-18 (Fort).   Mark J. Rosenberg, another

Plaintiffs' counsel, disagreed, however, stating: "I believe that the preliminary injunction motion

should not have ever had to be [sic] filed[,] . . . [because,] before we filed this case[,] we put

Leviton on notice of <u>TransCore</u>[,] and they proceeded anyway."  March 6, 2013 Tr. at 37:14-19

(Rosenberg).  Ms. Fort also questioned Leviton Manufacturing's evidence of its subjective good

faith.   <u>See</u> March 6, 2013 Tr. at 46:13-22 (Fort).   While Leviton Manufacturing's chief

intellectual property counsel, Blonder, submitted a declaration that Leviton Manufacturing

believed that the Settlement Agreement did not grant a license or covenant to anything other than

the '558 and '766 patents, Ms. Fort argued that the Blonder Decl. merely describes Leviton

Manufacturing's subjective intent at the time of the Settlement Agreement's formation and does

not show that Leviton Manufacturing maintained that belief following the <u>TransCore</u> ruling.  <u>See</u>

March 6, 2013 Tr. at 46:13-22 (Fort).  Ms. Fort concluded: "[E]ven if it did, it was objectively

unreasonable for [Leviton Manufacturing] to persist in that belief."  March 6, 2013 Tr. at 46:22

(Fort).

## LAW REGARDING ATTORNEY'S FEES UNDER 35 U.S.C. § 285

Section 285 of Title 35 of the United States Code provides: "The court in exceptional

cases may award reasonable attorney fees to the prevailing party."  35 U.S.C. § 285.  The test for

determining whether a case is exceptional under § 285 formerly came from <u>Brooks Furniture</u>

<u>Manufacturing, Inc. v. Dutailier International, Inc.</u>, 393 F.3d 1378 (Fed. Cir. 2005)("<u>Brooks</u>").

<u>Brooks</u> outlined two scenarios that can render a case "exceptional."  First, "[a] case may be

deemed exceptional when there has been some material inappropriate conduct related to the

matter in litigation, such as willful infringement, fraud or inequitable conduct in procuring the

patent, misconduct during litigation, vexatious or unjustified litigation, conduct that violates Fed.

R. Civ. P. 11, or like infractions." Brooks, 393 F.3d at 1381. Second, a case may be exceptional "if both (1) the litigation is brought in subjective bad faith, and (2) the litigation is objectively baseless." Brooks, 393 F.3d at 1381.

In 2014, however, the Supreme Court of the United States expressly rejected the Brooks framework as being "overly rigid" and "superimpos[ing] an inflexible framework onto statutory text that is inherently flexible." Octane Fitness, LLC v. ICON Health & Fitness, Inc., 134 S. Ct. 1749, 1756 (2014)("Octane"). The Supreme Court also took issue with Brooks' imposition of a "clear and convincing" standard, noting that patent-infringement cases typically require only a showing of a "preponderance of the evidence." Octane, 134 S. Ct. at 1758.

Octane overruled Brooks and held that an "exceptional" case is merely one that "stands out from others with respect to the substantive strength of a party's litigating position . . . or the unreasonable manner in which the case was litigated." Octane, 134 S. Ct. at 1752. To determine whether a case is exceptional, district courts may "consider[] the totality of the circumstances" on a case-by-case basis. Octane, 134 S. Ct. at 1752. While not providing a precise rule to apply, the Supreme Court suggested that district courts consider a "nonexclusive list of factors, including frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." 134 S. Ct. at 1756 n.6 (2014)(quoting Fogerty v. Fantasy, Inc., 510 U.S. 517, 534(1994))(internal quotation marks omitted). "Because § 285 commits the determination whether a case is 'exceptional' to the discretion of the district court, that decision is to be reviewed on appeal for abuse of discretion." Highmark Inc. v. Allcare Health Mgmt. Sys. Inc., 134 S. Ct. 1744, 1748 (2014)("Highmark"). "Although the award of fees is clearly within the discretion of the district court, when . . . a court finds litigation misconduct and that a

case is exceptional, the court must articulate the reasons for its fee decision." Oplus Techs., Ltd. v. Vizio, Inc., 782 F.3d 1371, 1375-76 (Fed. Cir. 2015).   These new guidelines apply retroactively to cases being litigated when the Supreme Court issued Octane.[9]   See, e.g., Precision Links Inc. v. USA Prods. Grp., Inc., No. 3:08-CIV-00576-MR, 2014 WL 2861759, at *3 (W.D.N.C. June 24, 2014)(applying the Octane standard that was issued while the case was pending);[10] Apple Inc. v. Samsung Elecs. Co., No. 11-CIV-01846-LHK, 2014 WL 4145499, at *2 (N.D. Cal. Aug. 20, 2014)("Following the Supreme Court's recent decisions [in Octane and Highmark], the Court asked the parties to each submit a supplemental brief addressing the effect of the Supreme Court's decisions on [the plaintiff]'s motion for attorneys' fees.").

---

[9]The Supreme Court wrote:

> When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule.

Harper v. Va. Dep't of Taxation, 509 U.S. 86, 97 (1993).

[10]The Honorable Martin K. Reidinger, United States District Judge for the Western District of North Carolina, noted:

> "The law of the case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Spencer v. Earley, 278 F. App'x 254, 261–62 (4th Cir. 2008) (quoting Arizona v. California, 460 U.S. 605, 618 (1983)).   Courts, however, have recognized an exception to this doctrine where "controlling authority has since made a contrary decision of law applicable to the issue . . . ."   United States v. Aramony, 166 F.3d 655, 661 (4th Cir. 1999)(internal quotation marks and citation omitted).   Clearly, the Supreme Court's decisions in Octane Fitness and Highmark present a contrary decision of law applicable to the issues before the Court, and therefore, the Court is bound by the Supreme Court's new precedent and is not bound by the legal standards applied by the Federal Circuit on appeal.

Precision Links Inc. v. USA Prods. Grp., Inc., 2014 WL 2861759, at *3 n.1.

Section 285 also requires that a party must be the "prevailing party" in the litigation to receive attorneys' fees.  35 U.S.C. § 285.  A party is the prevailing party so long as "'they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'"  Hensley, 461 U.S. at 433 (quoting Nadeau v. Helgemoe, 581 F.2d 275, 278-79 (1st Cir. 1978)).  A party prevails "when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the [nonmovant's] behavior in a way that directly benefits the [movant]."  Farrar v. Hobby, 506 U.S. 103, 111-12 (1992).

"Allowance of fees only in exceptional cases is based on the premise that courts should attempt to strike a balance between the interest of the patentee in protecting his statutory rights and the interest of the public in confining such rights to their legal limits."  Mach. Corp. of Am. v. Gullfiber AB, 774 F.2d at 471.  A court may award attorney's fees under this statute to either a plaintiff or a defendant.  See Phonometrics, Inc. v. ITT Sheraton Corp., 64 F. App'x 219, 221 (Fed. Cir. 2003)(unpublished)[11]("When 'the patentee is manifestly unreasonable in assessing

---

[11]Phonometrics, Inc. v. ITT Sheraton Corp. is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  The Federal Circuit rules allow citation to unpublished opinions issued on or after January 1, 2007.  See Fed. Circ. R. 32.1(a)i-ii ("A court may not prohibit or restrict the citation of federal judicial opinions, orders, judgments, or other written dispositions that have been: (i) designated as 'unpublished,' 'not for publication,' 'non-precedential,' 'not precedent,' or the like; and (ii) issued on or after January 1, 2007.").  In the past, the Federal Circuit prohibited cases "designated as not to be cited as precedent . . . [to] be employed or cited as precedent," Fed. Circ. R. 47.6(b), superseded by Fed. Circ. R. Rule 32.1, see 1 Annotated Patent Digest § 2:18, but now the Federal Circuit leaves the citation of cases before January 1, 2007 to the discretion of the district courts across the country.  The Court will take whatever guidance it can get from the Federal Circuit and will consider, and not preclude, the citation of opinions issued before January 1, 2007.  The Tenth Circuit, for its part, permits citing to unpublished opinions both before and after 2007, see 10th Cir. R. 32.1(C), but only "for their persuasive value," 10th Cir. R. 32.1(A).  The Court finds that Phonometrics, Inc. v. ITT Sheraton Corp. has persuasive value with respect

infringement, while continuing to assert infringement in court, an inference is proper of bad faith, whether grounded in or denominated [by] wrongful intent, recklessness, or gross negligence.'"  (quoting Eltech Sys., Corp. v. PPG Indus., 903 F.2d 805, 811 (Fed. Cir. 1990))). The Federal Circuit applies its own law "to claims for attorneys' fees under section 285 of the Patent Act because section 285 relates to an area of substantive law within our exclusive jurisdiction" while also "afford[ing] district courts 'considerable discretion' in determining the amount of reasonable attorney fees under § 285."  Bywaters v. United States, 670 F.3d 1221, 1227-28 (Fed. Cir. 2012).  The Federal Circuit adopted this approach to "respect 'the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters.'"  Bywaters v. United States, 670 F.3d at 1228 (quoting Hensley, 461 U.S. at 437 (1983)).

"As a general matter, . . . a claim for attorney's fees is not part of the merits of the action to which the fees pertain."  Budinich v. Becton Dickinson & Co., 486 U.S. 196, 200 (1988). "Such an award does not remedy the injury giving rise to the action, and indeed is often available to the party defending against the action."  Budinich v. Becton Dickinson & Co., 486 U.S. at 200.  "At common law, attorney's fees were regarded as an element of 'costs' awarded to the prevailing party."  Budinich v. Becton Dickinson & Co., 486 U.S. at 200.  Additionally, "[m]any federal statutes providing for attorney's fees continue to specify that they are to be taxed and collected as 'costs.'"  Budinich v. Becton Dickinson & Co., 486 U.S. at 201.  Even when a lower court has not yet decided the issue of attorneys' fees, and the attorneys' fees are "part of the merits of judgment," the merits of a case are still final for appellate purposes:

---

to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

> This practical approach to the matter suggests that what is of importance here is not preservation of conceptual consistency in the status of a particular fee authorization as "merits" or "nonmerits," but rather preservation of operational consistency and predictability in the overall application of § 1291. This requires, we think, a uniform rule that an unresolved issue of attorney's fees for the litigation in question does not prevent judgment on the merits from being final.

Budinich v. Becton Dickinson & Co., 486 U.S. at 202.   It is irrelevant for purposes of determining whether the merits of an action are final -- and thus appealable -- whether the plaintiff requested attorney's fees as part of the prayer in his or her complaint, or in a separate motion.   See Budinich v. Becton Dickinson & Co., 486 U.S. at 201 ("[W]e conclude that the § 1291 effect of an unresolved issue of attorney's fees for the litigation at hand should not turn upon the characterization of those fees by the statute or decisional law that authorizes them.").

To determine the amount of reasonable attorneys' fees, the Federal Circuit calls for district courts to calculate a "lodestar" amount, determined "by multiplying the number of hours reasonably expended by a reasonable hourly rate."   Bywaters v. United States, 670 F.3d at 1225-26.   This lodestar figure "provides an objective basis on which to make an initial estimate of the value" of an attorney's services.   Hensley, 461 U.S. at 433.   The party requesting attorneys' fees must submit evidence to support its representations of time spent and rates sought.   See Hensley 461 U.S. at 434.   If the evidence is inadequate, the district court may reduce the fee award accordingly.   See Hensley, 461 U.S. at 434.

A district court may also make adjustments to the lodestar figure to reflect a plaintiff's overall success level.   See Bywaters v. United States, 670 F.3d at 1229 (citing Hensley, 461 U.S. at 435-36).   "There is no precise rule or formula" for making such determinations.   Hensley, 461 U.S. at 436.   In Hensley, the Supreme Court explained the rationale behind this approach:

> Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours on a claim-by-claim basis.   Such a lawsuit cannot be viewed as a series of discrete claims.   Instead, the district court should

focus on the significance of the overall relief obtained by the plaintiff in relation
to the hours reasonably expended on the litigation.

461 U.S. at 435.

While discrete acts of litigation misconduct can, on their own, render an entire case
exceptional, "the amount of the award must bear some relation to the extent of the misconduct."
Read Corp. v. Portec, Inc., 970 F.2d 816, 831 (Fed. Cir. 1992). Thus, district courts may, in
those cases, award attorneys' fees under § 285 relating only to the litigation misconduct. See,
e.g., Digital Reg of Tex., LLC v. Adobe Sys., Inc., No. CIV 12-1971 CW, 2015 WL 1026226, at
*5 (N.D. Cal. 2015)("Adobe's motion for attorneys' fees . . . is GRANTED to the extent that it is
entitled to fees, in an amount to be determined, incurred in relation to Mr. Patterson's and
Mr. Venters' deposition and testimony.")

Furthermore, when a plaintiff brings related claims, failure on some claims should not
preclude full recovery if the plaintiff achieves success on a significant interrelated claim. See
Hensley, 461 U.S. at 440 ("Where a lawsuit consists of related claims, a plaintiff who has won
substantial relief should not have his attorney's fee reduced simply because the district court did
not adopt each contention raised."). Claims are interrelated when they are either based on "a
common core of facts" or based on "related legal theories." Hensley, 461 U.S. at 435. The
Supreme Court explained: "Litigants in good faith may raise alternative legal grounds for a
desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient
reason for reducing a fee." Hensley, 461 U.S. at 435.

## ANALYSIS

The Court will deny the Plaintiffs' motion for attorneys' fees, because Leviton
Manufacturing neither pursued objectively baseless litigation nor litigated unreasonably. This
case is not exceptional under either the Brooks formulation or the Octane standard. Even if the

case were exceptional, the Court would find some of the Plaintiffs' requested attorneys' fees to be unreasonable and thus not recoverable.

## I.   THE PLAINTIFFS ARE THE PREVAILING PARTY.

Attorneys' fees under § 285 are available only to the prevailing party.  A prevailing party is one that "succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'"  Hensley, 461 U.S. at 433 (quoting Nadeau v. Helgemoe, 581 F.2d at 278-279 (1st Cir. 1978).  A party prevails "when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the [nonmovant's] behavior in a way that directly benefits the [movant]."  Farrar v. Hobby, 506 U.S. at 111-12.

The Court agrees with the Plaintiffs that they are the "prevailing party" under 35 U.S.C. § 285, because: (i) the Court granted their requested injunction against Leviton Manufacturing, see Nov. 30, 2010 MOO at 2, which the Federal Circuit upheld on appeal, see Gen. Protecht Grp., Inc. v. Leviton Mfg. Co., Inc., 651 F. 3d 1355, 1366 (Fed. Cir. 2011); and (ii) Leviton Manufacturing ultimately dismissed its patent infringement counterclaims against the Plaintiffs with prejudice, see May 12, 2012 MOO at 32.  The injunction ordered Leviton Manufacturing to "dismiss its patent-infringement claims against the Plaintiffs in the pending ITC action and in the pending action in the United States District Court for the Northern District of California," Nov. 30, 2010 MOO at 2, which "alter[ed] the legal relationship between the parties by modifying [Leviton Manufacturing's] behavior in a  way that directly benefit[ed]" the Plaintiffs, Farrar v. Hobby, 506 U.S. at 111-12, because the Plaintiffs no longer had to defend themselves in forums other than the forum upon which the parties had previously agreed.

Furthermore, that the Court dismissed all of the Plaintiffs' counts requesting declaratory judgments of non-infringement and invalidity of Leviton Manufacturing's '124 and '151 patents,

see May 12, 2012 MOO at 32, does not suggest that the Plaintiffs could not prevail on those counts.  Rather, the Plaintiffs requested that the Court dismiss those claims pursuant to an agreement with Leviton Manufacturing following the Federal Circuit's ruling; Leviton Manufacturing, in turn, agreed to ask the Court to dismiss its infringement counterclaims against the Plaintiffs with prejudice, to which the Court agreed.  See May 12, 2012 MOO at 32.  Thus, the Plaintiffs effectively beat Leviton Manufacturing's infringement claims.

## II.   ALTHOUGH THE PLAINTIFFS ARE THE PREVAILING PARTY, THE CASE IS NOT EXCEPTIONAL, BECAUSE LEVITON MANUFACTURING'S POSITION <u>WAS NOT OBJECTIVELY BASELESS OR PURSUED IN BAD FAITH</u>.

There is no question that the rules from <u>Octane</u> make it easier for district courts to award attorneys' fees in patent cases than was the case under <u>Brooks</u>.  Likewise, <u>Highmark</u> means district courts' decisions to award or not award attorneys' fees are now far more likely to be upheld on appeal.  For one, the standard for exceptionality is now more relaxed.  Under <u>Brooks</u>, a case was exceptional only when the district court found either: (i) "some material inappropriate conduct related to the matter in litigation, such as willful infringement, fraud or inequitable conduct in procuring the patent, misconduct during litigation, vexatious or unjustified litigation, conduct that violates Fed. R. Civ. P. 11, or like infractions," or (ii) "if both (1) the litigation is brought in subjective bad faith, and (2) the litigation is objectively baseless."  <u>Brooks</u>, 393 F.3d at 1381.  In <u>Octane</u>, the Supreme Court rejected the first <u>Brooks</u> category in large part because it covered actions otherwise sanctionable in their own right.  See <u>Octane</u>, 134 S. Ct. at 1756.  The Supreme Court rejected the second category as well, finding it too restrictive, because "a case presenting either subjective bad faith or exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award."  <u>Octane</u>, 134 S. Ct. at 1757.  Consequently, the Supreme Court directed district courts to determine whether a case is exceptional "in the

case-by-case exercise of their discretion, considering the totality of the circumstances." Octane, 134 S. Ct. at 1756. An "exceptional" case is merely one that "stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." Octane, 134 S. Ct. at 1756. While not providing a precise rule to apply, the Supreme Court suggested that district courts consider a "nonexclusive list of factors, including frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." Octane, 134 S. Ct. at 1756 n.6 (internal quotations omitted)(quoting Fogerty v. Fantasy, Inc., 510 U.S. at 534).

The second reason why district courts can award attorneys' fees more easily in patent cases now is that the standard of proof has been eased considerably. Under Brooks, a party seeking attorneys' fees awards under § 285 could do so by "clear and convincing evidence." Brooks, 393 F.3d at 1382. The Supreme Court noted, however, that, in the past, it has "not interpreted comparable fee-shifting statutes to require . . . clear and convincing evidence." Octane, 134 S. Ct. at 1758. Moreover, "nothing in § 285 justifies such a high standard of proof[;] [it] imposes no specific evidentiary burden, much less such a high one." Octane, 134 S. Ct. at 1758. Instead, the Supreme Court found the "preponderance of evidence" standard appropriate, particularly in light of that standard's traditional role in patent cases in particular and in civil actions in general. Octane, 134 S. Ct. at 1758.

Third, the standard of review is now more deferential to district court decisions. Before Highmark, the Federal Circuit would review appeals to § 285 rulings de novo (for questions of law) or for clear error (for questions of fact). See Highmark, 134 S. Ct. at 1748. In Highmark,

issued the same day as Octane, the Supreme Court stated that, because determining whether a case is exceptional is now, under Octane, a matter of the court's discretion, the standard of review on appeal can be only for abuse of that discretion.  See Highmark, 134 S. Ct. at 1748.

While the new guidelines clearly make the prevailing party's job easier in getting attorneys' fees under § 285, the few articles published evaluating Octane's actual impact reflect some uncertainty regarding how much Octane will truly change the game.  For instance, one study of § 285 cases in district courts from the release of Octane, on April 29, 2014, through September 7, 2014, found no dramatic change from the Brooks era.  The study noted that "[t]he analysis necessary to decide whether to assert an infringement claim or assert a defense to an infringement claim should not change," and predicted that "[t]he impact of Octane Fitness and Highmark should be minimal."   Danielle Williams, Octane Fitness, HighMark, and VirtualAgility Inc.: Their Impact on Patent Law Practitioners and Clients, in The Impact of Recent Patent Law Cases and Developments 63 (2015).  By contrast, in a recent article in the Washington Law Review examining attorneys' fee motions in patent cases settled since Octane through the end of 2014, the author reported a trend towards more attorneys' fee awards, particularly for defendants:

> In the decade leading up to 2013, patentees (normally plaintiffs) benefited from seventy-one percent of fee awards under § 285, with the other twenty-nine percent going to defendants.  After Octane, by contrast, only twenty-three percent of awards went to plaintiffs, and the remaining seventy-seven percent went to defendants.

Darin Jones, A Shifting Landscape for Shifting Fees: Attorney-Fee Awards in Patent Suits After Octane and Highmark, 90 Wash. L. Rev. 505, 532 (2015).

Here, the Court has the task of not only applying the new Octane standards to this case, but also rendering judgment based on the parties' arguments formulated under the outdated

Brooks framework.  Doing so in this case is acceptable, not only because the parties had over a year to file supplemental briefs to the Court offering new arguments and chose not to do so, but because their original arguments are still relevant.  For instance, the Plaintiffs' contention that "Leviton conducted its appeal in a vexatious manner," Plaintiffs' Reply ECB at 8, is far from obsolete even though Octane made no mention of the "vexatious litigation" path to exceptionality which Brooks expressly mentioned, 393 F.3d at 1381, because such arguments can be neatly tucked into Octane's "unreasonable manner in which the case was litigated" standard, Octane, 134 S. Ct. at 1752.   Likewise, the Plaintiffs' allegations that Leviton Manufacturing knew its position was baseless, but pursued it anyway, fits nicely within Octane's "substantive strength of a party's litigating position."  Octane, 134 S. Ct. at 1752.  Additionally, the non-exclusive factors that the Supreme Court suggested -- "frivolousness, motivation, objective unreasonableness . . . and the need in particular circumstances to advance considerations of compensation and deterrence," Octane, 134 S. Ct. at 1756 n.6 -- indicate that the Court has all the information and discretion it needs to settle this question using the language and arguments that the parties' put in their original briefs.   As the Plaintiffs' argument for Leviton Manufacturing's litigation misconduct is almost entirely premised on Leviton Manufacturing's alleged bad faith pursuit of an objectively baseless claim, see, e.g., Plaintiffs' Reply ECB at 6, and the Plaintiffs have made no specific allegations of otherwise sanctionable misconduct, the Court will first consider the strength -- or lack thereof -- of Leviton Manufacturing's litigation position by asking whether its position was objectively baseless. Next, the Court will consider the unreasonableness of Leviton Manufacturing's litigation strategy in light of the strength of its position.  Ultimately, the Court finds that the Plaintiffs have not proved by a preponderance of evidence that Leviton Manufacturing's position was objectively

baseless, and, consequently, the Court does not find Leviton Manufacturing's position to be so weak as to support a finding of exceptionality on that basis alone.  The Court also finds that, while Leviton Manufacturing's position was fatally weak, it was reasonable enough that pursuing it in this forum and in the Federal Circuit does not render this case exceptional.

### A.    LEVITON MANUFACTURING'S POSITION WAS NOT OBJECTIVELY BASELESS.

The Court finds Leviton Manufacturing's position regarding the CSA's applicability was not baseless -- while Leviton Manufacturing did not prevail, its claims were not objectively baseless.  A claim is objectively baseless when "no reasonable litigant could reasonably expect success on the merits."  Taurus IP, LLC v. DaimlerChrysler Corp., 726 F.3d 1306, 1327 (Fed. Cir. 2013).  Even post-Octane, "objective reasonableness remains a relevant factor" when considering the exceptionality of a case.  Biax Corp. v. Nvidia Corp., No. 2013-1649, 2015 WL 755940, at *4 (Fed. Cir. Feb. 24, 2015).

The Plaintiffs make several arguments why Leviton Manufacturing's claims were objectively baseless.  First, the Plaintiffs argue that this case is like Interspiro USA, Inc. v. Figgie International Inc., 18 F.3d 927 (Fed. Cir. 1994)("Interspiro"), which upheld a district court's holding, *inter alia*, that the case was "exceptional" and the prevailing party deserved attorneys' fees under 35 U.S.C. § 285, because "the question of infringement 'was not close' and . . . [the Defendant] demonstrated bad faith."  18 F.3d at 934.  A closer look at that case reveals why this comparison is inapt.   In Interspiro, the plaintiff manufactured a Self Contained Breathing Apparatus ("SCBA") designed to protect firefighters from inhaling toxic fumes.  See Interspiro USA, Inc. v. Figgie Int'l, Inc., 815 F. Supp. 1488, 1498 (D. Del. 1993).  The SCBAs relied on a patented regulator which automatically pressurizes the mask -- preventing toxic fumes from entering -- when the firefighter inhales.  See 815 F. Supp. at 1495.  When the firefighter exhales,

the force pushes a diaphragm of rubber disks upward, closing a valve and cutting off oxygen inflow to the mask; once the firefighter inhales, the force pulls the disks back down, uncovering the valve and allowing oxygen to flow again.  <u>See</u> 815 F. Supp. at 1496.  When the SCBA is not in use, firefighters can manually set a "detent mechanism" to secure the diaphragm against the valve opening, blocking oxygen flow; when a user puts on the mask and inhales, the force automatically releases the detent mechanism.  815 F. Supp. at 1496-97.  The plaintiffs discovered that the defendants were producing SCBA units that used a similar regulator device.  <u>See</u> 815 F. Supp. at 1497.  The parties eventually reached a settlement under which the defendant would pay royalties to the plaintiff for each SCBA unit sold.  <u>See</u> 815 F. Supp. at 1497.  The defendants soon began producing a new SCBA model, called the E-Z Flo, featuring an automatic regulator seemingly designed to circumvent the plaintiff's patent.  <u>See</u> 815 F. Supp. at 1497-98.  The plaintiff sued the defendant, arguing, among other things, that the defendants owed royalties on the E-Z Flo under the original settlement, because the E-Z Flo was not a "new product."  815 F. Supp. at 1500.  The court found that the E-Z Flo was not a new product, because the differences between the patented regulator and the E-Z Flo regulator were superficial.  <u>See</u> 815 F. Supp. at 1521.  The court concluded:

> [N]ot only did [the defendant] fail to design around the . . . patent, it failed in a transparent, obvious way . . . .   [The defendant] merely switched the detent mechanism from one side of the diaphragm to [the] other, accomplishing little if anything, and then attempted to exaggerate this minor change into a design innovation.  <u>It should have been abundantly clear to [the defendant] that it was producing an infringing device and improperly withholding royalty payments generated from its sales.</u>

815 F. Supp. at 1521 (emphasis added).

The Court does not find that <u>Interspiro</u> proves the Plaintiffs' point.  There is, of course, a fundamental difference complicating the comparison: <u>Interspiro</u> concerns a question of

engineering -- should the defendants have known moving the detent where they did would fail to avoid infringement -- while the case before the Court poses a question of law -- should Leviton Manufacturing have known its interpretation of Transcore and the CSA was baseless. One need not struggle through an apples-and-oranges analysis, however, because a comparison of the opinions from each court reveals a disparity in the perceived merits of the losing parties' arguments. In Interspiro, the district court found that the defendant infringed "in a transparent, obvious way" and that "[i]t should have been abundantly clear" that the defendant's designed infringed on the plaintiff's patent. 815 F. Supp. at 1521. By contrast, neither the Court's MOO nor the Federal Circuit's opinion described the central legal question with any language in the ballpark of "obvious" or "abundantly clear."[12]

The Plaintiffs also argue, more generally, that Leviton Manufacturing's position was objectively baseless in part because Leviton Manufacturing should have known its case was flawed given the "well-established law regarding implied licenses." Plaintiffs' Exceptional Case Brief at 11. In response, Leviton Manufacturing contends that "judicially implied licenses are rare under any doctrine," ECB Response at 10 (quoting Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc., 103 F.3d 1571,1581 (Fed. Cir. 1997)), and that "[i]nfringement is often difficult to

---

[12]For instance, the Court wrote, in its Nov. 30, 2010 MOO, "[i]t appears that the best construction of [the CSA] is that it constitutes a patent license to the '558 and '766 patents." Nov. 30, 2010 MOO at 26 (emphasis added). The Federal Circuit wrote that, "[f]rom our holding in Transcore it reasonably follows that where, as here, continuations issue from parent patents that previously have been licensed as to certain products, it may be presumed that, absent clear indication of mutual intent to the contrary, those products are impliedly licensed under the continuations as well." Gen. Protecht Grp., Inc. v. Leviton Mfg. Co., Inc., 651 F. 3d at 1361 (emphasis added).

determine, and a patentee's ultimately incorrect view of how a court will find does not of itself establish bad faith," ECB Response at 10 (quoting Brooks, 393 F.3d at 1381).

The Court concludes that the question was not frivolous, and the Federal Circuit proceedings support this conclusion.  Leviton Manufacturing argues that the "Court's lengthy opinion and the precedential Federal Circuit Opinion [demonstrate that] this case was subject to reasonable dispute."  ECB Response at 10.  Leviton Manufacturing also argues that, when the Court concluded that "the best construction" of the Settlement Agreement is that it established an implied license to the '124 and '151 patents, the Court implicitly acknowledged that the Agreement may allow for other constructions.  ECB Response at 14 (quoting Nov. 30, 2010 MOO at 34)(internal quotation marks omitted).  While the Court ultimately agrees with Leviton Manufacturing's conclusion, it hastens to add that Leviton Manufacturing may have read too much into the Court's MOO.  As a general matter, the Court cautions against presumptions that the lengths of its opinions are necessarily proportional to the closeness of the question at hand. Additionally, referring to the "best construction" does not necessarily signal that it regards other interpretations as completely unreasonable.  The Court, however, as mentioned above, did not include language -- and finds no reason to conjure any now -- indicating it found the very premise of Leviton Manufacturing's argument to be frivolous or objectively baseless.  E.g., Intex Recreation Corp. v. Team Worldwide Corp., 2015 WL 135532, at *3 (finding a case exceptional in part because the defendant "filed a conclusory expert report and advanced flawed, nonsensical, and baseless arguments, which lacked factual support"); Cognex Corp. v. Microscan Sys., Inc., No. CIV 13- 2027 JSR, 2014 WL 2989975, at *4 (S.D.N.Y. June 30, 2014)(finding a case exceptional in part because "the defenses that were offered at trial were particularly weak and lacked support").

Moreover, the Federal Circuit published its opinion.  See Gen. Protecht Grp, Inc. v. Leviton Mfg. Co., Inc., 651 F.3d 1355.  While the Plaintiffs argued, in the hearing on March 6, 2013, that there may be a number of reasons besides that it found merit in the question why a Federal Circuit court may publish an opinion, it is sensible to infer that the court did so because it saw an interesting legal question whose resolution could provide precedential value.  Indeed, subsequent jurisprudence demonstrates that the Federal Circuit's ruling in General Protecht Group, Inc. v. Leviton Mfg. Co. Inc. has contributed to implied patent common law, helping to further define the doctrine beyond what can be gleaned from Transcore.   In Universal Electronics, Inc. v. Universal Remote Control, Inc., for instance, published three years after General Protecht Group, Inc. v. Leviton Manufacturing Co. Inc., the court not only details the doctrinal contributions of the case, but calls them into question:

> "Legal estoppel refers to a narrow[ ] category of conduct encompassing scenarios where a patentee has licensed or assigned a right, received consideration, and then sought to derogate from the right granted." TransCore, LP v. Elec. Transaction Consultants Corp., 563 F.3d 1271, 1279 (Fed. Cir. 2009) (citing Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc., 103 F.3d 1571, 1581 (Fed. Cir. 1997)).  The development of the doctrine in the patent context has an interesting trajectory.  In AMP Inc. v. United States, the court held that:
>
>> [W]hen a person sells a patent which employs an invention which infringes a prior patent, the person selling is estopped from bringing an action against his grantee for that infringement, even though the earlier patent is acquired after the sale of the later patent.  The same principle applies to the grant of a patent right by license as well as assignment.
>
> 389 F.2d 448, 451 (Ct. Cl. 1968). Picking up that strain many years later, the Federal Circuit in TransCore expanded the doctrine, holding that whether the later-acquired patent existed before the licensed patent was a distinction without a difference, and that an implied license arose when the asserted patent was broader than, and thus necessary to practice, the licensed patent. 563 F.3d at 1279. Because the non-licensed patent in TransCore was "broader than, and necessary to practice" the licensed patent, the court concluded that the patentee was legally estopped from asserting it, and had granted an implied license.  Id.  That was so even though the license stated that it did not apply to any other patents to be

issued in the future, because while that language was generally operative, it did not permit the patentee to derogate from the rights it expressly granted. Id.

Two years later, the Federal Circuit expanded the doctrine again. Gen. Protecht Grp., Inc. v. Leviton Mfg. Co., Inc., 651 F.3d 1355 (Fed. Cir. 2011). In General Protecht, the patentee argued that the doctrine did not apply because at least some claims of its continuation patents were narrower than the previously asserted claims, so denying an implied license would not derogate from the right to practice the licensed claims. Id. at 1361. The patentee pointed to specific limitations in the asserted patents that did not appear in the licensed claims. Id. The Federal Circuit rejected the patentee's argument, finding that the continuation patents were based on the same disclosure as the licensed patents, and by definition, could not claim any invention not already supported in the earlier issued patents. Id. General Protecht thus expanded TransCore by holding that the relative breadth of the patents was not controlling, and that narrower claims could be subject to the implied license, at least where the patents share the same disclosure. 651 F.3d at 1362.

General Protecht's focus on the patents' disclosure, rather than their claims, is somewhat anomalous given the law, stated in the case upon which General Protecht relies, that "the grant of a patent does not provide the patentee with an affirmative right to practice the patent but merely the right to exclude," TransCore, 563 F.3d at 1275, coupled with the "'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005)(quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Also curious is General Protecht's conclusion that it "reasonably follows" from TransCore that where "continuations issue from parent patents that previously have been licensed as to certain products, it may be presumed that, absent a clear indication of mutual intent to the contrary, those products are impliedly licensed under the continuations as well." 651 F.3d at 1361. TransCore specifically turned on the relative breadth of the claims, not the mere fact that the patents bore a specific familial relationship. So whether or not General Protecht is sound policy, it is hard to say it "reasonably follows" from TransCore.

Finally, General Protecht stated that it was merely articulating an interpretive presumption that "parties are free to contract around." Id. Yet, it held unavailing the provisions of the license expressly preserving the patentee's "right to sue on related patents," although it did not quote those provisions or discuss them in detail. Id. While not outcome determinative here, General Protecht may have implications for the Federal Circuit's concern for "predictability in the resolution of patent disputes," Lighting Ballast Control LLC v. Philips Electronics N. Am. Corp., 744 F.3d 1272 (Fed. Cir. 2014), and predictability in patent licensing.

Universal Electronics, Inc. v. Universal Remote Control, Inc., 34 F. Supp. 3d 1061, 1073-75 (C.D. Cal. 2014)(Guilford, J.)(emphases added).

Additionally, several law journals have discussed the Federal Circuit's ruling in General Protecht Group, Inc. v. Leviton Mfg. Co. Inc.  The American University Law Review, for instance, wrote that the Federal Circuit, in its ruling, demonstrated how settlement agreements creating implied licenses represent "[a]nother potential pitfall for patentees seeking to enforce their rights."  Robert A. Pollock, et al.,[13] 2011 Patent Law Decisions of the Federal Circuit, 61 Am. U. L. Rev. 785, 1006 (2012).  The Berkeley Technology Law Journal, in its "annual review," noted how the case showed that an implied license can cover patents even when "some of the asserted [infringement] claims . . . [are] narrower than the claims of the patents named in the covenant not to sue."  Survey of Additional Ip Developments, 27 Berkeley Tech. L.J. 981, 984 (2012).  The intellectual property journal Les Nouvelles, meanwhile, considered the ruling's significance on future patent litigation:

> This case appears to establish a new presumption in license drafting that continuation patents will be impliedly included in any license agreement at least with respect to products specifically licensed under that agreement.  In addition, the court's decision appears to require an extremely clear expression of intent to exclude continuation patents in order to avoid this presumption.  Based on this decision, it would be wise to always expressly state whether continuations are included or excluded in any license and make sure that the intent is clear from the language of the agreement.  Based on this decision, a general disclaimer of rights will likely not be sufficient.

---

[13]Authors Robert A. Pollock, Linda A. Wadler, and Robert D. Litowitz are partners at the intellectual property firm Finnegan, Henderson, Farabow, Garret & Dunner, LLP; Joyce Craig, Zhenyu Yang, and Mindy L. Ehrenfried are Finnegan associates; and Bart A. Gerstenblith and Christina Szakaly are former Finnegan associates.

Brian Brunsvold & John C. Paul,[14] Recent U.S. Decisions and Developments Affecting Licensing, 46 Les Nouvelles 346, 355 (2011).  In sum, the Federal Circuit's actions and the apparent doctrinal contributions of the Federal Circuit's opinion buttress the Court's view that the infringement question in this case was not frivolous, and consequently not exceptional under 35 U.S.C. § 285.

The Plaintiffs argue in the alternative that, if the Court does not find Leviton Manufacturing's position to be frivolous from the start, "Leviton's appeal became frivolous after . . . the Federal Circuit affirmed the preliminary injunction."  Plaintiffs' Reply ECB at 8. The Court disagrees as a matter of principle.  In the Court's view, if a position is reasonable at the onset, it cannot simply transform into frivolity once asserted past some arbitrary junction along the path of rightful appeals.

## B.  LEVITON MANUFACTURING DID NOT LITIGATE IN AN UNREASONABLE MANNER, BECAUSE ITS CASE WAS BASED ON A NON-FRIVOLOUS ASSERTION OF AN ULTIMATELY INCORRECT INTERPRETATION OF LAW.

Octane holds that a case can be "exceptional" under § 285 if it "stands out from others with respect to . . . the unreasonable manner in which the case was litigated."  Octane, 134 S. Ct. at 1752.  District courts may consider a "nonexclusive list of factors, including frivolousness, motivation, objective unreasonableness . . . and the need in particular circumstances to advance considerations of compensation and deterrence."  Octane, 134 S. Ct. at 1756 n.6 (internal quotations omitted)(quoting Fogerty v. Fantasy, Inc., 510 U.S. at 534).  Since the Octane ruling, "[a]mong the most commonly cited ways to establish exceptionality

---

[14]Brian Brunsvold and John C. Paul are partners at the intellectual property firm Finnegan, Henderson, Farabow, Garret & Dunner, LLP.

are . . . showing the party proceeded in bad faith[,] and . . . litigation misconduct." Bayer CropScience AG v. Dow AgroSciences LLC, No. CIV 12-0256 RMB/JS, 2015 WL 108415, at *3 (D. Del. Jan. 5, 2015) (citations omitted)(noting that other common bases for exceptionality include failing to conduct adequate pre-filing investigation or exercise due diligence before filing suit, a party knowing that its position was meritless, and bringing suit only to extract a settlement), report and recommendation adopted in part by 2015 WL 1197436 (D. Del. March 13, 2015).

The Plaintiffs argue Leviton Manufacturing acted in bad faith by: (i) filing suits against the plaintiffs in forums other than the District of New Mexico, in breach of the Settlement Agreement; and (ii) asserting patent infringement counterclaims for licensed patents. See Plaintiffs' Exceptional Case Brief at 8-9. The Plaintiffs argue that "the fact [that Leviton Manufacturing] was in possession of objective evidence -- the [CSA] -- at the outset of the case establishing that its infringement claims . . . had to be brought in this District" and that Leviton Manufacturing was "aware of the legal basis for the Plaintiffs' implied license argument," not only because of Transcore, but because "Plaintiffs' counsel certainly notified Leviton of their implied license position," is proof that Leviton Manufacturing acted in bad faith. Plaintiffs' Reply ECB at 6. Additionally, the Plaintiffs argue that courts can infer bad faith "[w]hen the patentee is manifestly unreasonable in assessing the infringement, while continuing to assert infringement in court, whether grounded in or denominated wrongful intent, recklessness, or gross negligence." Plaintiffs' Exceptional Case Brief at 10 (quoting Phonometrics, Inc. v. Westin Hotel Co., 350 F.3d 1242, 1246 (Fed. Cir. 2003))(internal quotation marks omitted). As such, the Plaintiffs argue, Leviton Manufacturing "was grossly negligent in asserting its infringement claims and counterclaims" which Leviton Manufacturing should have known

would fail, because the "well-established law regarding implied licenses" should have made that fact clear.  Plaintiffs' Exceptional Case Brief at 11.

Leviton Manufacturing asserts that it did not act in bad faith, because "[i]nfringement is often difficult to determine, and a patentee's ultimately incorrect view of how a court will find does not of itself establish bad faith."  ECB Response at 10 (quoting Brooks, 393 F.3d at 1381).  Consequently, Leviton Manufacturing asserts that it did not act in bad faith to avoid the Court's jurisdiction because it believed "that since the patents in issue were excluded from the Settlement Agreement[,] the forum selection clause was not an issue."  ECB Response at 3.  Leviton Manufacturing asserts that it chose the Northern District of California, because it provided jurisdiction over all named parties, and filed in the ITC "for the unique relief available from that venue."  ECB Response at 3.

Leviton Manufacturing did not act in bad faith, because it merely asserted a position based on legal interpretations that proved to be incorrect.  The Plaintiffs contend that Leviton Manufacturing proceeded with its litigation while possessing documents which contradicted its position -- namely, Transcore and the CSA.  See Plaintiffs' Reply ECB at 6.  The Plaintiffs compare this case to MarcTec, LLC v. Johnson and Johnson, 664 F.3d 907 (Fed. Cir. 2012) ("MarcTec"), arguing that the Federal Circuit found the case to be exceptional, because there was "objective proof [showing] that the plaintiff was in possession of certain information that should have notified it that its case was baseless, but went forward with the case anyway." Plaintiffs' Reply ECB at 5-6.

This case is not that case.  In MarcTec, the plaintiff alleged that the defendant infringed on a patent for a "surgical device for implantation in a body" which relied on the application of heat to render the device's polymeric material "flowable, tacky, and adherent."  MarcTec, 664

F.3d at 911.  The district court also found that the plaintiff's original patent application asserted

that it was not a stent.  See 664 F.3d at 912.  The district court granted summary judgment in

favor of the defendant, because, unlike the plaintiff's patent, the defendant's device was a stent

and, moreover, did not require heat to bond its polymeric material -- important differences that

precluded infringement.  See 664 F.3d at 913-14.  The plaintiff appealed the summary judgment

and lost, and the district court deemed the case exceptional and awarded the defendant attorneys'

fees under § 285.  See 664 F.3d at 914.  The plaintiffs appealed the award of attorneys' fees, and

the Federal Circuit affirmed the award, finding that the district court had sufficient evidence

"that MarcTec subjectively knew that it had no basis for asserting infringement and therefore

pursued [its] litigation in bad faith."  664 F.3d at 918.  The court noted that the district court

> found that, even after [the plaintiff] had evidence that [the defendant's] stent's
> coating is applied at room temperature and does not bond using heat, MarcTec
> continued to pursue its frivolous case "by relying on mischaracterizations of the
> claim construction adopted by this Court and expert testimony that did not meet
> the requirements for scientific reliability or relevance. . . ."

664 F.3d at 915 (quoting MarcTec, LLC v. Johnson & Johnson, No. CIV 07- 825 DRH, 2010

WL 680490, at *10 (S.D. Ill. Feb. 23, 2010)).  The district court had excluded the plaintiff's

expert testimony -- which posited that the defendant's device actually relied on heat to bond --

 for being "unreliable and . . . inadmissible," MarcTec, 664 F.3d at 913, stating:

> [The expert's] theory that spraying droplets at an unrealistic speed, approaching
> the speed of sound (and unrelated to anything that happens in the [defendant's
> device's] coating process) would increase the temperature of the droplets -- in
> ways that cannot be measured -- for 5 millionths of a second (0.000005 seconds)
> is an untested and untestable theory that is neither reliable nor relevant to the
> issues at hand.

MarcTec, LLC v. Johnson & Johnson, 638 F. Supp. 2d at 1004.  The district court also rejected

the defendant's argument "that the use of heat at an earlier stage of the [defendant's]

manufacturing process could satisfy the heat bonding limitations," because "the court found that

use of heat at other stages of the process has no 'bearing on whether the polymers are bonded to the device by the application of heat.'" MarcTec, 664 F.3d at 913 (quoting MarcTec, LLC v. Johnson & Johnson, 638 F. Supp. 2d at 1006). Moreover, the district court noted that, because the inventor "represented to the [Patent and Trademark Office] that the claims exclude stents in order to obtain allowance, [the plaintiff] cannot turn around in litigation and assert the patents-in-suit against the [defendant's] stent." MarcTec, LLC v. Johnson & Johnson, 2010 WL 680490, at *9.

The Plaintiffs' contention that, like the plaintiff in MarcTec, Leviton Manufacturing possessed proof the argument it was furthering was baseless is unavailing. Leviton Manufacturing's fault was a matter of legal interpretation of the CSA and case precedent; the fact that Leviton Manufacturing possessed the documents that the Plaintiffs asserted, and the Court ultimately agreed, contradicted Leviton Manufacturing's position, is hardly a smoking gun that Leviton Manufacturing acted in bad faith by continuing to assert it. The question in MarcTec, after all, is clearer than the question in this case. What the Court sees in MarcTec is a plaintiff (i) insisting that a stent is not actually a stent, despite simple and clear proof to the contrary; and (ii) positing that the defendant's device employs heat to become bondable, either under improbable usage conditions or during the manufacturing stage, long before the device is actually used. See MarcTec, 664 F.3d at 913-14. The Court finds the MarcTec plaintiff's faulty arguments, which basic plain-language evidence and logistical common sense contradicted, to be far more baffling than Leviton Manufacturing's failure to properly apply the legal doctrine implicit in Transcore to its reading of its CSA, particularly when, as discussed above, the eventual Federal Circuit ruling on this dispute may not have merely affirmed the principals in Transcore, but saw fit to add some of its own.

- 51 -

The Plaintiffs also argue for Leviton Manufacturing's bad faith in their comparisons to Interspiro, contending that "Leviton's assertion of infringement claims and counterclaims and its choice of forums were all unjustified and constituted the exercise of bad faith in implementing the Settlement Agreement.  In Interspiro, similar bad faith led to a finding of exceptional case under section 285 . . . ."  Plaintiffs' Exceptional Case Brief at 10.  This comparison does not, however, tell the whole story of Interspiro.  While it is true that, in Interspiro, as the Federal Circuit observed, the district court found that "the question of infringement was not close and that [the defendant] demonstrated bad faith in implementing the [settlement] agreement," Plaintiffs' Exceptional Case Brief at 10 (quoting Interspiro, 18 F.3d at 934)(internal quotation marks omitted), the Plaintiffs gloss over the additional facts that led the Interspiro court to make a finding of bad faith -- namely, in ways other than merely positing a deficient argument regarding infringement.  The district court wrote:

> The Court predicates its finding not only on the closeness of the case, but also on Figgie's conduct in general and approach to the case.  In this respect, the Court highlights Figgie's recalcitrance in implementing the settlement agreement, particularly with regard to Figgie's stonewalling of the audit, and its apparent intention to settle the original patent infringement case and then scuttle the settlement, as evidenced by its plans to develop the E-Z Flo while negotiations for the settlement agreement were underway, and its subsequent sale of the E-Z Flo without paying royalties.  Even ignoring the E-Z Flo issue, Figgie scorned the settlement agreement from the first by failing to pay its full share of royalties based on sales of the Featherweight Cylinder and sales from SSA.

Interspiro, 815 F. Supp. at 1521 (emphasis added).  In other words, when the Plaintiffs argue that Leviton Manufacturing's claims, counterclaims, and choice of forums "constituted an exercise of bad faith in implementing the Settlement Agreement," Exceptional Case Brief at 10, they attempt to draw a parallel with the Interspiro defendant's "bad faith in implementing the [settlement] agreement," when in fact the Interspiro defendant, unlike Leviton Manufacturing, undertook a

slew of actions to impede or ignore the agreement beyond simply asserting an unsuccessful legal position regarding its meaning.

The Plaintiffs also assert that Leviton Manufacturing acted unreasonably -- if not with bad faith -- by "conduct[ing] its appeal in a vexatious manner, including an excessively aggressive strategy of seeking amici and culminating in seeking en banc review of the Federal Circuit's opinion," Plaintiffs' Reply ECB at 8, which "prolonged these proceedings unnecessarily at every stage, thereby increasing Plaintiff's fees and expenses," Plaintiffs' Reply ECB at 5. The Plaintiffs assert that, "[e]ven if Leviton had a good faith belief that the [CSA] did not cover the '124 and '151 patents, it knew, or should have known, that Plaintiffs would assert the [CSA] as a defense, thereby necessitating that Leviton's action be filed in this Court." Plaintiffs' Reply ECB at 2. The Plaintiffs argue that, "[w]hen viewed in isolation, it might appear that Leviton was merely exercising the options available to it under the governing rules . . . [,] [b]ut this court should . . . evaluate the overall pattern of Leviton's conduct in which it failed to heed the numerous road signs warning it to 'STOP.'" Plaintiffs' Reply ECB at 4. The Court disagrees, for the same reason that it cannot, as previously mentioned, deem Leviton Manufacturing's position to be frivolous for only part of the litigation process: if a position is colorable at the beginning of a case, then it is colorable throughout -- absent some change in controlling law or discovery of facts not heretofore known -- and, thus, any action legally and ethically available to a party to pursue that position cannot be done in bad faith.

III. **EVEN HAD THE COURT AWARDED ATTORNEYS' FEES, THE PLAINTIFFS WOULD HAVE RECEIVED LESS THAN THEY REQUESTED.**

Although the Court finds this case unexceptional, and thus an award of attorneys' fees inappropriate, it nonetheless addresses the reasonableness of the Plaintiffs' requested fees. The Court finds that: (i) the Plaintiffs' paralegal fees would have been recoverable under § 285 -- at

least insofar as the paralegals were performing non-clerical work; (ii) fees accrued by "litigation database analysts" would not be recoverable; (iii) fees relating to the trade-secret dispute would not have been recoverable; (iv) fees relating to an attorney's trip to China were excessive and would not have been recoverable; (v) having three attorneys attend depositions of one witness was excessive, and fees accrued by two of the attorneys would not have been recoverable; (vi) conversations about an interpreter were not excessive and would have been recoverable; (vii) attorneys' fees incurred, not only fees paid, would be recoverable; (viii) the Plaintiffs' attorneys' rates were reasonable; and (ix) the Court would not have adjusted the lodestar.

**A.  THE PLAINTIFFS PROBABLY WOULD HAVE BEEN ENTITLED TO PARALEGAL AND TECHNICAL SPECIALIST FEES, EVEN FOR WORK ATTORNEYS DO NOT DO, SO LONG AS THE WORK WAS NOT CLERICAL.**

Fees that paralegals accrue are recoverable under § 285 to the extent they do not include clerical or secretarial work.  As the Plaintiffs point out, <u>see</u> Plaintiffs' Reply ECB at 9, the Federal Circuit has ruled:

> The purpose of § 285 is . . . to compensate the prevailing party for its monetary outlays in the prosecution or defense of the suit.  <u>Codex Corp. v. Milgo Electronic Corp.</u>, 541 F.Supp. 1198, 1201 (D.Mass.1982)("The compensatory purpose of § 285 is best served if the prevailing party is allowed to recover his reasonable expenses in prosecuting the entire action.")  <u>We interpret attorney fees to include those sums that the prevailing party incurs in the preparation for and performance of legal services related to the suit.</u>  <u>See Codex</u>, <u>supra</u>, (§ 285 held to include lawyer's fees for time spent on the issue of attorney fees, disbursements, non-legal personnel, and <u>paralegal personnel</u>)(citations omitted).

<u>Cent. Soya Co. v. Geo. A. Hormel & Co.</u>, 723 F.2d 1573, 1578 (Fed. Cir. 1983)(emphases added)(citations omitted).  This passage, read too literally, may appear to allow a prevailing party to recover all paralegal fees incurred while working on a patent case, regardless of the work that the paralegal performed.  Most courts have not taken such a broad approach.  For one, as a general matter, clerical work is not recoverable as attorneys' fees, even when an attorney

performs the work.  See Ysasi v. Brown, 2015 WL 403930, at *16 (D.N.M. Jan. 7, 2015)

(Browning, J.)(citing Johnson v. District of Columbia, 850 F. Supp. 2d 74, 80 (D.D.C.

2012)(Facciola, J.)).  Likewise, clerical work "should not be billed at a paralegal rate, regardless

of who performs them."  Missouri v. Jenkins by Agyei, 491 U.S. 274, 288 n.10 (1989)(noting

that the purpose of awarding paralegal fees as attorneys' fees is to encourage attorneys to allow

paralegals to do work the attorney might otherwise do, but at a lower rate).  It follows that when

paralegals perform clerical tasks, those fees should not be recoverable.  For example, in Eli Lilly

and Co. v. Zenith Goldline Pharmaceuticals, Inc., 264 F. Supp. 2d 753 (S.D. Ind. 2003)

("Zenith"), the court found that "time devoted to clerical or other tasks" was unrecoverable under

§ 285.  264 F. Supp. 2d at 776.  The court noted a labor law case from the United States Court of

Appeals for the Seventh Circuit, holding that:

> The relevant inquiry for requested paralegal fees is "whether the work was
> sufficiently complex to justify the efforts of a paralegal, as opposed to an
> employee at the next rung lower on the pay-scale ladder."  Accordingly, the
> district court should disallow time spent on what are essentially "clerical" or
> secretarial tasks.

Eli Lilly & Co. v. Zenith Goldline Pharm., Inc., 264 F. Supp. 2d at 776 (emphasis added)

(quoting Spegon v. Catholic Bishop of Chi., 175 F.3d 544, 553 (7th Cir. 1999)).

Leviton Manufacturing argues, however, that paralegal fees are recoverable only when

the work is the kind that attorneys typically perform.  See ECB Response at 20 (citing Allen v.

U.S. Steel Corp. 665 F.2d 689, 697 (5th Cir. 1982)("Allen")(finding that paralegal expenses

"are . . . recoverable . . . only to the extent that the paralegal performs work traditionally done by

an attorney"); Jean v. Nelson, 863 F.2d 759, 778 (11th Cir. 1988)).  While neither case Leviton

Manufacturing cites are patent disputes -- Allen concerned Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e-2, and Jean v. Nelson considered attorneys' fees under the Equal

Access to Justice Act, 28 U.S.C. § 2412 -- the distinction is of little consequence, as the phrase "work traditionally done by an attorney" contemplates much the same standard as found in Soya and Zenith.  In any case, Allen and Jean are 1982 and 1988 cases, respectively.  The Court does not agree that a paralegal has to do work an attorney does to be compensated.  The whole point of hiring good paralegals is so that attorneys can handle the more complicated aspects of litigation -- legal thinking, briefing, writing, and strategizing -- rather than managing document control, organization, production, and privilege logs.  Attorneys do not handle documents as they once did, because they no longer can handle the volume that cases today involve.  Once upon a time -- in a less technologically advanced atmosphere -- attorneys could organize their own documents in getting a case through discovery and ready for trial, but most cases in federal courts -- particularly patent cases -- are too document-intensive and complex for a lawyer to manage his or her documents and get anything else done on the case.  Moreover, when the Allen court invokes the "work traditionally done by an attorney" rule, it does so by citing a case from the United States District Court for the Eastern District of New York, which envisioned such work to include "digesting depositions, collating, marking and indexing exhibits, preparing and arranging for service of subpoenas, etc."   Selzer v. Berkowitz, 477 F. Supp. 686, 691 n.3 (E.D.N.Y. 1979).  If "collating . . . exhibits" is work an attorney traditionally performs, then the Court finds it difficult to imagine a paralegal task too simplistic to negate a paralegal's expense. In any case, the specific tasks whose fees Leviton Manufacturing argues are unrecoverable -- "creating databases, indexing documents and creating case calendars," ECB Response at 20 -- would be equally unrecoverable under the Allen's "work traditionally done by an attorney" standard as under Soya and Zenith.

As the Court is not awarding attorneys' fees in this case, it declines to sort through the hundreds of pages of the Plaintiffs' timesheets to test how many of the paralegal entries that Leviton Manufacturing identified as unrecoverable are "sufficiently complex to justify the efforts of a paralegal."  Spegon v. Catholic Bishop of Chi., 175 F.3d at 553.  Some tasks, of course, can more easily be classified as clerical rather than work requiring a paralegal's skills, such as printing court documents, see Ysasi v. Brown, 2015 WL 403930, at *41, or distributing documents around an office, Clawson v. Mountain Coal Co., No. CIV 01-02199 MSK-MEH, 2007 WL 4225578, at *8 (D. Colo. Nov. 28, 2007).  The Court would have, for example, allowed recovery on fees accrued for "Drafting Notice of Briefing Complete; editing/cite check [plaintiffs'] reply and response brief," Annotated Time Entries #6 at 4, filed July 17, 2012 (Doc. 217-6); see Declaration of Shaun Snader ¶ 9, at 2 (executed July 16, 2012), filed July 16, 2012 (Doc. 216), and "Labeling product samples and preparing them for production and adding their images to production database," Annotated Time Entries #2 at 15, filed July 17, 2012 (Doc. 217-2).  For vague entries, e.g., "Transcript for WFL," Annotated Time Entries #6 at 2, the Court might reduce those amounts, which would encourage parties to carefully consider -- and clearly present -- their fee requests.[15]

---

[15]Indeed, some district courts will simply reduce claimed hours by a percentage:

The Court finds it impractical to attempt to locate and excise each and every instance in which Stahl or Southern performed unnecessary document review and distribution, or other non-compensable clerical functions.  Instead, the Court will simply make a percentage reduction from the hours claimed for them.  Based on the Court's assessment of both individuals' time entries, it appears that a wholesale reduction of . . . claimed hours by 10% would [be] sufficient to account for all time charged for their non-compensable clerical duties.

Clawson v. Mountain Coal Co., 2007 WL 4225578, at *9 (citations omitted).

The Court would also award attorneys' fees for work done by Litigation Database Analysts. The Plaintiffs argue these fees are recoverable for the same reason that the paralegal fees are recoverable: Soya provides that attorneys' fees include "those sums that the prevailing party incurs in the preparation for and performance of legal services related to the suit." Soya, 723 F.2d at 1578. While this principle may cover some costs that would not be otherwise recoverable as taxable costs under 28 U.S.C. § 1920, the law is less clear to what extent it covers wages that technical specialists accrue doing non-legal work. The only case the Court can find addressing this question comes from the United States District Court for the District of Maryland, and, coincidentally, involves a familiar face. In Leviton Manufacturing Co. v. Shanghai Meihao Electric, Inc., 613 F. Supp. 2d 670 (D. Md. 2009), vacated and remanded on other grounds sub nom Leviton Manufacturing Co. v. Universal Security Instruments, Inc., 606 F.3d 1353 (Fed. Cir. 2010), the district court considered whether to award attorneys' fees for work performed by a "litigation technology specialist[]" who "[p]roduce[d] client documents in electronic and paper format [and] [c]reate[d] production database to track the history of the production." 613 F. Supp. 2d at 737 (internal quotation marks omitted). The prevailing party argued doing so would be appropriate, because the specialist was "employed in order to . . . improve the quality of work-product." 613 F. Supp. 2d at 737. While admitting that doing so "seems like a sensible approach," the district acknowledged that "[t]his may be a situation where the development of the law is lagging behind the practice in the legal community." 613 F. Supp. 2d at 737. Nonetheless, the district court endeavored to take "a functional approach, reviewing the time entries for [the technical specialist] [and] attempting to distinguish . . . traditional legal work from work historically categorized as 'overhead.'" 613 F. Supp. 2d at 737. The district court found that the nature of the technology specialist's work

was "technology-focused and non-legal," and "not similar to that of a paralegal." 613 F. Supp. 2d at 738 (emphasis omitted). Consequently, the district court determined that it would not be appropriate to award attorneys' fees for work that the litigation technology specialist performed. See 613 F. Supp. 2d at 738. These facts are very similar to the facts in this case. Here, the Plaintiffs request attorneys' fees for work that "Litigation Database Analysts" performed. Declaration of Ann G. Fort ¶ 12, at 4 (executed June 22, 2012), filed June 22, 2012 (Doc. 207). The Plaintiffs argue that this work is not clerical, involving instead "the creation and maintenance of sophisticated computer databases by highly skilled information specialists, including databases for the review and production of documents." Plaintiffs' Reply ECB at 10.

The Court is inclined, however, to go the other way: while technology specialists' duties are not strictly legal in the traditional sense, the Court believes that these technicians provide meaningful value to law firms and, ultimately, clients during litigation; those contributions should not go overlooked. In time past, young attorneys would select documents that paralegals would incorporate into specially created databases -- e.g., "hot docs," "Top 100 documents," or documents specific to a particular witness or witnesses -- and maintain them for the senior lawyers' review. As technology developed, however, paralegals began uploading documents into databases which could then be searched and sorted using queries. Now so much is on ESI; the technology specialist helps produce documents and keep documents produced by other parties. These technology specialists now do some of the specialized work that paralegals used to do. As Law Practice magazine noted:

> [T]he evolution of document management technology has created a new legal
> support staff member who merges the skills of a paralegal and a computer
> specialist into a legal technology specialist. . . . A legal technology specialist
> provides technical support for large e-discovery projects, document production
> and document reviews. This position did not exist 15 years ago. If a specialized
> database was needed, the firm's IT technician or department would assist a legal

assistant in creating one.  However, a legal technology specialist not only requires advanced knowledge of document management software programs and database manipulation, but also a thorough understanding of federal and state rules of civil procedure.

Cynthia Thomas, The Changing Role of Legal Support Staff Technological Advancements Have Helped to Redefine Responsibilities for Legal Assistants/Paralegals & Legal Secretaries, Law Prac., January/February 2014, at 52, 53, available at: http://www.americanbar.org/publications/law_practice_magazine/2014/january-february/the-changing-role-of-legal-support-staff.html.

There is no sound reason to pay paralegals for document work in the 1980s and 1990s, but not technology specialists doing similar work in 2015 just because their job titles are different.  The specialist is improving the quality of work product, and as a sensible approach, the case law should not penalize the practice in the legal community that is becoming more technology-based and efficient.  Specialists may actually save money.  Having a technology specialist for a single case is not unusual, and it can be more efficient sometimes to hire a specialist for a case than use a paralegal.  To do otherwise would be to allow the case law to lag behind the introduction of document management products and databases in the twenty-first century.  The proof that technology specialists are now doing legal work is that law firms hire technology specialist employees.  Many years ago, few firms had paralegals; now it is the rare firm that does not have one or two.  Forty years ago, few firms had specialists to manage documents; now, firms with twenty or more lawyers can justify hiring technology specialists for the job, and smaller firms may hire them on a contract basis.  Today, when a client hires a law firm, it is hiring its paralegals as well as its technology specialists.  When marketing their work, firms often quote their paralegal rates with their attorney rates.  Document management is in great part what law firms do today, and clients expect to pay for that work.  It is only fair for courts to follow the legal profession's development of new means of providing high-quality representation and

recognize technology specialists' contributions as being legal in nature.[16]   The Court would therefore include technology specialist fees in its calculation of attorneys' fees, subject to the same restrictions placed on other attorneys' fees, i.e., that the technology specialists work pertained to the lawsuit at hand, and the hours were reasonable.

### B.   FEES RELATING TO THE TRADE-SECRET DISPUTE WOULD NOT HAVE BEEN RECOVERABLE.

The attorneys' fees that the Plaintiffs accrued relating to the trade-secret claim would not have been recoverable under § 285.   "[F]ees are only awarded [under § 285] for work on non-patent issues if those issues are so intertwined with the patent issues that the evidence would be material to both types of issues." F.B. Leopold Co. v. Roberts Filter Mfg. Co., 119 F.3d 15, at 7 (Fed. Cir. 1997).   In dismissing Leviton Manufacturing's trade-secret dispute claim, see May 12, 2012 MOO at 32, the Court already determined that Leviton Manufacturing failed to "demonstrate[] that there is a common nucleus of operate fact between the patent dispute . . . and the trade-secret dispute," May 12, 2012 MOO at 26.   The Court added that, "[w]hile there may be an overarching dispute involving GPG's efforts to sell its products in competition with Leviton Manufacturing that relate to the products underlying the patent claims," Leviton Manufacturing failed to make that argument.   May 12, 2012 MOO at 26.   Here, the Plaintiffs appear to concede the issue as well, as their briefs make no mention of the trade-secret dispute. See Plaintiffs' Reply ECB passim.   Accordingly, the Court would not have awarded the Plaintiffs

---

[16]Most law firms have, or contract for, IT people to run their computer systems.   IT people are overhead in firms and should be absorbed into the attorneys' hourly rates.   Technical specialists, however, are more like paralegals, and are often billed separately from attorneys and paralegals.

attorneys' fees accrued for legal work relating to the trade-dispute claim, which Leviton

Manufacturing calculates to be $30,929.00.  See ECB Response at 20.

C.      FEES RELATING TO THE CONVERSATIONS ABOUT THE INTERPRETER WERE NOT EXCESSIVE, BUT FEES FOR THREE ATTORNEYS TO ATTEND DEPOSITIONS OF SINGLE WITNESSES AND FOR AN ATTORNEY TO TRAVEL TO CHINA ARE EXCESSIVE.

Leviton Manufacturing argues that much of the Plaintiffs' hours are excessive.  See ECB

Response at 21.  Specifically, Leviton Manufacturing notes that the Plaintiffs request attorneys'

fees for: (i) "having three attorneys present at single depositions"; (ii) sending "their lead counsel

to travel to China and participate in a press conference"; and (iii) "extensive discussions between

attorneys about selecting an appropriate interpreter."  ECB Response at 21.

Leviton Manufacturing argues that requesting attorneys' fees for three attorneys to attend

depositions of single witnesses is excessive.  See ECB Response at 21.  "Employing multiple

attorneys or firms is per se not unreasonable. 'Indeed, division of responsibility may make it

necessary for more than one attorney to attend activities such as depositions and hearings.'"

PSM Holding Corp. v. Nat'l Farm Fin. Corp., 743 F. Supp. 2d 1136, 1157 (C.D. Cal. 2010)

(quoting Williamsburg Fair Housing Committee v. Ross-Rodney Housing Corp., 599 F. Supp.

509, 518 (S.D.N.Y. 1984)).  As a general matter, however, parties requesting fees must "make a

good faith effort to exclude . . . hours that are excessive, redundant, or otherwise unnecessary."

Hensley, 461 U.S. at 434 (1983).  Moreover, the United States Court of Appeals for the Eleventh

Circuit wrote:

> [A] fee applicant is entitled to recover for the hours of multiple attorneys if he satisfies his burden of showing that the time spent by those attorneys reflects the distinct contribution of each lawyer to the case and is the customary practice of multiple-lawyer litigation.  But the fee applicant has the burden of showing that, and where there is an objection raising the point, it is not a make-believe burden.

<u>Am. Civil Liberties Union of Ga. v. Barnes</u>, 168 F.3d 423, 432 (11th Cir. 1999).  The Plaintiffs' use of three attorneys at three different depositions may have been warranted, but here the Plaintiffs have made no argument for why three attorneys were necessary.  While there may be good reason justifying the presence of three attorneys in a patent case such as this one, the Court should not have to make the argument for the Plaintiffs.  Consequently, the Court would have found only fees for one of the three attorneys to be recoverable.

Leviton Manufacturing also questions the Plaintiffs' fee request for "their lead counsel to travel to China and participate in a press conference."  ECB Response at 21.  Leviton Manufacturing is apparently referring to the $1778.35 in travel expenses for "WFLONG" -- presumably William F. Long, the Plaintiffs' lead counsel -- for "9/11-15-2010 BEIJING, CHINA-ATTEND PRESS CONF. W/ GEN. PROTECHT GROUP, INC."  Time Entries # 1 at 4, filed June 22, 2012 (Doc. 207-1) at 17; <u>see</u> Fort Decl. ¶ 11.  The Court does not see why such a trip should be included within a calculation of reasonable attorneys' fees and indeed the Plaintiffs do not make a case for its inclusion.  It may be that Mr. Long gave advice to his Chinese clients, intended to speak privately with them, or had to discuss legal issues at a press conference, but the Plaintiffs do not make that case.  Consequently, the Court cannot presume to do the work of justifying the expense on behalf of the Plaintiffs.  This request for $1,778.35 is thus excessive and would not have been included in the Court's calculation of reasonable attorneys' fees.

The Court would not find fees for interpreter-related discussion excessive.  For one, the six entries that the Court identified on the pages cited by Leviton Manufacturing do not account for the Plaintiffs discussing the <u>selection</u> of an interpreter; rather, they appear to merely account for communications with the interpreter or logistical discussions regarding the interpreter.  More

importantly, discussions with or about the interpreter are, in each entry that the Court identified, listed among many other topics, and all of these entries are within the range of 1.5 to 3.8 hours. See Time Entries # 3 at 20-22, 24, 27, filed June 22, 2012 (Doc. 207-3).

While it is impossible to know how much time was devoted to translator discussions, it is not a stretch to presume they only took up a modest portion of it,[17] and, indeed, the only entry concerning solely translator issues lasted only twelve minutes.  See Time Entries #3 at 21.  There is little that the Court sees in Leviton Manufacturing's brief, or in its own review of the Plaintiffs' expense reports, suggesting that the time devoted to translator issues was excessive.

### D.   THE PLAINTIFFS WOULD HAVE BEEN ENTITLED TO FEES NOT YET PAID.

The Plaintiffs also argue they are entitled to fees incurred, not just fees they have already paid.  This claim defies easy analysis not only because the Plaintiffs, in their briefs, do not specify which fees, if any, remained unpaid, but because, given the time between the brief and this opinion, whatever that figure used to be, it has presumably changed.  Moreover, the Plaintiffs support this proposition by citing cases that are not perfectly on point.  For instance, the Plaintiffs offer a quote from Automated Business Companies, Inc. v. NEC America, Inc., 202

---

[17]A typical entry, accounting for 2.5 hours on April 7, 2011, reads:

Telephone call with Mr. Chen to obtain more accurate information on the [sic] Mr. Chen and Mr. Sokolo's meeting Mr. Blonder referred to in his deposition, and drafted an email reporting the meeting and what happened in the meeting based on the information provided by Mr. Chen; coordinated travel plan for the check translator; reviewed email communications re privilege issues in response to Mr. Blonder's deposition; and reviewed and discussed Leviton's letter to NM court requesting to speed up a ruling on the security bond.

Time Entries at 21 (emphasis added).

F.3d 1353 (Fed. Cir. 2000), which held that "courts should not be, and have not been, limited to reimbursement of only those amounts actually paid by the injured named party."  202 F.3d at 1356.  This quote has been taken out of context somewhat, as it contemplates a situation in which an entity other than the actual party in the case covers some of the party's attorneys' fees, finding that the actual party is, nonetheless, entitled to all attorneys' fees.  202 F.3d at 1356-57.  Next, the Plaintiffs cite Phillips v. General Services Administration, 924 F.3d 1577 (Fed. Cir. 1991), which held that, under the fee-shifting provision of the Equal Access to Justice Act, 28 U.S.C § 2412 (2011), the prevailing party is entitled to attorneys' fees it has not yet paid and only owed the attorney in the event they prevailed in the case.  924 F.3d at 1538.  While not perfectly analogous, these cases point towards a general proposition that a prevailing party entitled to attorneys' fees is entitled to all attorneys' fees incurred, irrespective of whether it has paid them.  Indeed, many § 285 cases refer to attorneys' fees incurred and not merely paid.  See, e.g., Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc., 687 F.3d 1300, 1310 (Fed. Cir. 2012) ("The purpose of section 285 . . . is remedial and for the purpose of compensating the prevailing party for the costs it incurred in the prosecution or defense of a case . . . ."  (emphasis added)), vacated and remanded sub nom. Highmark Inc. v. Allcare Health Mgmt. Sys., Inc., 134 S. Ct. 1744 (2014).  In any case, Leviton Manufacturing did not see fit to contest this issue, so the Court would have had no qualms issuing an award for attorneys' fees incurred and not just attorneys' fees paid.

### E.   THE COURT WOULD NOT HAVE ADJUSTED THE LODESTAR FIGURE BASED ON THE PLAINTIFFS' SUCCESS LEVEL.

The Court determines the "lodestar" figure by multiplying the hours that a party's attorneys reasonably spent on litigation by a reasonable rate.  Bywaters v. United States, 670 F.3d at 1225-26.  This lodestar figure "provides an objective basis on which to make an initial

estimate of the value" of an attorney's services.  Hensley, 461 U.S. at 433.  The party requesting attorneys' fees must submit evidence to support its representations of time spent and rates sought.  See Hensley, 461 U.S. at 434.  If the evidence is inadequate, the district court may reduce the fee award.  See Hensley, 461 U.S. at 434.  A district court may also make adjustments to the lodestar figure -- up or down -- to reflect a plaintiff's overall success level.  See Bywaters v. United States, 670 F.3d at 1229 (citing Hensley, 461 U.S. at 435-36).  Leviton Manufacturing does not dispute the reasonableness of the Plaintiffs' rates,[18] but notes Leviton Manufacturing was billed "just over a third of what the Plaintiffs were billed" -- 892 hours versus the Plaintiffs' request for over 2,500 hours.  ECB Response at 21-22.  Consequently, Leviton Manufacturing notes that its "total fees were less than half of Plaintiffs' fees . . . [and] [e]ven taking into account that there were multiple plaintiffs represented by two law firms, that fact hardly justifies a $500,000 difference in legal fees and costs."  ECB Response at 21.  Leviton Manufacturing requests that "any fee award, after deducting the impermissible amounts noted above, be further reduced by at least 30% to take into account the excesses . . . ."  ECB Response at 22.

The Court would have accepted the Plaintiffs' rates as reasonable.  Courts commonly consider the "prevailing market rates in the relevant community" to determine a reasonable fee.

---

[18]For Sills Cummis & Gross, one of the Plaintiffs' counsel, the hourly rate for Counsel ranged between $425.00-495.00, Partner at $550.00, Associate between $350.00-$390.00, and Paralegal at $140.00, see Declaration of Mark J. Rosenberg ¶ 11, at 3 (executed June 22, 2012), filed June 22, 2012 (Doc. 206); for Sutherland Asbill & Brennan LLP, Partner rates ranged from $530.00-$590.00, Counsel at $390.00, Associate between $280.00-$390.00, Paralegal between $150.00-$290.00, Litigation Database Analyst between $140.00 and $200.00, and Contract Attorney at $50.00, Fort Decl. ¶ 12, at 4.

Blum v. Stenson, 465 U.S. 886, 895 (1984).[19]   In practice, this consideration often involves a

court evaluating whether the actual billed rates seem reasonable.[20]   See, e.g., Copar Pumice Co.

v. Morris, No. CIV 07-0079 JB/ACT, 2012 WL 2383667, at *21 (D.N.M. June 13, 2012)

(Browning, J.)("Given that the Defendants do not dispute the reasonableness of these rates and

that the Court has found similar rates reasonable for these attorneys, the Court will accept as

---

[19]While Blum concerns attorneys' fees under 42 U.S.C. § 1988, the approach "is applicable to 'all cases' in which attorneys' fees are awarded," including § 285 cases. Codex Corp. v. Milgo Elec. Corp., 541 F. Supp. at 1202 (quoting Furtado v. Bishop, 635 F. 2d 915, 920 (1st Cir. 1980)).

[20]In Blum, the Supreme Court addressed the challenge in determining a reasonable fee:

We recognize, of course, that determining an appropriate "market rate" for the services of a lawyer is inherently difficult.  Market prices of commodities and most services are determined by supply and demand.  In this traditional sense there is no such thing as a prevailing market rate for the service of lawyers in a particular community. The type of services rendered by lawyers, as well as their experience, skill and reputation, varies extensively -- even within a law firm. Accordingly, the hourly rates of lawyers in private practice also vary widely.  The fees charged often are based on the product of hours devoted to the representation multiplied by the lawyer's customary rate. But the fee usually is discussed with the client, may be negotiated, and it is the client who pays whether he wins or loses. . . .  [T]he critical inquiry in determining reasonableness is now generally recognized as the appropriate hourly rate.  And the rates charged in private representations may afford relevant comparisons.

        In seeking some basis for a standard, courts properly have required prevailing attorneys to justify the reasonableness of the requested rate or rates.  To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence -- in addition to the attorney's own affidavits -- that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.  A rate determined in this way is normally deemed to be reasonable, and is referred to -- for convenience -- as the prevailing market rate.

Blum, 465 U.S. at 896 n.11.

reasonable the billing rates . . . that Copar Pumice [used] to calculate its [attorneys'] fees."). It is worth noting that, when a party hires non-local attorneys, a court need not look to the local legal market to determine the reasonableness of fees so long as "it is clear that a reasonable, paying client would have paid those higher [non-local] rates." Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany & Albany Cnty. Bd. of Elections, 522 F.3d 182, 191 (2d Cir. 2008). Given that the case's substance has little to do with New Mexico, and the parties began litigating the issue in a district outside of New Mexico, the Plaintiffs' decision to hire experienced attorneys outside of New Mexico is more than reasonable.

While hiring attorneys primarily in Atlanta, Georgia, may have been reasonable, evaluating the rate's reasonableness in light of the market in which the attorneys work is, however, not without its challenges, as the Court is not personally familiar with typical legal rates in the Atlanta market. The Court nevertheless is comfortable accepting these rates as reasonable, because: (i) the Plaintiffs agreed to these rates; and (ii) Leviton Manufacturing does not urge the Court to question them. See, e.g., Ysasi v. Brown, 2015 WL 403930, at *44 ("[B]ecause the Defendants do not object to Mr. Proctor's rate, and because Mr. Proctor used $267.03 per hour in his requested fee amount, the Court will apply $267.03 per hour in calculating Mr. Proctor's fees."). The Court is compelled to add, however, that the biographic information and work history of the Plaintiffs' attorneys provides, at best, incomplete assistance to determining the reasonableness of their rates. As the Supreme Court noted in Blum,

> [t]o inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence -- in addition to the attorney's own affidavits -- that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.

465 U.S. at 896 n.11.  While the background information the Plaintiffs provided no doubt speaks to the attorneys' accomplishments and accolades, and leaves no doubt they are deserving of ample compensation, the Court has little guidance at how to convert the content of their CVs into reasonable market rates in a city which the Court lacks sufficient familiarity.  Typically, the movant for fees usually submits an affidavit from an attorney in the market who knows the attorneys, knows the movant, and knows rates.  See Sanchez v. Matta, No. CIV 03-0297 JB/LFG, 2005 WL 2313621, at *15 (D.N.M. July 29, 2005)(Browning, J.)(stating that, when determining appropriate hourly rates for fee awards, the Court may consider "affidavits of other attorneys regarding their understanding of the applicable market rates for plaintiffs' counsel based on their personal knowledge of the skill and experience of those lawyers.")  The Plaintiffs did not do this here.  While the Court finds the Plainttiffs' rates reasonable in this case, the Court cautions that a party seeking attorneys' fees incurred by attorneys in a market different from the Court's own district but, for whatever reason, lacks set rates to which the clients agreed -- such as attorneys working on contingency -- may do well to seek additional sources of support to make their case.  There may be statements or reports by research groups or affidavits by other lawyers, but the movant for fees must make some effort to educate the court.

The Plaintiffs' time sheets are sufficiently detailed.  Parties requesting attorneys' fees must submit evidence to support their representations of time spent and rates sought.  See Hensley, 461 U.S. at 434.  If the evidence is inadequate, the district court may reduce the fee award accordingly.  See Hensley, 461 U.S. at 434.  The Plaintiffs have submitted extensive time sheets proving the name, rate, subject, and duration of each discrete instance of work.  While these time sheets employ block billing, listing multiple activities within a discrete timeframe and making it difficult -- if not impossible -- to determine precisely how much time was spent on

each specific activity, these records are nonetheless sufficiently detailed.  See, e.g., United States ex rel. Belt Con Const., Inc. v. Metric Const., Inc., No. CIV 02-1398 JB/LAM, 2007 WL 5685140, at *10 (D.N.M. 2007)(Browning, J.)(finding block billing time sheets adequately detailed to support an award of attorneys' fees).

The Court would not adjust the lodestar amount based solely on the Plaintiffs' degree of success.  A district court may adjust the lodestar figure to reflect a plaintiff's overall success level.  See Bywaters v. United States, 670 F.3d at 1229 (citing Hensley, 461 U.S. at 435-36).  Failure on some claims should not preclude full recovery if the plaintiff achieves success on a significant interrelated claim.  See Hensley, 461 U.S. at 440.

As mentioned above, the Court finds that the Plaintiffs are the "prevailing party" under 35 U.S.C. § 285, because: (i) the Court granted their requested injunction against Leviton Manufacturing, see Nov. 30, 2010 MOO at 2, which the Federal Circuit upheld on appeal, see General Protecht Group, 651 F.3d at 1366; and (ii) Leviton Manufacturing ultimately dismissed its patent infringement counterclaims against the Plaintiffs with prejudice, see May 12, 2012 MOO at 32.  The Plaintiffs did not win on every count, but those counts on which they did not prevail do not support adjusting the lodestar downward.  The Court dismissed the Plaintiffs' requests for declaratory judgment of non-infringement and invalidity of Leviton Manufacturing's '124 and '151 patents, but only at the Plaintiffs' request, pursuant to an agreement with Leviton Manufacturing following the Federal Circuit's ruling; Leviton Manufacturing, in turn, agreed to request that the Court dismiss its infringement counterclaims against the Plaintiffs with prejudice, to which the Court agreed.  See May 12, 2012 MOO at 32.  Consequently, the Court dismissed the Plaintiffs' second claim, for a Declaratory Judgment of Non-Infringement Based on License and/or Estoppel, as moot, as no controversy remained.  See May 12, 2012 MOO

at 33.  The Plaintiffs got everything that they wanted out of this case.  The Court also declined to take up the Plaintiffs' breach-of-contract claim, which was based on state law, as all federal claims had been resolved.  See May 12, 2012 MOO at 55-56.

While courts can adjust the lodestar amount upwards for a party's overall success, see Bywaters v. United States, 670 F.3d at 1229 (citing Hensley, 461 U.S. at 435-36), the Court would have declined to do so in this case.  First, enhancements are to be awarded only in rare or exceptional circumstances, Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 554 (2010), and "the burden of proving that an enhancement is necessary must be borne by the fee applicant," 559 U.S. at 543.  Here, the Plaintiffs merely assert that they "achieved an excellent result from the litigation, defeating Leviton at every stage, despite Leviton's scorched earth tactics."  Plaintiffs' Reply ECB at 7.  While the Plaintiffs unquestionably performed ably during this litigation, the Court does not believe prevailing at every stage is sufficient basis, on its own, for an upward adjustment of the lodestar.

**IT IS ORDERED** that the Plaintiffs' Motion for Finding Exceptional Case Under 35 U.S.C. § 285 and Award of Attorneys' Fees, filed June 22, 2012 (Doc. 202)("Motion"), is denied.

_____
UNITED STATES DISTRICT JUDGE

_Counsel:_

Roger E. Michener
Michener Law Firm, LLC
Placitas, New Mexico

   _Attorney for the Plaintiffs_

- 71 -

William F. Long
Ann G. Fort
Joshua D. Curry
Lei Fang
Sutherland Asbill & Brennan LLP
Atlanta, Georgia

> *Attorneys for Plaintiffs General Protecht Group, Inc., f/k/a Zhejiang, Dongzheng*
> *Electrical Co, SecurElectric Corporation, G-Techt Global Corporation, and*
> *Warehouse-Lighting.com LLC*

Mark J. Rosenberg
Tarter Krinsky & Drogin LLP
New York, New York

> *Attorney for Plaintiffs Harbor Freight Tools USA, Inc. and Central Purchasing, LLC*

Emil J. Kiehne
Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Albuquerque, New Mexico

--and--

Stefani E. Shanberg
Robin L. Brewer
Wilson Sonsini Goodrich & Rosati, P.C.
Palo Alto, California

--and--

Larry L. Shatzer
Shaun R. Snader
Wilson Sonsini Goodrich & Rosati, P.C.
Washington, D.C.

> Attorneys for Defendant Leviton Manufacturing Co.